# TAB D

#39303256_v1

Filed 13 June 5 P4:39
Chris Daniel - District Clerk
Harris County
ED101J017526770
By: Jerri L. Coble

> ### 2013-33584 / Court: 152

NO. _____

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | OF HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | § § § § § § § | |
| Defendants. | § § | _____ JUDICIAL DISTRICT |

### PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

COME NOW, Plaintiffs WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP and file this Original Petition and Request for Disclosure, and respectfully shows the following:

### I.     DISCOVERY

1.      Pursuant to Tex. R. Civ. P. 190.3, discovery is intended to be conducted under a Level 3 discovery control plan.

### II.     PARTIES

2.      Plaintiff Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans ("LoanStar") is a limited liability company organized under the laws of the State of Georgia.   LoanStar is registered to transact business in the State of Texas.

**APPENDIX 0018**

3.      Plaintiff Integrity Texas Funding, LP ("Integrity") is a limited partnership organized under the laws of the State of South Carolina.  Integrity is registered to transact business in the State of Texas.

4.      LoanStar and Integrity are hereafter referred to collectively as "Plaintiffs."

5.      Defendant TMX Finance Holdings, Inc. ("TMX Finance Holdings") is a corporation organized under the laws of the State of Delaware, whose home office address is 15 Bull Street, Suite 200, Savannah, GA 31401.  Defendant TMX Finance Holdings has engaged in business in the State of Texas, does not maintain a regular place of business in the State of Texas, does not have a registered agent for service of process in the State of Texas, and therefore may be served with process through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.

6.      Defendant TMX Finance, LLC ("TMX Finance") is a limited liability company organized under the laws of the State of Delaware, whose home office address is 15 Bull Street, Suite 200, Savannah, GA 31401.  Defendant TMX Finance has engaged in business in the State of Texas, does not maintain a regular place of business in the State of Texas, does not have a registered agent for service of process in the State of Texas, and therefore may be served with process through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.

7.      Defendant TMX Finance of Texas, Inc. ("TMX Finance Texas") is a corporation organized under the laws of the State of Delaware.  TMX Finance Texas is registered to transact business in the State of Texas and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

8.      Defendant TitleMax of Texas, Inc. ("TMX Texas") is a corporation organized under the laws of the State of Delaware.  TMX Texas is registered to transact business in the State of

Certified Document Number: 56223691 - Page 2 of 12

Texas and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

9.      Defendant Felix DeLeon, an individual, may be served with process at his usual place of business, TitleMax, 1930 W. William Cannon Road, Austin, Travis County, Texas 78745, or wherever he may be found.

10.     Defendant Ishmael Hernandez, an individual, is believed to be a resident of Harris County, Texas.  Defendant Hernandez may be served with process at his usual place of business, TitleMax, 5248 Aldine Mail Route Rd., Houston, Harris County, TX 77039, or wherever he may be found.

11.     Defendants TMX Finance Holdings, TMX Finance, TMX Finance of Texas, TMX Texas, Felix DeLeon and Ishmael Hernandez are jointly and severally liable for Plaintiffs' claims and are collectively referred to as "Defendants" or "TitleMax."

### III.     JURISDICTION

12.     The court has jurisdiction over the lawsuit because the amount in controversy exceeds this court's minimum jurisdictional requirements.

13.     The court has jurisdiction over defendants, nonresident corporations, because Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas.

### IV.     VENUE

14.     Venue is proper in Harris County under Chapter 15 of the Tex. Civ. Prac. & Rem. Code, including but not limited to §15.002.

3

APPENDIX 0020

## V.   ACTS OF AGENTS

15.   When it is alleged that Defendants did any act, it is meant that Defendants performed or participated in such act or thing, or Defendants' officers, agents or employees performed or participated the act or thing and were authorized to do so by Defendants.

## VI.   FACTS

### A.   PLAINTIFFS' BUSINESS

16.   LoanStar is licensed and operates as a Credit Services Organization ("CSO") under Texas law.

17.   Integrity operates as a consumer lender to provide secured and unsecured loans to customers.

18.   LoanStar brokers loans exclusively with Integrity.  The loans that LoanStar and Integrity specialize in offering are loans secured by customers' motor vehicles.

19.   The major value of a customer's business to Plaintiffs is the retention of that customer, both for refinances and future loans.  Therefore, Plaintiffs invest significant time and resources in developing the existing customer relationship.  Due to these efforts, customers will return to Plaintiffs for future loans and use Plaintiffs to refinance their loans.  It is this customer retention that produces value for Plaintiffs.

20.   To preserve that value, Plaintiffs expend significant effort and money to obtain and retain the business of its customers.  Plaintiffs' customer list is proprietary and confidential, and the information is appropriately protected from any unauthorized access or distribution.

21.   LoanStar shares its proprietary customer list and customer loan information with Integrity under contractual assurances of confidentiality and appropriate treatment.  LoanStar's customers are Integrity's customers.

Certified Document Number: 56223691 - Page 4 of 12

### B.   DEFENDANTS' BUSINESS

22.    Defendants are part of a family of related companies operating under the name "TitleMax." TitleMax is engaged in the business of automobile title lending, and is a competitor of Plaintiffs.

23.    Defendant TMX Texas operates as a CSO under Texas law and is a competitor of Plaintiffs.

24.    Defendant TMX Finance Texas also operates as a CSO under Texas law and is a competitor of Plaintiffs.

25.    Defendant TMX Finance is a parent company which owns all ownership and membership interests of various operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas. Defendant TMX Finance manages, directs, and controls all operations of its operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas.

26.    Defendant TMX Finance Holdings is a parent company which owns all ownership and membership interests in Defendant TMX Finance, and thus indirectly owns Defendants TMX Finance Texas and TMX Texas.

### C.   TEXAS DMV DRIVER INFORMATION DATABASE

27.    The Texas Department of Motor Vehicles ("DMV") maintains a database of records containing drivers' personal information collected in connection with obtaining a driver's license and/or vehicle registration ("DMV Records"). The DMV sells DMV Records to certain entities who are authorized to resell the DMV Records under very limited circumstances (the "Authorized Resellers"). Access to DMV Records is severely restricted to only a few permissible uses because of the sensitive personal identifying nature of the information contained

Certified Document Number: 56223691 - Page 5 of 12

therein.  Violation of the federal and state laws limiting access to DMV Records is a punishable criminal offense.

### D.   CONDUCT OF DEFENDANTS' EMPLOYEES OR AGENTS

28.    Defendants have surreptitiously targeted and collected the license plate numbers of the customers in LoanStar's parking lot, using that information to perform impermissible searches for the customers' personal information in DMV Records.

29.    Defendants have searched and continue to search the DMV Records by lienholder for Plaintiffs' customers, obtaining the customers' personal information, and then using such personal information for impermissible purposes.

30.    Through these acts, Defendants are collecting and compiling the information contained in Plaintiffs' confidential customer lists for Defendants' use in the direct contact and solicitation of Plaintiffs' customers.

31.    Individual Defendants Felix DeLeon and Ishmael Hernandez have actively assisted Defendants in carrying out the illegal and unlawful conduct described herein.[1]

32.    Defendants illegal and unlawful actions have interfered with and hindered Plaintiffs' ability to conduct their businesses and affairs with such customers.  As a result, Plaintiffs have suffered significant actual damages.

### VII.   CAUSES OF ACTION

### A.   COUNT I – MISAPPROPRIATION OF PLAINTIFFS' TRADE SECRET

33.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

34.    Plaintiffs' customer list and related loan information are trade secrets under Texas law.

---

[1] Plaintiffs believe that other individuals may have actively assisted Defendants in carrying out the illegal and unlawful conduct described herein and reserve the right to add additional defendants if appropriate.

6

35.     Defendants have acquired or discovered Plaintiffs' trade secret by improper means. Defendants have performed unlawful and impermissible searches for the drivers' personal information in the DMV Records in order to target Plaintiffs' customers for direct contact and solicitation.  This conduct is continuous and ongoing.

36.     Defendants have used, and continue to use, Plaintiffs' trade secret without authorization from Plaintiffs.  Upon information and belief, Defendants have accessed information from the DMV Records to circumvent the measures Plaintiffs have in place to prevent unauthorized access to Plaintiffs' trade secret.  Defendants then used the unlawfully accessed personal information to solicit Plaintiffs' customers for business.

37.     Defendants' unauthorized use of Plaintiffs' trade secret has harmed Plaintiffs. Defendants were and are in fact using the personal information, including the name, address, date of birth, and driver's license number, to directly contact and solicit Plaintiffs' existing and prospective customers.  Defendants' unlawful efforts have caused Plaintiffs to lose customers to Defendants.

38.     As a direct and proximate result of Defendants' infringing acts, Plaintiffs have suffered damages in the form of the loss of existing and prospective customers, loss of business goodwill, loss of interest payments under the current loan contracts, loss of interest payments under the prospective loan contracts, and loss of associated prospective fees in an amount not less than that which will make Plaintiffs whole and which will be proven at trial.

39.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Plaintiffs' legitimate rights.  Accordingly, Plaintiffs are entitled to recover exemplary damages in an amount to be determined by a jury.

## B.    COUNT II - TORTIOUS INTERFERENCE WITH INTEGRITY'S LOAN CONTRACTS

40.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

41.    Defendants had actual knowledge of the valid Loan Contracts existing between Integrity and its customers.

42.    Despite their actual knowledge of the Loan Contracts, Defendants willfully and intentionally interfered with the customers' performance of the Loan Contracts by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers. Defendants were not parties to the Loan Contracts, had no rights or interests in the Loan Contracts and no legitimate justification or excuse for their interference.

43.    Integrity has been damaged as a direct and proximate result of Defendants' conduct including the loss of existing customers and Loan Contracts, loss of business goodwill, and loss of interest due under the Loan Contracts, in an amount not less than that which will make Integrity whole and which will be proven at trial.

44.    Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Integrity's legitimate rights. Accordingly, Integrity is entitled to recover exemplary damages in an amount to be determined by a jury.

## C.    COUNT III - TORTIOUS INTERFERENCE WITH INTEGRITY'S PROSPECTIVE LOAN CONTRACTS AND BUSINESS RELATIONSHIPS

45.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

Certified Document Number: 56223691 - Page 8 of 12

APPENDIX 0025

46.     Defendants had actual knowledge of the relationship between Integrity and its customers, including the reasonable probability that Integrity would have entered into business relationships with its repeat customers.

47.     Despite Defendants' actual knowledge of the current and prospective relationships between Integrity and its customers, Defendants willfully and intentionally interfered with Integrity's prospective contracts and business relationships by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers.   Defendants had no legitimate right, justification, or excuse to interfere in the relationship between Integrity and its customers, and Defendants' conduct was intentionally calculated to damage Integrity.

48.     Integrity has been damaged as a direct and proximate result of Defendants' conduct including the loss of prospective Loan Contracts, loss of business goodwill, and loss of interest due under the prospective Loan Contracts, in an amount not less than that which will make Integrity whole and which will be proven at trial.

49.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Integrity's legitimate rights.   Accordingly, Integrity is entitled to recover exemplary damages in an amount to be determined by a jury.

### D.     COUNT IV - TORTIOUS INTERFERENCE WITH LOANSTAR'S PROSPECTIVE CSO CONTRACTS AND BUSINESS RELATIONSHIPS

50.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

51.     Defendants had actual knowledge of the relationship between LoanStar and its existing customers, including the reasonable probability that LoanStar would have entered into business relationships with its repeat customers.

52.     Despite Defendants' actual knowledge of the relationship between LoanStar and its customers, Defendants willfully and intentionally interfered with LoanStar's prospective contracts and business relationships by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers.  Defendants had no legitimate right, justification, or excuse to interfere in the relationship between LoanStar and its customers, and Defendants' conduct was intentionally calculated to damage LoanStar.

53.     LoanStar has been damaged as a direct and proximate result of Defendants' conduct including the loss of existing customers, loss of business goodwill, and loss of CSO Fees under the prospective CSO Contracts, in an amount not less than that which will make LoanStar whole and which will be proven at trial.

54.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of LoanStar's legitimate rights.  Accordingly, LoanStar is entitled to recover exemplary damages in an amount to be determined by a jury.

## VIII.   EQUITABLE RELIEF

55.     As may be demonstrated in a separate application for temporary restraining order, temporary injunction, and permanent injunction, Plaintiffs request any and all equitable relief to which they may be entitled.

Certified Document Number: 56223691 - Page 10 of 12

## IX.    JURY DEMAND

56.    Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

## X.    CONDITIONS PRECEDENT

57.    All conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

## XI.    REQUEST FOR DISCLOSURE

58.    Under Tex. R. Civ. Proc. 194, Plaintiffs request that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XII.    PRAYER

WHEREFORE, Plaintiffs respectfully pray that Defendants be cited to appear and answer, and on final trial, that Plaintiffs be awarded a judgment against Defendants, jointly and severally, for the following:

a.    Actual damages;

b.    Exemplary damages;

c.    Prejudgment and postjudgment interest;

d.    Court costs; and

e.    All other relief to which Plaintiffs are entitled.

SUTHERLAND ASBILL & BRENNAN LLP

By:    /s/ Daniel Johnson
       Kent C. Sullivan
       Texas Bar No. 19487300
       Daniel Johnson
       Texas Bar No. 24046165
       Robert A. Lemus
       Texas Bar No. 24052225
       1001 Fannin, Suite 3700
       Houston, Texas 77002
       Telephone:  (713) 470-6100

Certified Document Number: 5622369l - Page 11 of 12

11

Facsimile:  (713) 654-1301
E-mail:  kent.sullivan@sutherland.com
E-mail:  daniel.johnson@sutherland.com
E-mail:  Robert.lemus@sutherland.com

And

WARGO & FRENCH LLP

Joseph D. Wargo
Georgia Bar No. 738764
(*Pro Hac Vice* in Process)
Kenneth W. Stroud
Georgia Bar No. 940329
(*Pro Hac Vice* in Process)
Jessica C. Casey
Georgia Bar No. 626823
(*Pro Hac Vice* in Process)
999 Peachtree Street, N. E., 26th Floor
Atlanta, Georgia 30309
Telephone:  (404) 853-1500
Facsimile:  (404) 853-1501
E-Mail:  jwargo@wargofrench.com
E-Mail:  kstroud@wargofrench.com
E-Mail:  jcasey@wargofrench.com

*Attorneys for Plaintiff*
*Wellshire Financial Services, LLC d/b/a*
*LoanStar Title Loans and*
*Integrity Texas Funding, LP*

Certified Document Number: 56223691 - Page 12 of 12

12



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   February 6, 2017

Certified Document Number:        56223691 Total Pages:  12

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

**APPENDIX 0030**

Filed 13 June 13 P3:46
Chris Daniel - District Clerk
Harris County
FAX15499217

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS | § | |
| and INTEGRITY TEXAS FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; | § | |
| TITLEMAX OF TEXAS, INC.; | § | |
| FELIX DeLEON; | § | |
| and ISHMAEL HERNANDEZ, | § | |
| | § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |

## DEFENDANTS TMX FINANCE OF TEXAS, INC. AND
## TITLEMAX OF TEXAS, INC.'S ORIGINAL ANSWER

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, Defendants TMX Finance of Texas, Inc. and TitleMax of Texas, Inc. ("Defendants"), and file this Original Answer, in support of which they would show as follows:

### GENERAL DENIAL

Subject to all stipulations and admissions that may hereinafter be made, Defendants assert a general denial as authorized by Rule 92 of the Texas Rules of Civil Procedure, hereby denying each and every, all and singular, of the material allegations in Plaintiffs' Original Petition, and demand that Wellshire Financial Services, LLC d/b/a Loanstar Title Loans and Integrity Texas Funding, LP ("Plaintiffs") be required to prove its charges and allegations against Defendants as required by the Constitution and laws of the State of Texas.

1730.00001/524147.v1

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Defendants pray that Plaintiffs take nothing; that these Defendants recover their costs of court; and that they be granted such other and further relief, at law or in equity, to which they may show themselves justly entitled.

Respectfully submitted,

BECK REDDEN LLP

By: _____

David J. Beck
State Bar No. 00000070
Geoff A. Gannaway
State Bar No. 24036617
Bryon A. Rice
State Bar No. 24065970
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Tel: 713-951-3700
Fax: 713-951-3720
Email: dbeck@beckredden.com
ggannaway@beckredden.com
brice@beckredden.com

**ATTORNEYS FOR DEFENDANTS
TMX FINANCE OF TEXAS, INC. AND
TITLEMAX OF TEXAS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing instrument to be served on counsel of record in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 13th day of June, 2013, by email and facsimile:

**SUTHERLAND ASBILL & BRENNAN LLP**
Kent C. Sullivan, Esq.
Daniel Johnson, Esq.
Robert A. Lemus, Esq.
Facsimile: (713) 654-1301
E-mail: kent.sullivan@sutherland.com
E-mail: daniel.johnson@sutherland.com
E-mail: robert.lemus@sutherland.com

**WARGO & FRENCH LLP**
Joseph D. Wargo, Esq.
Kenneth W. Stroud, Esq.
Jessica C. Casey, Esq.
Facsimile: (404) 853-1501
E-Mail: jwargo@wargofrench.com
E-Mail: kstroud@wargofrench.com
E-Mail: jcasey@wargofrench.com

**HALL MAINES LUGRIN, P.C.**
William Maines, Esq.
Reece Rondon, Esq.
Fax: (713) 871-8962
E-Mail: wmaines@hallmaineslugrin.com
E-Mail: rrondon@hallmaineslugrin.com

**SMYSER KAPLAN & VESELKA, LLP**
Christina Bryan, Esq.
Fax: (713-221-2320
E-Mail: cbryan@skv.com

By: _____
Geoff A. Gannaway

1730.00001/524147.v1

4/9/2014 3:27:52 PM
Chris Daniel - District Clerk Harris County
Envelope No. 949860
By: SALENE SMITH

NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS § | |
| and INTEGRITY TEXAS FUNDING, LP, § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | OF HARRIS COUNTY, TEXAS |
| § | |
| TMX FINANCE HOLDINGS, INC.; § | |
| TMX FINANCE, LLC; § | |
| TMX FINANCE OF TEXAS, INC.; § | |
| TITLEMAX OF TEXAS, INC.; § | |
| FELIX DeLEON; § | |
| and ISHMAEL HERNANDEZ, § | |
| § | |
| Defendants. § | 152nd JUDICIAL DISTRICT |

## DEFENDANT TMX FINANCE, LLC'S ORIGINAL ANSWER

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, Defendant TMX Finance, LLC ("TMX Finance"), and files this Original

Answer, in support of which it would show as follows:

### GENERAL DENIAL

Subject to all stipulations and admissions that may hereinafter be made, TMX Finance

asserts a general denial as authorized by Rule 92 of the Texas Rules of Civil Procedure, hereby

denying each and every, all and singular, of the material allegations in Plaintiffs' Original

Petition, and demands that Wellshire Financial Services, LLC d/b/a Loanstar Title Loans and

Integrity Texas Funding, LP ("Plaintiffs") be required to prove their charges and allegations

against TMX Finance as required by the Constitution and laws of the State of Texas.

1730.00001/541663.v1

PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, TMX Finance prays that Plaintiffs take nothing; that TMX Finance recover its costs of court; and that it be granted such other and further relief, at law or in equity, to which it may show itself justly entitled.

Respectfully submitted,

BECK REDDEN LLP

By: 

David J. Beck
State Bar No. 00000070
Geoff A. Gannaway
State Bar No. 24036617
Bryon A. Rice
State Bar No. 24065970
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Tel: 713-951-3700
Fax: 713-951-3720
Email: dbeck@beckredden.com
        ggannaway@beckredden.com
        brice@beckredden.com

Stephen T. LaBriola
Christina M. Baugh
FELLOWS LABRIOLA LLP
Suite 2300, South Tower, Peachtree Center
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
Tel. 404 586-9200
Fax: 404 529-4028
Email: slabriola@fellab.com
        cbaugh@fellab.com

ATTORNEYS FOR DEFENDANTS
TMX FINANCE OF TEXAS, INC.,
TITLEMAX OF TEXAS, INC. AND
TMX FINANCE LLC

APPENDIX 0035

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing instrument to be served on counsel of record in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 9th day of April, 2014, by email and facsimile:

**SUTHERLAND ASBILL & BRENNAN LLP**
Kent C. Sullivan, Esq.
Daniel Johnson, Esq.
Robert A. Lemus, Esq.
Facsimile: (713) 654-1301
E-mail: kent.sullivan@sutherland.com
E-mail: daniel.johnson@sutherland.com
E-mail: robert.lemus@sutherland.com

**WARGO & FRENCH, LLP**
Joseph D. Wargo
Sarah Powers
Christina Goebelsmann
Facsimile: (404) 853-1501
E-Mail: jwargo@wargofrench.com
E-Mail: spowers@wargofrench.com
E-Mail: cgoebelsmann@wargofrench.com

By: _____
        Geoff A. Gannaway

Unofficial Copy Office of Chris Daniel District Clerk

**APPENDIX 0036**

9/30/2014 4:05:34 PM
Chris Daniel - District Clerk Harris County
Envelope No. 1408594
By: SALENE SMITH

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, d/b/a/ MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and d/b/a/ MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP, | § § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § § | OF HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; and TITLEMAX OF TEXAS, INC. | § § § § § | |
| Defendants. | § § § | 152nd JUDICIAL DISTRICT |

**PLAINTIFFS' AMENDED PETITION AND
REQUEST FOR DISCLOSURE**

COME NOW, Plaintiffs WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, d/b/a/ MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and d/b/a/ MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP and file this Amended Petition and Request for Disclosure, and respectfully show the following:

**I.  DISCOVERY**

1.    Pursuant to Tex. R. Civ. P. 190.4, discovery is to be conducted under a Level 3 discovery control plan.

**II.  PARTIES**

2.    Plaintiff Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax ("Wellshire") is a limited liability company

organized under the laws of the State of Georgia.  Wellshire is registered to transact business in the State of Texas.

3.      Plaintiff Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a/ MoneyMax Title Loans ("Meadowwood") is a limited liability company organized under the laws of the State of Georgia.  Meadowwood is registered to transact business in the State of Texas.

4.      Plaintiff Integrity Texas Funding, LP ("Integrity") is a limited partnership organized under the laws of the State of South Carolina.  Integrity is registered to transact business in the State of Texas.

5.      Wellshire, Meadowwood, and Integrity are hereafter referred to collectively as "Plaintiffs."

6.      Defendant TMX Finance Holdings, Inc. ("TMX Finance Holdings") is a corporation organized under the laws of the State of Delaware, whose home office address is 15 Bull Street, Suite 200, Savannah, GA 31401.  Defendant TMX Finance Holdings has engaged in business in the State of Texas, does not maintain a regular place of business in the State of Texas, does not have a registered agent for service of process in the State of Texas, and therefore may be served with process through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.

7.      Defendant TMX Finance, LLC ("TMX Finance") is a limited liability company organized under the laws of the State of Delaware, whose home office address is 15 Bull Street, Suite 200, Savannah, GA 31401.  Defendant TMX Finance has engaged in business in the State of Texas, does not maintain a regular place of business in the State of Texas, does not have a registered agent for service of process in the State of Texas, and therefore may be served with process through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.

2

8.      Defendant TMX Finance of Texas, Inc. ("TMX Finance Texas") is a corporation organized under the laws of the State of Delaware.  TMX Finance Texas is registered to transact business in the State of Texas and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

9.      Defendant TitleMax of Texas, Inc. ("TMX Texas") is a corporation organized under the laws of the State of Delaware.  TMX Texas is registered to transact business in the State of Texas and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

10.     Defendants TMX Finance Holdings, TMX Finance, TMX Finance of Texas, and TMX Texas are jointly and severally liable for Plaintiffs' claims and are collectively referred to as "Defendants" or "TitleMax."

### III.    JURISDICTION

11.     The court has jurisdiction over the lawsuit because the amount in controversy exceeds this court's minimum jurisdictional requirements.

12.     The court has jurisdiction over Defendants, nonresident corporations, because Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas.

### IV.    VENUE

13.     Venue is proper in Harris County under Chapter 15 of the Tex. Civ. Prac. & Rem. Code, including but not limited to §15.002.

3

APPENDIX 0039

## V.   ACTS OF AGENTS

14.    When it is alleged that Defendants did any act, it is meant that Defendants performed or participated in such act or thing, or Defendants' officers, agents, or employees performed or participated the act or thing and were authorized to do so by Defendants.

## VI.   FACTS

### A.   PLAINTIFFS' BUSINESS

15.    Wellshire is licensed and operates as a Credit Services Organization ("CSO") under Texas law.

16.    Meadowwood is licensed and operates as a Credit Services Organization ("CSO") under Texas law.

17.    Integrity operates as a consumer lender to provide secured and unsecured loans to customers.

18.    Wellshire brokers loans exclusively with Integrity. The loans that Wellshire and Integrity specialize in offering are loans secured by customers' motor vehicles.

19.    Meadowwood brokers loans exclusively with Integrity. The loans that Meadowwood and Integrity specialize in offering are loans secured by customers' motor vehicles.

20.    The major value of a customer's business to Plaintiffs is the retention of that customer, both for refinances and future loans. Therefore, Plaintiffs invest significant time and resources in developing the existing customer relationship. Due to these efforts, customers will return to Plaintiffs for future loans and use Plaintiffs to refinance their loans. It is this customer retention that produces value for Plaintiffs.

4

21.    To preserve that value, Plaintiffs expend significant effort and money to obtain and retain the business of its customers.  Plaintiffs' customer list is proprietary and confidential, and the information is appropriately protected from any unauthorized access or distribution.

22.    Wellshire shares its proprietary customer list and customer loan information with Integrity under contractual assurances of confidentiality and appropriate treatment.  Wellshire's customers are Integrity's customers.

23.    Meadowwood shares its proprietary customer list and customer loan information with Integrity under contractual assurances of confidentiality and appropriate treatment. Meadowwood's customers are Integrity's customers.

### B.    DEFENDANTS' BUSINESS

24.    Defendants are part of a family of related companies operating under the name "TitleMax."  TitleMax is engaged in the business of automobile title lending, and is a competitor of Plaintiffs.

25.    Defendant TMX Texas operates as a CSO under Texas law and is a competitor of Plaintiffs.

26.    Defendant TMX Finance Texas also operates as a CSO under Texas law and is a competitor of Plaintiffs.

27.    Defendant TMX Finance is a parent company that owns all ownership and membership interests of various operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas.  Defendant TMX Finance manages, directs, and controls all operations of its operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas.

5

APPENDIX 0041

28.     Defendant TMX Finance Holdings is a parent company which owns all ownership and membership interests in Defendant TMX Finance, and thus indirectly owns Defendants TMX Finance Texas and TMX Texas.

### C.     TEXAS DMV DRIVER INFORMATION DATABASE

29.     The Texas Department of Motor Vehicles ("DMV") maintains a database of records containing drivers' personal information collected in connection with obtaining a driver's license and/or vehicle registration ("DMV Records"). The DMV sells DMV Records to certain entities who are authorized to resell the DMV Records under very limited circumstances (the "Authorized Resellers"). Access to DMV Records is severely restricted to only a few permissible uses because of the sensitive personal identifying nature of the information contained therein. Violation of the federal and state laws limiting access to DMV Records is a punishable criminal offense.

### D.     CONDUCT OF DEFENDANTS' EMPLOYEES OR AGENTS

30.     Defendants have surreptitiously targeted and collected the license plate numbers of the customers in Wellshire's parking lots, using that information to perform impermissible searches for the customers' personal information in DMV Records.

31.     Upon information and belief, Defendants have also surreptitiously targeted and collected the license plate numbers of the customers in Meadowwood's parking lots, using that information to perform impermissible searches for the customers' personal information in DMV Records.

32.     Defendants have searched and continue to search the DMV Records by lienholder for Plaintiffs' customers, obtaining the customers' personal information, and then using such personal information for impermissible purposes.

6

APPENDIX 0042

33.    Through these acts, Defendants are collecting and compiling the information contained in Plaintiffs' confidential customer lists for Defendants' use in the direct contact and solicitation of Plaintiffs' customers.

34.    Defendants illegal and unlawful actions have interfered with and hindered Plaintiffs' ability to conduct their businesses and affairs with such customers.  As a result, Plaintiffs have suffered significant actual damages.

## VII.    CAUSES OF ACTION

### A.    COUNT I – MISAPPROPRIATION OF PLAINTIFFS' TRADE SECRETS

35.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

36.    Plaintiffs' customer list and related loan information are trade secrets under Texas law.

37.    Defendants have acquired or discovered Plaintiffs' trade secrets by improper means. Defendants have performed unlawful and impermissible searches for the drivers' personal information in the DMV Records in order to target Plaintiffs' customers for direct contact and solicitation.  This conduct is continuous and ongoing.

38.    Defendants have used, and continue to use, Plaintiffs' trade secrets without authorization from Plaintiffs.  Upon information and belief, Defendants have accessed information from the DMV Records to circumvent the measures Plaintiffs have in place to prevent unauthorized access to Plaintiffs' trade secrets.  Defendants then used the unlawfully accessed personal information to solicit Plaintiffs' customers for business.

39.    Defendants' unauthorized use of Plaintiffs' trade secrets has harmed Plaintiffs. Defendants were and are in fact using the personal information, including the name, address, date of birth, and driver's license number, to directly contact and solicit Plaintiffs' existing and

7

APPENDIX 0043

prospective customers. Defendants' unlawful efforts have caused Plaintiffs to lose customers to Defendants.

40.     As a direct and proximate result of Defendants' infringing acts, Plaintiffs have suffered damages in the form of the loss of existing and prospective customers, loss of business goodwill, loss of interest payments under the current loan contracts, loss of interest payments under the prospective loan contracts, and loss of associated prospective fees in an amount not less than that which will make Plaintiffs whole and which will be proven at trial.

41.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Plaintiffs' legitimate rights. Accordingly, Plaintiffs are entitled to recover exemplary damages in an amount to be determined by a jury.

### B.     COUNT II - TORTIOUS INTERFERENCE WITH INTEGRITY'S LOAN CONTRACTS

42.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

43.     Defendants had actual knowledge of the valid Loan Contracts existing between Integrity and its customers.

44.     Despite their actual knowledge of the Loan Contracts, Defendants willfully and intentionally interfered with the customers' performance of the Loan Contracts by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records, or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers. Defendants were not parties to the Loan Contracts, had no rights or interests in the Loan Contracts and no legitimate justification or excuse for their interference.

8

APPENDIX 0044

45.     Integrity has been damaged as a direct and proximate result of Defendants' conduct, including the loss of existing customers and Loan Contracts, loss of business goodwill, and loss of interest due under the Loan Contracts, in an amount not less than that which will make Integrity whole and which will be proven at trial.

46.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Integrity's legitimate rights.  Accordingly, Integrity is entitled to recover exemplary damages in an amount to be determined by a jury.

### C.     COUNT III - TORTIOUS INTERFERENCE WITH INTEGRITY'S PROSPECTIVE LOAN CONTRACTS AND BUSINESS RELATIONSHIPS

47.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

48.     Defendants had actual knowledge of the relationship between Integrity and its customers, including the reasonable probability that Integrity would have entered into business relationships with its repeat customers.

49.     Despite Defendants' actual knowledge of the current and prospective relationships between Integrity and its customers, Defendants willfully and intentionally interfered with Integrity's prospective contracts and business relationships by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records, or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers.   Defendants had no legitimate right, justification, or excuse to interfere in the relationship between Integrity and its customers, and Defendants' conduct was intentionally calculated to damage Integrity.

50.     Integrity has been damaged as a direct and proximate result of Defendants' conduct, including the loss of prospective Loan Contracts, loss of business goodwill, and loss of interest

9

due under the prospective Loan Contracts, in an amount not less than that which will make Integrity whole and which will be proven at trial.

51.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Integrity's legitimate rights.  Accordingly, Integrity is entitled to recover exemplary damages in an amount to be determined by a jury.

### D.     COUNT IV - TORTIOUS INTERFERENCE WITH WELLSHIRE'S AND MEADOWWOOD'S PROSPECTIVE CSO CONTRACTS AND BUSINESS RELATIONSHIPS

52.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

53.     Defendants had actual knowledge of the relationship between Wellshire and Meadowwood and their existing customers, respectively, including the reasonable probability that Wellshire and Meadowwood would have entered into business relationships with their respective repeat customers.

54.     Despite Defendants' actual knowledge of the relationship between Wellshire and its customers, and Meadowwood and its customers, Defendants willfully and intentionally interfered with Wellshire's and Meadowwood's, respective, prospective contracts and business relationships by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records, or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers. Defendants had no legitimate right, justification, or excuse to interfere in the relationship between Wellshire and its customers, or between Meadowwood and its customers, and Defendants' conduct was intentionally calculated to damage Wellshire and Meadowwood.

10

55.     Wellshire and Meadowwood have been damaged as a direct and proximate result of Defendants' conduct, including the loss of existing customers, loss of business goodwill, and loss of CSO Fees under the prospective CSO Contracts, in an amount not less than that which will make Wellshire and Meadowwood whole and which will be proven at trial.

56.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Wellshire's and Meadowwood's legitimate rights.  Accordingly, Wellshire and Meadowwood are entitled to recover exemplary damages in an amount to be determined by a jury.

## VIII.   EQUITABLE RELIEF

57.     As may be demonstrated in a separate application for temporary restraining order, temporary injunction, and permanent injunction, Plaintiffs request any and all equitable relief to which they may be entitled.

## IX.    ATTORNEY FEES

58.     Plaintiffs are entitled recover reasonable and necessary attorney fees under Tex. Civ. Prac. & Rem. Code § 134.005(b).

## X.    JURY DEMAND

59.     Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

## XI.    CONDITIONS PRECEDENT

60.     All conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

## XII.    REQUEST FOR DISCLOSURE

61.     Under Tex. R. Civ. Proc. 194, Plaintiffs request that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

11

## XIII.  PRAYER

WHEREFORE, Plaintiffs respectfully pray that Defendants be cited to appear and answer, and on final trial, that Plaintiffs be awarded a judgment against Defendants, jointly and severally, for the following:

a.    Actual damages;

b.    Exemplary damages;

c.    Pre-judgment and post-judgment interest;

d.    Attorney fees;

e.    Court costs; and

f.    All other relief to which Plaintiffs are entitled.

Respectfully submitted,

**SUTHERLAND ASBILL & BRENNAN LLP**

By:    */s/ Daniel Johnson*
        Kent C. Sullivan (SBN 19487300)
        Daniel Johnson (SBN 24046165)
        Robert A. Lemus (SBN 24052225)
        1001 Fannin, Suite 3700
        Houston, Texas 77002
        Telephone:  (713) 470-6100
        Facsimile:  (713) 654-1301
        E-mail:  kent.sullivan@sutherland.com
        E-mail:  daniel.johnson@sutherland.com
        E-mail:  robert.lemus@sutherland.com

**WARGO FRENCH LLP**

By:    */s/ Joseph D. Wargo*
        Joseph D. Wargo (GA No. 738764)
        (Admitted *Pro Hac Vice*)
        Abigail Joy Stecker (CA No. 284534)
        (*Pro Hac Vice* in Process)
        999 Peachtree Street, N. E., 26th Floor
        Atlanta, Georgia 30309
        Telephone:  (404) 853-1500

APPENDIX 0048

Facsimile:  (404) 853-1501
E-mail:  jwargo@wargofrench.com
E-mail:  astecker@wargofrench.com

And

**WARGO FRENCH LLP**

By:  */s/ Sarah F. Powers*
        Sarah F. Powers (CA No. 238184)
        (Admitted *Pro Hac Vice*)
        Christina L. Goebelsmann (CA No. 273379)
        (Admitted *Pro Hac Vice*)
        1888 Century Park East, Suite 1520
        Los Angeles, California 90067
        Telephone: (310) 853-6300
        Facsimile:  (310) 853-6333
        E-Mail:  spowers@wargofrench.com
        E-Mail:  cgoebelsmann@wargofrench.com

*Attorneys for Plaintiffs*
*WELLSHIRE FINANCIAL SERVICES, LLC,*
*d/b/a LOANSTAR TITLE LOANS, d/b/a/*
*MONEYMAX TITLE LOANS, and d/b/a*
*LOANMAX; MEADOWWOOD FINANCIAL*
*SERVICES, LLC, d/b/a LOANSTAR TITLE*
*LOANS, and d/b/a/ MONEYMAX TITLE*
*LOANS;  and INTEGRITY TEXAS FUNDING,*
*LP*

13

Unofficial Copy Office of Chris[...] Clerk

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of Plaintiffs' Amended Petition and Request for Disclosure has been forwarded to all counsel of record in accordance with TEX. R. CIV. P. 21 and 21a on this 30th day of May, 2014.

Geoff Gannaway
Byron Rice
BECK REDDEN LLP
1221 McKinney St., Suite 4500
Houston, Texas 77010.

Stephen LaBriola
Christina Baugh
FELLOWS LABRIOLA LLP
Peachtree Center
Suite 2300, South Tower
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731

*Attorneys for Defendants*
*TMX Finance of Texas, Inc.; and*
*TitleMax of Texas, Inc., TitleMax Finance LLC*

/s/ Daniel Johnson
Daniel Johnson .

14

APPENDIX 0050

6/11/2014 11:30:46 AM
Chris Daniel - District Clerk Harris County
Envelope No. 1507362
By: Rhonda Momon

NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, §<br>d/b/a LOANSTAR TITLE LOANS, d/b/a §<br>MONEYMAX TITLE LOANS, and d/b/a §<br>LOANMAX; MEADOWWOOD FINANCIAL §<br>SERVICES, LLC, d/b/a LOANSTAR TITLE §<br>LOANS, and d/b/a MONEYMAX TITLE §<br>LOANS; and INTEGRITY TEXAS §<br>FUNDING, LP, §<br> §<br>Plaintiffs, §<br> §<br> §<br>v. §<br> §<br> §<br>TMX FINANCE HOLDINGS, INC.; §<br>TMX FINANCE, LLC; §<br>TMX FINANCE OF TEXAS, INC.; and §<br>TITLEMAX OF TEXAS, INC.; §<br> §<br>Defendants. § | IN THE DISTRICT COURT<br><br><br><br><br><br><br><br><br><br>OF HARRIS COUNTY, TEXAS<br><br><br><br><br><br>152ND JUDICIAL DISTRICT |

### DEFENDANTS TMX FINANCE OF TEXAS, INC., TITLEMAX OF TEXAS, INC., AND TMX FINANCE LLC'S FIRST AMENDED ORIGINAL ANSWER AND ORIGINAL COUNTERCLAIM FOR ATTORNEYS' FEES

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, Defendants TMX Finance of Texas, Inc., TitleMax of Texas, Inc., and TMX Finance LLC ("Defendants"), and file this First Amended Original Answer and Original Counterclaim for Attorneys' Fees, in support of which they would show as follows:

### GENERAL DENIAL

Subject to all stipulations and admissions that may hereinafter be made, Defendants assert a general denial as authorized by Rule 92 of the Texas Rules of Civil Procedure, hereby denying each and every, all and singular, of the material allegations in Plaintiffs' Amended Petition, and demand that Plaintiffs be required to prove their charges and allegations against Defendants as required by the Constitution and laws of the State of Texas.

1730.00001/524147.v1

**APPENDIX 0051**

ORIGINAL COUNTERCLAIM FOR ATTORNEYS' FEES

1.    Defendant and Counter-Plaintiff TMX Finance LLC is a limited liability company organized under the laws of the State of Delaware.

2.    Defendant and Counter-Plaintiff TMX Finance of Texas, Inc. is a corporation organized under the laws of the State of Delaware.

3.    Defendant and Counter-Plaintiff TitleMax of Texas, Inc. is a corporation organized under the laws of the State of Delaware.

4.    Plaintiff and Counter-Defendant Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax ("Wellshire") is a limited liability company organized under the laws of the State of Georgia. Wellshire has already appeared in this litigation.

5.    Plaintiff and Counter-Defendant Meadowwood Financial Services, LLC, d/b/a LoneStar Title Loans, and d/b/a MoneyMax Title Loans ("Meadowwood") is a limited company organized under the laws of the State of Georgia. Meadowwood has already appeared in this litigation.

6.    Plaintiff and Counter-Defendant Integrity Texas Funding, LP ("Integrity") is a limited partnership organized under the laws of the State of South Carolina. Integrity has already appeared in this litigation.

7.    The amount in controversy in this lawsuit is within the jurisdictional limits of this Court. Venue of the underlying action establishes venue over this counterclaim. Accordingly, venue in Harris County, Texas is proper under TEX. CIV. PRAC. & REM. CODE §15.062.

8.    Defendants and Counter-Plaintiffs seek recovery of their court costs and reasonable and necessary attorney's fees in defending the claims brought against them in this lawsuit, pursuant

to Tex. Civ. Prac. & Rem. Code §134.005(b).  Section §134.005(b), invoked and relied upon by

Plaintiffs and Counter-Defendants in their Amended Petition, "compel[s] the award of reasonable

and necessary attorney's fees to a party that successfully defends against a claim under this act,

without any prerequisite that the claim be found groundless, frivolous, or brought in bad faith."

*Air Routing Intern. Corp. (Canada) v. Britannia Airways, Ltd.*, 150 S.W.3d 682, 684 (Tex. App.—

Houston [14th Dist.] 2004, no pet.).

     9.     All conditions precedent to this Counterclaim have been performed or have

occurred.

PRAYER FOR RELIEF

     WHEREFORE, PREMISES CONSIDERED, Defendants and Counter-Plaintiffs pray that

Plaintiffs and Counter-Defendants take nothing; that these Defendants and Counter-Plaintiffs

recover their costs of court and reasonable and necessary attorney's fees; and that they be granted

such other and further relief, at law or in equity, to which they may show themselves justly

entitled.

     Respectfully submitted,

     BECK  REDDEN LLP

     By:

        David J. Beck
        State Bar No. 00000070
        Geoff A. Gannaway
        State Bar No. 24036617
        Bryon A. Rice
        State Bar No.  24065970
     1221 McKinney Street, Suite 4500
     Houston, Texas  77010
     Tel:  713-951-3700
     Fax:  713-951-3720
     Email:  dbeck@beckredden.com
            ggannaway@beckredden.com
            brice@beckredden.com

Unofficial Copy Office of Chris Daniel District Clerk

Stephen T. LaBriola
Christina M. Baugh
FELLOWS LABRIOLA LLP
Suite 2300, South Tower, Peachtree Center
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
Tel.  404 586-9200
Fax:  404 529-4028
Email:  slabriola@fellab.com
          cbaugh@fellab.com

**ATTORNEYS FOR DEFENDANTS AND COUNTER-PLAINTIFFS TMX FINANCE OF TEXAS, INC., TITLEMAX OF TEXAS, INC. AND TMX FINANCE LLC**

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing instrument to be served on counsel of record in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 11th day of June, 2014, by email:

**SUTHERLAND ASBILL & BRENNAN LLP**
Kent C. Sullivan, Esq.
Daniel Johnson, Esq.
Robert A. Lemus, Esq.
E-mail: kent.sullivan@sutherland.com
E-mail: daniel.johnson@sutherland.com
E-mail: robert.lemus@sutherland.com
E-mail: carla.kelley@sutherland.com

**WARGO & FRENCH LLP**
Joseph D. Wargo, Esq.
Abigail Joy Stecker, Esq.
Sarah Powers, Esq.
Christina Goebelsmann, Esq.
E-Mail: jwargo@wargofrench.com
E-Mail: astecker@wargofrench.com
E-Mail: spowers@wargofrench.com
E-Mail: cgoegelsmann@wargofrench.com
E-Mail: ecastaneda@wargofrench.com

Geoff A. Gannaway

1730.00001/524147.v1

7/2/2014 4:10:40 PM
Chris Daniel - District Clerk Harris County
Envelope No. 1714972
By: KATINA WILLIAMS

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, d/b/a/ MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and d/b/a/ MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP, | § § § § § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs*, | § § § | OF HARRIS COUNTY, TEXAS |
| v. | § § | |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; and TITLEMAX OF TEXAS, INC. | § § § § § | |
| *Defendants*. | § § | 152nd JUDICIAL DISTRICT |

## PLAINTIFFS' SECOND AMENDED PETITION AND REQUEST FOR DISCLOSURE

COME NOW, Plaintiffs WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, d/b/a/ MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and d/b/a/ MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP and file this Amended Petition and Request for Disclosure, and respectfully show the following:

### I.   DISCOVERY

1. Pursuant to Tex. R. Civ. P. 190.4, discovery is to be conducted under a Level 3 discovery control plan.

## II.    PARTIES

2.      Plaintiff Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans ("LoanStar") is a limited liability company organized under the laws of the State of Georgia. LoanStar is registered to transact business in the State of Texas.

3.      Plaintiff Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a/ Moneymax Title Loans ("Meadowwood") is a limited liability company organized under the laws of the State of Georgia. Meadowwood is registered to transact business in the State of Texas.

4.      Plaintiff Integrity Texas Funding, LP ("Integrity") is a limited partnership organized under the laws of the State of South Carolina. Integrity is registered to transact business in the State of Texas.

5.      LoanStar, Meadowwood, and Integrity are hereafter referred to collectively as "Plaintiffs."

6.      Defendant TMX Finance Holdings, Inc. ("TMX Finance Holdings") is a corporation organized under the laws of the State of Delaware, whose home office address is 15 Bull Street, Suite 200, Savannah, GA 31401. Defendant TMX Finance Holdings has engaged in business in the State of Texas, does not maintain a regular place of business in the State of Texas, does not have a registered agent for service of process in the State of Texas, and therefore may be served with process through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.

7.      Defendant TMX Finance, LLC ("TMX Finance") is a limited liability company organized under the laws of the State of Delaware, whose home office address is 15 Bull Street, Suite 200, Savannah, GA 31401. Defendant TMX Finance has engaged in business in the State of Texas, does not maintain a regular place of business in the State of Texas, does not have a

2

registered agent for service of process in the State of Texas, and therefore may be served with process through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.

8.      Defendant TMX Finance of Texas, Inc. ("TMX Finance Texas") is a corporation organized under the laws of the State of Delaware.  TMX Finance Texas is registered to transact business in the State of Texas and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

9.      Defendant TitleMax of Texas, Inc. ("TMX Texas") is a corporation organized under the laws of the State of Delaware.  TMX Texas is registered to transact business in the State of Texas and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

10.      Defendants TMX Finance Holdings, TMX Finance, TMX Finance of Texas, and TMX Texas are jointly and severally liable for Plaintiffs' claims and are collectively referred to as "Defendants" or "TitleMax."

### III.      JURISDICTION

11.      The court has jurisdiction over the lawsuit because the amount in controversy exceeds this court's minimum jurisdictional requirements.

12.      The court has jurisdiction over Defendants, nonresident corporations, because Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas.

### IV.      VENUE

13.      Venue is proper in Harris County under Chapter 15 of the Tex. Civ. Prac. & Rem. Code, including but not limited to §15.002.

3

## V.   ACTS OF AGENTS

14.   When it is alleged that Defendants did any act, it is meant that Defendants performed or participated in such act or thing, or Defendants' officers, agents, or employees performed or participated the act or thing and were authorized to do so by Defendants.

## VI.   FACTS

### A.   PLAINTIFFS' BUSINESS

15.   LoanStar is licensed and operates as a Credit Services Organization ("CSO") under Texas law.

16.   Meadowwood is licensed and operates as a Credit Services Organization ("CSO") under Texas law.

17.   Integrity operates as a consumer lender to provide secured and unsecured loans to customers.

18.   LoanStar brokers loans exclusively with Integrity.  The loans that LoanStar and Integrity specialize in offering are loans secured by customers' motor vehicles.

19.   Meadowwood brokers loans exclusively with Integrity.  The loans that Meadowwood and Integrity specialize in offering are loans secured by customers' motor vehicles.

20.   The major value of a customer's business to Plaintiffs is the retention of that customer, both for refinances and future loans.  Therefore, Plaintiffs invest significant time and resources in developing the existing customer relationship.  Due to these efforts, customers will return to Plaintiffs for future loans and use Plaintiffs to refinance their loans.  It is this customer retention that produces value for Plaintiffs.

4

APPENDIX 0058

21.     To preserve that value, Plaintiffs expend significant effort and money to obtain and retain the business of its customers.  Plaintiffs' customer list is proprietary and confidential, and the information is appropriately protected from any unauthorized access or distribution.

22.     LoanStar shares its proprietary customer list and customer loan information with Integrity under contractual assurances of confidentiality and appropriate treatment.  LoanStar's customers are Integrity's customers.

23.     Meadowwood shares its proprietary customer list and customer loan information with Integrity under contractual assurances of confidentiality and appropriate treatment. Meadowwood's customers are Integrity's customers.

### B.     DEFENDANTS' BUSINESS

24.     Defendants are part of a family of related companies operating under the name "TitleMax." TitleMax is engaged in the business of automobile title lending, and is a competitor of Plaintiffs.

25.     Defendant TMX Texas operates as a CSO under Texas law and is a competitor of Plaintiffs.

26.     Defendant TMX Finance Texas also operates as a CSO under Texas law and is a competitor of Plaintiffs.

27.     Defendant TMX Finance is a parent company that owns all ownership and membership interests of various operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas.  Defendant TMX Finance manages, directs, and controls all operations of its operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas.

APPENDIX 0059

28.    Defendant TMX Finance Holdings is a parent company that owns all ownership and membership interests in Defendant TMX Finance, and thus indirectly owns Defendants TMX Finance Texas and TMX Texas.

## C.    TEXAS DMV DRIVER INFORMATION DATABASE

29.    The Texas Department of Motor Vehicles ("DMV") maintains a database of records containing drivers' personal information collected in connection with obtaining a driver's license and/or vehicle registration ("DMV Records"). The DMV sells DMV Records to certain entities with authorization to resell the DMV Records under very limited circumstances (the "Authorized Resellers"). Access to DMV Records is severely restricted to only a few permissible uses because of the sensitive personal identifying nature of the information contained therein. Violation of the federal and state laws limiting access to DMV Records is a punishable criminal offense.

## D.    CONDUCT OF DEFENDANTS' EMPLOYEES OR AGENTS

30.    Defendants have surreptitiously targeted and collected the license plate numbers of the customers in LoanStar's parking lots, using that information to perform impermissible searches for the customers' personal information in DMV Records.

31.    Upon information and belief, Defendants have also surreptitiously targeted and collected the license plate numbers of the customers in Meadowwood's parking lots, using that information to perform impermissible searches for the customers' personal information in DMV Records.

32.    Defendants have searched and continue to search the DMV Records by lienholder for Plaintiffs' customers, obtaining the customers' personal information, and then using such personal information for impermissible purposes.

6

33.     Through these acts, Defendants are collecting and compiling the information contained in Plaintiffs' confidential customer lists for Defendants' use in the direct contact and solicitation of Plaintiffs' customers.

34.     Individual employees of Defendants have actively assisted Defendants in carrying out the illegal and unlawful conduct described herein.[1]

35.     Defendants illegal and unlawful actions have interfered with and hindered Plaintiffs' ability to conduct their businesses and affairs with such customers.  As a result, Plaintiffs have suffered significant actual damages.

## VII.   CAUSES OF ACTION

### A.     COUNT I – MISAPPROPRIATION OF PLAINTIFFS' TRADE SECRETS

36.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

37.     Plaintiffs' customer list and related loan information are trade secrets under Texas law.

38.     Defendants have acquired or discovered Plaintiffs' trade secret by improper means. Defendants have performed unlawful and impermissible searches for the drivers' personal information in the DMV Records in order to target Plaintiffs' customers for direct contact and solicitation.  This conduct is continuous and ongoing.

39.     Defendants have used, and continue to use, Plaintiffs' trade secrets without authorization from Plaintiffs.  Upon information and belief, Defendants have accessed information from the DMV Records to circumvent the measures Plaintiffs have in place to prevent unauthorized access to Plaintiffs' trade secrets.  Defendants then used the unlawfully accessed personal information to solicit Plaintiffs' customers for business.

---

[1] Plaintiffs believe that many individuals may have actively assisted Defendants in carrying out the illegal and unlawful conduct described herein and reserve the right to add additional defendants if appropriate.

7

40.    Defendants' unauthorized use of Plaintiffs' trade secrets has harmed Plaintiffs. Defendants were and are in fact using the personal information, including the name, address, date of birth, and driver's license number, to directly contact and solicit Plaintiffs' existing and prospective customers.  Defendants' unlawful efforts have caused Plaintiffs to lose customers to Defendants.

41.    As a direct and proximate result of Defendants' infringing acts, Plaintiffs have suffered damages in the form of the loss of existing and prospective customers, loss of business goodwill, loss of interest payments under the current loan contracts, loss of interest payments under the prospective loan contracts, and loss of associated prospective fees in an amount not less than that which will make Plaintiffs whole and which will be proven at trial.

42.    Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Plaintiffs' legitimate rights.  Accordingly, Plaintiffs are entitled to recover exemplary damages in an amount to be determined by a jury.

## B.    COUNT II - TORTIOUS INTERFERENCE WITH INTEGRITY'S LOAN CONTRACTS

43.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

44.    Defendants had actual knowledge of the valid Loan Contracts existing between Integrity and its customers.

45.    Despite their actual knowledge of the Loan Contracts, Defendants willfully and intentionally interfered with the customers' performance of the Loan Contracts by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers.  Defendants were not parties to the

8

Loan Contracts, had no rights or interests in the Loan Contracts and no legitimate justification or excuse for their interference.

46.     Integrity has been damaged as a direct and proximate result of Defendants' conduct including the loss of existing customers and Loan Contracts, loss of business goodwill, and loss of interest due under the Loan Contracts, in an amount not less than that which will make Integrity whole and which will be proven at trial.

47.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Integrity's legitimate rights.  Accordingly, Integrity is entitled to recover exemplary damages in an amount to be determined by a jury.

### C.     COUNT III - TORTIOUS INTERFERENCE WITH INTEGRITY'S PROSPECTIVE LOAN CONTRACTS AND BUSINESS RELATIONSHIPS

48.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

49.     Defendants had actual knowledge of the relationship between Integrity and its customers, including the reasonable probability that Integrity would have entered into business relationships with its repeat customers.

50.     Despite Defendants' actual knowledge of the current and prospective relationships between Integrity and its customers, Defendants willfully and intentionally interfered with Integrity's prospective contracts and business relationships by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers.   Defendants had no legitimate right, justification, or excuse to interfere in the relationship between Integrity and its customers, and Defendants' conduct was intentionally calculated to damage Integrity.

9

51.     Integrity has been damaged as a direct and proximate result of Defendants' conduct including the loss of prospective Loan Contracts, loss of business goodwill, and loss of interest due under the prospective Loan Contracts, in an amount not less than that which will make Integrity whole and which will be proven at trial.

52.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Integrity's legitimate rights.  Accordingly, Integrity is entitled to recover exemplary damages in an amount to be determined by a jury.

### D.     COUNT IV - TORTIOUS INTERFERENCE WITH LOANSTAR'S AND MEADOWWOOD'S PROSPECTIVE CSO CONTRACTS AND BUSINESS RELATIONSHIPS

53.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

54.     Defendants had actual knowledge of the relationship between LoanStar and Meadowwood and their existing customers, respectively, including the reasonable probability that LoanStar and Meadowwood would have entered into business relationships with their respective repeat customers.

55.     Despite Defendants' actual knowledge of the relationship between LoanStar and its customers, and Meadowwood and its customers, Defendants willfully and intentionally interfered with LoanStar's and Meadowwood's respective, prospective contracts and business relationships by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers. Defendants had no legitimate right, justification, or excuse to interfere in the relationship

APPENDIX 0064

between LoanStar and its customers, and between Meadowwood and its customers, and Defendants' conduct was intentionally calculated to damage LoanStar and Meadowwood.

56.     LoanStar and Meadowwood have been damaged as a direct and proximate result of Defendants' conduct including the loss of existing customers, loss of business goodwill, and loss of CSO Fees under the prospective CSO Contracts, in an amount not less than that which will make LoanStar and Meadowwood whole and which will be proven at trial.

57.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of LoanStar's and Meadowwood's legitimate rights.  Accordingly, LoanStar and Meadowwood are entitled to recover exemplary damages in an amount to be determined by a jury.

### VIII.   EQUITABLE RELIEF

58.     As may be demonstrated in a separate application for temporary restraining order, temporary injunction, and permanent injunction, Plaintiffs request any and all equitable relief to which they may be entitled.

### IX.   JURY DEMAND

59.     Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

### X.   CONDITIONS PRECEDENT

60.     All conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

### XI.   REQUEST FOR DISCLOSURE

61.     Under Tex. R. Civ. Proc. 194, Plaintiffs request that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

11

## XII.   PRAYER

WHEREFORE, Plaintiffs respectfully pray that Defendants be cited to appear and answer, and on final trial, that Plaintiffs be awarded a judgment against Defendants, jointly and severally, for the following:

a.      Actual damages;

b.      Disgorgement of all profits wrongfully earned by Defendants;

c.      Exemplary damages;

d.      Pre-judgment and post-judgment interest;

e.      Attorney fees;

f.      Court costs; and

g.      All other relief to which Plaintiffs are entitled.

Respectfully submitted,

SUTHERLAND ASBILL & BRENNAN LLP

By: */s/ Daniel Johnson*

Kent C. Sullivan
Texas Bar No. 19487300
kent.sullivan@sutherland.com
Daniel Johnson
Texas Bar No. 24046165
daniel.johnson@sutherland.com
Robert A. Lemus
Texas Bar No. 24052225
robert.lemus@sutherland.com
First City Tower
1001 Fannin, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301

And

APPENDIX 0066

WARGO & FRENCH LLP

Joseph D. Wargo (GA No. 738764)
(Admitted *Pro Hac Vice*)
Sarah F. Powers (CA. No. 238184)
(Admitted *Pro Hac Vice*)
Christina L. Goebelsmann (CA No. 273379)
(Admitted *Pro Hac Vice*)
E-Mail: jwargo@wargofrench.com
E-Mail: spowers@wargofrench.com
E-Mail: cgoebelsmann@wargofrench.com

*Attorneys for Plaintiffs*
*WELLSHIRE FINANCIAL SERVICES, LLC,*
*d/b/a LOANSTAR TITLE LOANS, d/b/a/*
*MONEYMAX TITLE LOANS, and d/b/a*
*LOANMAX; MEADOWWOOD FINANCIAL*
*SERVICES, LLC, d/b/a LOANSTAR TITLE*
*LOANS, and d/b/a/ MONEYMAX TITLE*
*LOANS; and INTEGRITY TEXAS FUNDING,*
*LP*

13

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties with a copy of the within and

foregoing **PLAINTIFFS' SECOND AMENDED PETITION AND REQUEST FOR**

**DISCLOSURE** has been forwarded to all counsel of record in accordance with TEX. R. CIV. P.

21 and 21a on this 2nd day of July, 2014.

David Beck
Geoff Gannaway
Bryon Rice
BECK REDDEN LLP
1221 McKinney St., Suite 4500
Houston, Texas 77010.

Stephen LaBriola
Christina Baugh
FELLOWS LABRIOLA LLP
Peachtree Center
Suite 2300, South Tower
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731

*Attorneys for TitleMax*
*TMX Finance of Texas, Inc. and*
*TitleMax of Texas, Inc.*

DATED:  July 2, 2014

/s/ *Daniel Johnson*
Daniel Johnson

APPENDIX 0068

2/17/2015 3:12:50 PM
Chris Daniel - District Clerk Harris County
Envelope No. 4179716
By: Carla Carrillo
Filed: 2/17/2015 3:12:50 PM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC., ET AL. | § § § | 152nd JUDICIAL DISTRICT |

---

## DEFENDANT/COUNTERPLAINTIFF TITLEMAX OF TEXAS, INC.'S COUNTERCLAIM

---

Defendant/Counterplaintiff TitleMax of Texas, Inc. brings this Counterclaim against Plaintiffs/Counterdefendants Wellshire Financial Services, LLC; Meadowwood Financial Services, LLC; and Integrity Texas Funding, LP (collectively, "Counterdefendants").

### I.
### PARTIES

1.      Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax of Texas") is a Delaware corporation with its principal place of business in Texas. TitleMax of Texas assists Texas customers in obtaining title loans through third-party lenders. TitleMax of Texas was sued by Counterdefendants in this lawsuit.

2.      Plaintiff/Counterdefendant Wellshire Financial Services, LLC ("Wellshire") is a Georgia limited liability company. Wellshire is a competitor of TitleMax of Texas that operates in Texas.

3.      Plaintiff/Counterdefendant Meadowwood Financial Services, LLC ("Meadowwood") is a Georgia limited liability company. Meadowwood is a competitor of TitleMax of Texas that operates in Texas.

4.      Plaintiff/Counterdefendant Integrity Texas Funding, LP ("Integrity") is a South Carolina limited partnership. Integrity is a third-party lender that provides title

loans to customers of Wellshire and Meadowwood.

## II.
## FACTS

5.      TitleMax of Texas is a credit service organization ("CSO"). As a CSO, TitleMax of Texas assists customers in obtaining title loans through third-party lenders. Namely, TitleMax of Texas connects a customer with a lender who will secure that loan with the customer's title to his/her vehicle. In addition to arranging for title loans, TitleMax of Texas will also help a customer refinance a pre-existing loan held with another CSO (such as a title loan held by Counterdefendants). TitleMax of Texas's business depends on entering into initial title loans, refinancing title loans, and entering into additional loan arrangements. Counterdefendants are in the same line of business as TitleMax of Texas and directly or indirectly compete with TitleMax of Texas.

6.      Counterdefendants have engaged in a campaign of corporate espionage against TitleMax of Texas and have interfered with its contracts, customers, and business relations.

7.      For example, Counterdefendants have entered TitleMax of Texas stores posing as potential customers or other third parties and, using recording devices, taken TitleMax of Texas's confidential financial and marketing information. Counterdefendants have taken TitleMax of Texas's confidential business information to attempt to undermine TitleMax of Texas and increase their competitiveness in the marketplace.

8.      Additionally, Counterdefendants have refused to provide Letters of Guarantee to TitleMax, substantially interfering with TitleMax of Texas's current and prospective business relationships. Title loans typically have a maturity of 30 days. At the end of the 30 days, one option a customer has is to pay the entirety of the loan. A customer can pay off the loan using his or her own money, or the customer may enter

APPENDIX 0070

into a new title loan with a different, competing title company such as TitleMax of Texas. If a customer decides to pay off the original loan using funds from a competing title company (a situation called a "buyout"), the original title-loan entity must release the title to the vehicle so that a new secured loan can be arranged. To secure the buyout, the competitor obtains from the original title-loan company either the title to the vehicle or a Letter of Guarantee of title ensuring that title to the vehicle will be released upon full payment of the original title loan. Counterdefendants, however, have refused to provide such Letters of Guarantee to TitleMax of Texas or its customers. Thus, the transaction cannot be completed, the loan cannot be purchased, and TitleMax of Texas loses that customer. Moreover, because customers frequently refinance their title loans, losing that customer likely resulted in not only the loss of the initial contract, but also future contracts (such as refinancing loans or arranging additional loans) with that customer.

### III.
### COUNTERCLAIMS

#### COUNT I—TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

9.      TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

10.      TitleMax of Texas had valid contracts with customers.

11.      Counterdefendants knew of these contracts and willfully and intentionally interfered with them.

12.      Counterdefendants' interferences proximately caused TitleMax of Texas injury.

13.      TitleMax of Texas incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

3

14.     Counterdefendants' actions were malicious or wanton, and therefore TitleMax of Texas specifically requests an award of exemplary damages.

### COUNT II—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

15.     TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

16.     TitleMax of Texas had a reasonable probability that potential customers would have entered into business relationships with TitleMax of Texas.

17.     Counterdefendants either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct.

18.     Counterdefendants' actions were independently tortious and/or unlawful.

19.     Counterdefendants' interferences proximately caused TitleMax of Texas injury.

20.     TitleMax of Texas incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

21.     Counterdefendants' actions were malicious or wanton, and therefore TitleMax of Texas specifically requests an award of exemplary damages.

### COUNT III—CONVERSION

22.     TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

23.     Counterdefendants have wrongly asserted dominion over TitleMax of Texas's property, namely its confidential marketing and financial information, inconsistent with TitleMax of Texas's right of ownership.

4

24.    TitleMax of Texas owns and has the right to possess over its confidential marketing and financial information.

25.    Counterdefendants unlawfully and knowingly came into actual possession of TitleMax of Texas's confidential marketing and financial information.

26.    Counterdefendants' knowingly used TitleMax of Texas's confidential marketing and financial information for their own benefit. The conversion resulted in damages to TitleMax of Texas, including but not limited to loss of prospective customers, loss of business goodwill, and loss of interest payments under prospective contracts.

27.    Counterdefendants' actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

### COUNT IV—THEFT OF PROPERTY

28.    TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

29.    Counterdefendants have committed theft regarding TitleMax of Texas's property, namely its confidential marketing and financial information.

30.    TitleMax of Texas owns and has a possessory right over its confidential marketing and financial information.

31.    Counterdefendants unlawfully and knowingly appropriated TitleMax of Texas's confidential marketing and financial information.

32.    TitleMax of Texas did not consent to Counterdefendants' taking of the property.

33.    Counterdefendants' theft has resulted in damages to TitleMax of Texas

APPENDIX 0073

including but not limited to loss of prospective customers, loss of business goodwill, and loss of interest payments under prospective contracts.

34.     Counterdefendants' actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

### COUNT V—CONSPIRACY

35.     TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

36.     Counterdefendants have engaged in an orchestrated and widespread campaign to acquire confidential financial and marketing information from TitleMax of Texas.

37.     Counterdefendants have entered storefronts belonging to TitleMax of Texas under false pretenses with the express purpose of obtaining TitleMax of Texas's confidential marketing and financial information.

38.     Counterdefendants have used TitleMax of Texas's confidential marketing and financial information to try to gain a competitive advantage over TitleMax of Texas in the marketplace and have caused damage to TitleMax of Texas.

### COUNT VI—DECLARATORY JUDGMENT

39.     TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

40.     A declaratory judgment would resolve a judicial controversy regarding the rights, obligations, and statuses of the parties with respect to buyouts.

41.     TitleMax of Texas seeks a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code declaring that:

6

APPENDIX 0074

a. When a debtor pays off a title loan, the title-loan company must immediately provide either the title to the vehicle or an executed guarantee of title; and

b. When a debtor seeks to pay off a title loan with funds brokered by a competitor title-loan company, the competitor assumes the legal rights of the debtor.

## IV.
## CONDITIONS PRECEDENT

42.    All conditions precedent to TitleMax of Texas's claims for relief have been performed or have occurred.

## V.
## PRAYER

43.    WHEREFORE, TitleMax of Texas prays for the following relief:

a.    actual damages;

b.    exemplary damages;

c.    declaratory judgment;

d.    temporary and permanent injunctive relief;

e.    prejudgment and post-judgment interest;

f.    court costs;

g.    attorneys' fees; and

h.    such other and further relief as the Court deems just and proper.

APPENDIX 0075

Dated: February 17th, 2015

Respectfully submitted,

**GREENBERG TRAURIG, L.L.P.**

By: */s/ L. Bradley Hancock* _____
Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
L. Bradley Hancock
State Bar No. 00798238
hancockl@gtlaw.com
Mary Olga Lovett
State Bar No. 00789289
lovettm@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

COUNSEL FOR DEFENDANTS AND
COUNTERPLAINTIFFS TMX FINANCE
OF TEXAS, INC. AND TITLEMAX OF
TEXAS, INC.

**BECK REDDEN, LLP**

David J. Beck
State Bar No. 00000070
dbeck@beckredden.com
Geoff A. Gannaway
State Bar No. 24036617
ggannaway@beckredden.com
Bryon A. Rice
State Bar No. 24065970
brice@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010
713-951-3700 - Telephone
713-951-3720 - Facsimile

COUNSEL FOR DEFENDANTS AND
COUNTERPLAINTIFFS TMX FINANCE
OF TEXAS, INC.; TITLEMAX OF TEXAS,
INC.; AND TMX FINANCE LLC

8

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 17th day of February, 2015.

*/s/ L. Bradley Hancock*
L. Bradley Hancock

2/25/2015 11:11:49 AM
Chris Daniel - District Clerk Harris County
Envelope No. 4275330
By: KATINA WILLIAMS
Filed: 2/25/2015 11:11:49 AM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL<br>SERVICES, LLC, ET AL. | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS,<br>INC., ET AL. | §<br>§ | 152nd JUDICIAL DISTRICT |

## DEFENDANTS TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; AND TMX FINANCE LLC'S SECOND AMENDED ANSWER AND AFFIRMATIVE DEFENSES

Defendants TMX Finance of Texas, Inc.; TitleMax of Texas, Inc.; and TMX Finance LLC (collectively, "Defendants") submit this Second Amended Answer and Affirmative Defenses to the Second Amended Petition filed by Plaintiffs Wellshire Financial Services, LLC; Meadowwood Financial Services, LLC; and Integrity Texas Funding, LP (collectively, "Plaintiffs").

### I.
### GENERAL DENIAL

In accordance with the rights granted to Defendants by Rule 92 of the Texas Rules of Civil Procedure, Defendants generally deny each and every material allegation contained in Plaintiffs' Second Amended Petition and demand that Plaintiffs be required to prove their charges and allegations against Defendants as required by the Constitution and the laws of the State of Texas.

### II.
### AFFIRMATIVE DEFENSES

1.     Plaintiffs' claims are barred in whole or in part by the affirmative defenses of justification or privilege.

**APPENDIX 0078**

2.      Plaintiffs' damages, if any, were proximately caused in whole or in part by the acts or omissions of negligence or other bad conduct of other parties or third parties over whom Defendants had no control or right of control or that were acting outside the scope of employment.

3.      Defendants acted in good faith and not with willful or reckless disregard of the law.

4.      Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.

5.      Defendants assert the affirmative defenses of res judicata and collateral estoppel.

6.      Plaintiffs' claims are barred at least in part by the applicable statutes of limitation.

7.      Plaintiffs' claims are barred by application of the doctrine of laches.

8.      Plaintiffs' claim for punitive damages should be dismissed to the extent an award of punitive damages would violate the U.S. Constitution or other applicable law.

9.      Plaintiffs' trespass claim is barred in whole or in part by application of the innocent trespasser doctrine.

10.     Plaintiffs' trespass claim is barred in whole or in part by effect of permission or invitation.

11.     Defendants assert any other affirmative defenses to which they are entitled.

2

## III.
## RESERVATION

Defendants expressly reserve the right to amend or supplement this Second Amended Answer and Affirmative Defenses to assert other and further defenses, affirmative defenses, counterclaims, cross-claims, and/or third-party claims as may be warranted.

## IV.
## PRAYER

Defendants pray that: (1) Plaintiffs take nothing by this suit; (2) Defendants recover their attorneys' fees, costs, and expenses incurred in this suit; and (3) Defendants have such other and further relief to which they may be entitled.

Dated: February 25, 2015

Respectfully submitted,

**GREENBERG TRAURIG, L.L.P.**

By: */s/ L. Bradley Hancock*
Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
L. Bradley Hancock
State Bar No. 00798238
hancockl@gtlaw.com
Mary Olga Lovett
State Bar No. 00789289
lovettm@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

COUNSEL FOR DEFENDANTS TMX
FINANCE OF TEXAS, INC. AND
TITLEMAX OF TEXAS, INC.

**BECK REDDEN, LLP**

David J. Beck

3

State Bar No. 00000070
dbeck@beckredden.com
Geoff A. Gannaway
State Bar No. 24036617
ggannaway@beckredden.com
Bryon A. Rice
State Bar No. 24065970
brice@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010
713-951-3700 - Telephone
713-951-3720 - Facsimile

COUNSEL FOR DEFENDANTS TMX
FINANCE OF TEXAS, INC.; TITLEMAX OF
TEXAS, INC.; AND TMX FINANCE LLC

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 25th day of February, 2015.

/s/ L. Bradley Hancock
L. Bradley Hancock

4

3/17/2015 11:22:09 AM
Chris Daniel - District Clerk Harris County
Envelope No. 4526016
By: SALENE SMITH
Filed: 3/17/2015 11:22:09 AM

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS; and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC., | § | |
| | § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |

## PLAINTIFFS/COUNTERDEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO TITLEMAX OF TEXAS, INC.'S COUNTERCLAIM

COME NOW, Plaintiffs/Counterdefendants Wellshire Financial Services, LLC d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans and Integrity Texas Funding, LP (collectively, "LoanStar"), submit this Answer and Affirmative Defenses to the Counterclaim filed by Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax").

### I.    GENERAL DENIAL

LoanStar asserts a general denial as authorized by Rule 92 of the Texas Rules of Civil Procedure, hereby denying each and every, all and singular, of the material allegations in TitleMax's Counterclaim, and demand that TitleMax be required to prove its charges and allegations against LoanStar as required by the Constitution and the laws of the State of Texas.

25701664.2

**APPENDIX 0082**

## II.  AFFIRMATIVE DEFENSES

Without conceding any applicable burden of proof, LoanStar further alleges the following as defenses to all of the Counts, numbered I through IV, set forth in TitleMax's Counterclaim:

### FIRST AFFIRMATIVE DEFENSE

#### (Failure to State a Cause of Action)

The Counterclaim and each and every Count therein fails to state facts sufficient to constitute a cause or causes of action against LoanStar.  Specifically, Counts I through VI fail as a matter of law because one or more of the elements of the causes of action are not supported by the allegations pled by TitleMax, even when those allegations are presumed true.

### SECOND AFFIRMATIVE DEFENSE

#### (Equitable Estoppel)

LoanStar is informed and believes, and based thereon alleges, that by virtue of TitleMax's acts, omissions, carelessness, and negligence, and by virtue of its conduct, TitleMax is equitably estopped from asserting the Counterclaim and each and every Count therein.

### THIRD AFFIRMATIVE DEFENSE

#### (Laches)

LoanStar is informed and believes, and based thereon alleges, that by virtue of TitleMax's acts, omissions, carelessness, and negligence, and by virtue of its conduct, TitleMax has inexcusably and unreasonably delayed the commencement of the action to the prejudice of LoanStar.

APPENDIX 0083

## FOURTH AFFIRMATIVE DEFENSE

### (Comparative/Contributory Negligence)

LoanStar is informed and believes, and based thereon alleges, that if TitleMax has suffered or sustained any loss, damage, or injury at or about the time and place alleged in the Counterclaim, the same was directly and proximately contributed to by the careless, reckless, negligent and/or unlawful conduct of TitleMax and/or its agents.  If TitleMax suffered or sustained any loss, damage, or injury at or about the time and place alleged in the Counterclaim, the total amount of damages to which TitleMax would otherwise be entitled should be reduced in proportion to the amount of negligence attributable to the TitleMax and/or its agents, which negligence directly and proximately contributed to TitleMax's loss or damage herein alleged.

## FIFTH AFFIRMATIVE DEFENSE

### (Acts of Third Persons)

LoanStar is informed and believes, and based thereon alleges, that the injuries and damages, if any, sustained by TitleMax were either in whole or in part caused by persons, firms, corporations, or entities other than LoanStar, and that said acts are either imputed to TitleMax by reason of the relationship of said parties to TitleMax.

## SIXTH AFFIRMATIVE DEFENSE

### (Intervening Causes)

LoanStar is informed and believes, and based thereon alleges, that any such acts by others, as alleged in the preceding Affirmative Defenses, constitute an intervening and superseding cause of the damages TitleMax allegedly suffered.

**APPENDIX 0084**

## SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

LoanStar is informed and believes, and based thereon alleges, that TitleMax should be barred from recovery under any Count in the Counterclaim by reason of TitleMax's failure to act reasonably to mitigate its alleged damages.

## EIGHTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

LoanStar is informed and believes, and based thereon alleges, that TitleMax's claims are barred by the applicable statute of limitations.

## NINTH AFFIRMATIVE DEFENSE

### (Punitive Damages)

LoanStar alleges that the Counterclaim, and each and every Count therein, fails to contain claims sufficient upon which to base a recovery for punitive damages.

## TENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

LoanStar is informed and believes, and thereon alleges, that with respect to the matters and Counts alleged in the Counterclaim, TitleMax does not come into court with clean hands and is precluded from recovering on said Counterclaim by the doctrine of unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Waiver)

LoanStar is informed and believes, and based thereon alleges, that TitleMax has engaged in conduct and activities sufficient to constitute a waiver of any alleged breach of duty, negligence, act, omission or any other conduct, if any, as set forth in the Counterclaim.

**APPENDIX 0085**

## TWELFTH AFFIRMATIVE DEFENSE

### (Justification or Privilege)

LoanStar is informed and believes, and based thereon alleges, that LoanStar's alleged conduct at issue in the Counterclaim was justified or privileged, which bars TitleMax from recovering under any of the Counts in its Counterclaim.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Reasonableness)

LoanStar is informed and believes, and based thereon alleges, that at all times relevant herein, it acted in a commercially reasonable manner and was acting in accordance with reasonable standards and practices applicable to the auto title lending industry.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Conduct Excused)

LoanStar is informed and believes, and based thereon alleges, that LoanStar's alleged conduct at issue in this litigation was excused, which bars TitleMax from recovering under any of the Counts in the Counterclaim.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Consent to Conduct)

LoanStar is informed and believes, and based thereon alleges, that TitleMax and/or its agents consented to the conduct that they attribute to LoanStar.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Good Faith)

LoanStar is informed and believes, and based thereon alleges, that the actions alleged in the Counterclaim as attributable to LoanStar were performed in good faith.

25701664.2

APPENDIX 0086

### III.   RESERVATION

LoanStar expressly reserves the right to amend or supplement this Answer and Affirmative Defenses to TitleMax's Counterclaim to assert other and further defenses, affirmative defenses, counterclaims, cross-claims, and/or third-party claims as may be warranted.

### IV.   EXEMPLARY DAMAGES

If LoanStar is found liable for exemplary damages, those damages must be capped under the Texas Damages Act and the Due Process Clauses of the United States and Texas Constitutions.

### V.   PRAYER

WHEREFORE, LoanStar prays for judgment on TitleMax's Counterclaim as follows:

1. That the Counterclaim, an all of the Counts asserted therein, be dismissed in its entirety with prejudice, and that TitleMax takes nothing by way of the Counterclaim;

2. For an award of costs of suit incurred in defense of the Counterclaim; and

3. For such other relief as the Court may deem proper.

DATED: March 17, 2015

Respectfully submitted,

**SUTHERLAND ASBILL & BRENNAN LLP**

By:  */s/ Daniel Johnson*
     Kent C. Sullivan (SBN 19487300)
     Daniel Johnson (SBN 24046165)
     Robert A. Lemus (SBN 24052225)
     1001 Fannin, Suite 3700
     Houston, Texas 77002
     Telephone:  (713) 470-6100
     Facsimile:  (713) 654-1301
     Email:  kent.sullivan@sutherland.com
     Email:  daniel.johnson@sutherland.com
     Email:  robert.lemus@sutherland.com

6

## CERTIFICATE OF SERVICE

This   is   to   certify   that   a   copy   of   the   within   and   foregoing
**PLAINTIFFS/COUNTERDEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES**
**TO TITLEMAX OF TEXAS, INC.'S COUNTERCLAIM** has been forwarded to all counsel
of record in accordance with the Texas Rules of Civil Procedure on this 17th day of March 2015.

Geoff Gannaway
Bryon Rice
BECK REDDEN LLP
1221 McKinney St., Suite 4500
Houston, Texas 77010.

*Attorneys for*
*TitleMax of Texas, Inc.*

/s/ *Daniel Johnson*
Daniel Johnson

APPENDIX 0088

8/28/2015 4:30:33 PM
Chris Daniel - District Clerk Harris County
Envelope No. 6709333
By: KATINA WILLIAMS
Filed: 8/28/2015 4:30:33 PM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC., ET AL. | § § § | 152nd JUDICIAL DISTRICT |

## DEFENDANT TMX FINANCE HOLDINGS, INC.'S SPECIAL APPEARANCE

Defendant TMX Finance Holdings, Inc. ("TMX Holdings") files this Special Appearance in response to Plaintiffs' petition, and asks that the Court dismiss with prejudice all claims against TMX Holdings for want of personal jurisdiction.

## Introduction

TMX Holdings is a Delaware corporation that was formed merely to facilitate more efficient estate planning and tax reporting for its owners. It has never conducted any consumer business activities anywhere, let alone in Texas, and it has no employees or operating assets. Therefore, Texas courts do not have jurisdiction over TMX Holdings because it lacks *any* contacts with Texas. This Court lacks general and/or specific jurisdiction over TMX Holdings, and subjecting it to this Court's jurisdiction would violate "traditional notions of fair play and substantial justice." Thus, Plaintiffs' causes of action filed against TMX Holdings should be dismissed with prejudice.

## Argument

TMX Holdings is a nonresident corporation formed and organized under the laws of the State of Delaware, and maintains its principal place of business in Georgia. TMX Holdings conducts no business in Texas and sells no services or products in Texas. TMX Holdings attaches an affidavit from Christopher Kelly Wall to establish that it is a nonresident and to establish facts not apparent from the record. *See* Affidavit of Christopher Kelly Wall, attached as **Exhibit A**.

Texas courts do not have jurisdiction over TMX Holdings because it lacks the "minimum contacts" with Texas that the U.S. and Texas Constitutions and other applicable laws require to

justify the exercise of personal jurisdiction over a nonresident. Therefore and pursuant to Texas Rule of Civil Procedure 120a, TMX Holdings specially appears and asks that all claims and causes of action asserted by Plaintiffs against TMX Holdings must be dismissed.

**A. The Law regarding Personal Jurisdiction over a Nonresident Defendant**

Texas courts may exercise jurisdiction over a nonresident only where two conditions are satisfied: (1) "the Texas long-arm statute authorizes the exercise of jurisdiction"; and (2) "the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process." *Baldwin v. Household Int'l, Inc.*, 36 S.W.3d 273, 276 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990)). In essence, the Texas long-arm statute governs Texas courts' exercise of jurisdiction over a nonresident defendant who "does business" in Texas. *See* TEX. CIV. PRAC. & REM. CODE §§ 17.041–45 (examples such as "contracts by mail" or "recruits Texas residents . . . for employment" are examples listed as "do[ing] business"). Plaintiff has the initial burden of pleading sufficient allegations to bring a foreign defendant within the provisions of the Texas long-arm statute. *Id.; see also*, *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). If a plaintiff meets that burden, the defendant must then negate the jurisdictional bases pleaded by the plaintiff. *Id.*

The Texas long-arm statute permits the exercise of jurisdiction to reach as far as due process under the United States Constitution will allow. TEX. CIV. PRAC. & REM. CODE § 17.042; *see also Baldwin*, 36 S.W.3d at 276. Therefore, if a plaintiff pleads sufficient allegations under the Texas long-arm statute, the entire test reduces to whether the jurisdiction alleged by plaintiff is consistent with federal constitutional requirements for due process. *Id.* Consequently, Texas courts "rely on precedent from the United States Supreme Court and other federal courts, as well as [Texas] decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction." *BMC Software*, 83 S.W.3d at 795.

Texas courts do not have jurisdiction over a nonresident defendant unless the nonresident

defendant purposefully established "minimum contacts" with Texas and the court's exercise of jurisdiction over a defendant comports with "fair play and substantial justice." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007); *BMC Software*, 83 S.W.3d at 795 (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).

Texas courts must determine whether the nonresident defendant has purposefully established minimum contacts with Texas. *Moki Mac*, 221 S.W.3d at 575–76; *CSR Ltd. v. Link*, 925 S.W.2d 591, 596 (Tex. 1996). To prove it had no minimum contacts with Texas, the defendant must show (1) that it did not "purposefully avail" itself of the privilege of conducting activities within Texas; and (2) any contacts it may have had with Texas do not give rise to specific or general jurisdiction. *Moki Mac*, 221 S.W.3d at 575–76; *BMC Software*, 83 S.W.3d at 795–96. To establish "purposeful availment," the defendant's acts must be purposeful rather than random, isolated, or fortuitous, and the defendant must have sought some benefit, advantage, or profit in availing itself of Texas jurisdiction. *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 596 (Tex. 2007); *Moki Mac*, 221 S.W.3d at 575.

Specific jurisdiction exists when the defendant's alleged liability arises from, or is related to, an activity conducted within the forum state. *BMC Software*, 83 S.W.3d at 796. In contrast, general jurisdiction allows the court to exercise personal jurisdiction regardless of whether the cause of action arises out of the defendant's activities in Texas. *Id.* General jurisdiction over a corporation is limited to where it is at home, which generally is the state of incorporation and principal place of business. *Daimler*, 134 S. Ct. 760 (rejecting "sprawling view of general jurisdiction").

**B. TMX Holdings Is Not Subject to General Jurisdiction**

Texas courts do not have general jurisdiction over TMX Holdings because it is not at home in Texas. *Id.* It is a Delaware corporation with its principal place of business in Georgia. *See* **Exhibit A** at ¶ 4.

Additionally, TMX Holdings has not had continuous and systematic contacts with Texas

because it:

    a.    has never been incorporated or otherwise formed in Texas;

    b.    has never maintained an office or facility of any kind in Texas;

    c.    has never had any employees, servants, or agents within Texas, other than counsel for this matter;

    d.    has never maintained a mailing address or telephone number in Texas;

    e.    does not have a registered agent for service of process in Texas;

    f.    is not required to pay, and has never paid, franchise or any other taxes in Texas;

    g.    has never maintained a savings and loan association or bank account in Texas;

    h.    has never owned, leased, rented, or controlled any real or personal property in Texas;

    i.    has never been licensed or otherwise authorized to do business in Texas;

    j.    has never had employees or agents in Texas; and

    k.    does not manufacture goods, distribute products, or sell or otherwise provide services in Texas.

*Id*. at ¶ 8. TMX Holdings should not be subject to this Court's general jurisdiction based on unsupported allegations of "random, fortuitous, and attenuated contacts." *BMC Software*, 83 S.W.3d at 795. This Court does not have general jurisdiction over TMX Holdings.

**C. TMX Holdings Is Not Subject to Specific Jurisdiction**

Texas courts cannot exercise specific jurisdiction over a nonresident defendant unless the plaintiff's causes of action result from injuries that are alleged to arise out of or relate to the defendant's contacts with Texas. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010); *Moki*, 221 S.W.3d at 585. A foreign court cannot exercise jurisdiction over a person merely on the basis of random, fortuitous, or attenuated contacts. *BMC Software*, 83 S.W.3d at 796 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S. Ct. 2174, 85 L.Ed.2d 528 (1985)). Rather, the defendant must purposefully avail itself of the privileges and benefits of conducting business in the

forum state. *Id.* Specific jurisdiction only exists when the defendant's alleged liability arises from, or is related to, an activity conducted within the forum state. *Id.* at 796.

In this matter, Plaintiffs vaguely allege that TMX Holdings is subject to jurisdiction because it "is a parent company that owns all ownership and membership interests in Defendant TMX Finance, and thus indirectly owns Defendants TMX Finance Texas and TMX Texas." *See* Plaintiffs' Second Amended Petition at ¶ 28. Plaintiffs lump TMX Holdings with the other named Defendants in this matter. This superficial attempt to establish jurisdiction is simply not sufficient.

Under the Driver's Privacy Protection Act (the "DPPA"), a "person who knowingly obtains, discloses or uses personal information, ***from a motor vehicle record***, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains. . . ." 18 U.S.C.A. § 2724 (emphasis added). Because an essential element of the DPPA claim is that the information was obtained from a driving record, there cannot be specific jurisdiction over TMX Holdings if it ***never*** accessed driving records in Texas. *See Goodyear*, 131 S. Ct. at 2851 (stating that specific jurisdiction exists where the lawsuit arises from the defendant's purposeful contacts with the forum). *Waller Marine, Inc. v. Magie*, 14-14-00181-CV, 2015 WL 1456879, at *6 (Tex. App.—Houston [14th Dist.] Mar. 26, 2015, no. pet. h.).

Not only has TMX Holdings never accessed any driving records in Texas, but it has never accessed driving records anywhere. *See* **Exhibit A** at ¶ 10. This follows at least in part from TMX Holdings' limited purpose, which was merely to facilitate estate planning and tax reporting for its owners. *Id.* at ¶ 5. Hence, there is no basis for specific jurisdiction over TMX Holdings.

## D. Exercising Jurisdiction Does Not Comport with Fair Play and Substantial Justice

Given the absence of both general and specific jurisdiction over TMX Holdings in Texas, this Court need not consider whether the assertion of jurisdiction comports with traditional principles of fair play and substantial justice. *See BMC Software*, 83 S.W.3d at 796 (citing *Burger King*, 417 U.S. at 476). In other words, the Court should not reach the considerations of fair play and

substantial justice because Plaintiffs have not established the requisite minimum contacts between TMX Holdings and Texas. But even if such minimum contacts could be established, fair play and substantial justice would not permit this Court to assert jurisdiction over TMX Holdings. *See Daimler*, 134 S. Ct. 754 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Not only would this Court's assumption of jurisdiction over TMX Holdings offend traditional notions of fair play and substantial justice, but it would also be inconsistent with the constitutional requirements of due process. *Moki*, 221 S.W.3d at 575. In determining whether the exercise of jurisdiction comports with notions of fair play and substantial justice, the Court may consider: (1) the burden on the defendant; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental social policies. *Id.* Each of these factors weighs against the Court's exercise of jurisdiction over TMX Holdings.

There is nothing fair and equitable about haling TMX Holdings—a Delaware corporation with no minimum contacts with Texas—into a Texas court to confront a frivolous lawsuit filed for no other reason than for harassment and corporate warfare.

**E. TMX Holdings Is Not an Alter Ego of the Other Defendants**

TitleMax of Texas, Inc. ("TitleMax of Texas") is the only defendant that provides consumer products or services in Texas**.** TMX Holdings is a separate and distinct entity from TitleMax of Texas and is not its alter ego. *See* Affidavit at ¶ 13. Moreover, TMX Holdings is separate and distinct from the other Defendants. *Id.*

More specifically, "a foreign parent corporation is not subject to the jurisdiction of a forum state simply because its subsidiary is present or doing business there." *Conner v. ContiCarriers and Terminals, Inc.*, 944 S.W.2d 405, 418 (Tex. App.—Houston [14th Cir.] 1997, no writ) (internal citations omitted). The party trying to establish jurisdiction must overcome the presumption of

corporate separateness and show that the parent controls "the internal business operations and affairs of the subsidiary" to a greater degree than "that normally associated with common ownership and directorship." *Id.* at 319; *All Star Enter., Inc. v. Buchanan*, 298 S.W.3d 404, 422-24 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The movant must show that the "parent so controls or dominates the subsidiary as to disregard corporate formalities." *Conner*, 944 S.W.2d at 418. Ownership of 100% of the stock is not sufficient, and common directors and officers are not sufficient. *Id.* Factors such as the following are analyzed: "(1) the amount of stock in one company that is owned by its affiliate; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether one company exercises complete control over the other's general policies or daily activities." *All Star Enter., Inc.*, 298 S.W.3d at 422-24.

In *Conner v. ContiCarriers and Terminals, Inc.*, plaintiff (an engineer on a push boat) was injured in an accident and sued both his employer (i.e. ContiCarriers) and the parent company of his employer (i.e. Continental Grain Inc.). 944 at 418-420.

The court found that the ties between the parent and the subsidiary were ***not sufficient*** to show that the subsidiary was the alter-ego of the parent so as to establish jurisdiction despite the following commonalities:

- the subsidiary received its initial capital from the parent;
- they shared office headquarters in Chicago, Illinois;
- employees have the same benefits and are paid by the same payroll system;
- employees for the parent provided legal, accounting and other services to the subsidiary; and
- approximately 50% of the subsidiary's revenue comes from providing shipping services to the parent. *Id.*

The court found that the parent did not "control" the subsidiary based on the following: each conducted separate operations and entering into separate contracts; each could pay off a judgment; each maintained separate bank accounts; and each filed separate tax returns. *Id.* Moreover, the court noted that the entities maintained separate officers and directors (except for two common officers), did not share joint stockholder or director meetings, and the parent made all operating policy

decisions independently. *Id. See also All Star Enter.*, 298 S.W.3d at 422-24 (reversing the trial court's denial of the special appearance and remanding for dismissal and severance of a defendant when that stock ownership between the corporate entities, common employees, one shared executive, sharing an office, and using the same letterhead, were "legally insufficient" to "fuse" the two companies). *See also, PHC Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 169 (Tex. 2007) (holding that parent did not exercise such control over the subsidiary so as to "fuse" the two when "the evidence cited points to parental involvement—involvement consistent with its investor status—not atypical control . . . What is lacking here is the 'plus' factor, "something beyond the subsidiary's mere presence within the bosom of the corporate family").

TMX Holdings does not exercise sole authority over general policies and does not have direct ownership interest in TitleMax of Texas. *See* **Exhibit A** at ¶ 13. Moreover, TMX Holdings maintains separate accounts from TitleMax of Texas and has separate operations. *Id.* As a result, TMX Holdings cannot possibly be TitleMax of Texas's alter ego for jurisdiction purposes. Similarly, TMX Holdings is not an alter ego of the other Defendants. *Id.*

## Prayer

Plaintiffs have failed to establish either general or specific jurisdiction over TMX Holdings, and exercising jurisdiction over this foreign defendant would offend traditional notions of fair play and substantial justice. Accordingly, TMX Holdings respectfully requests that the Court grant this Special Appearance and dismiss Plaintiffs' claims against TMX Holdings for lack of personal jurisdiction.

Respectfully submitted,

**GREENBERG TRAURIG, L.L.P.**

By: */s/ L. Bradley Hancock*
        Roland Garcia, Jr.
        State Bar No. 07645250
        garciar@gtlaw.com
        L. Bradley Hancock
        State Bar No. 00798238
        hancockl@gtlaw.com
        1000 Louisiana Street
        Suite 1700
        Houston, Texas 77002
        713-374-3500 – Telephone
        713-374-3505 – Facsimile

        COUNSEL FOR DEFENDANT TMX
        FINANCE HOLDINGS, INC.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 28th day of August, 2015.

        */s/ Theresa Wanat*
        Theresa Wanat

# EXHIBIT A

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC., ET AL. | § § | 152nd JUDICIAL DISTRICT |

## AFFIDAVIT OF CHRISTOPHER KELLY WALL

| | |
|---|---|
| STATE OF GEORGIA | § |
| COUNTY OF FULTON | § |

BEFORE ME, the undersigned authority, appeared **Christopher Kelly Wall** known to me to be the person whose name is subscribed hereto and, after being duly sworn by me, stated as follows:

1.  My name is **Christopher Kelly Wall**. I am over the age of 21 years of age and am of sound mind, and am fully competent to give this Affidavit. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

2.  I am the Vice President of TMX Finance Holdings, Inc. ("TMX Holdings"). I have personal knowledge of the facts stated in this Affidavit through my role with TMX Holdings. Each of the statements made below is based upon my personal knowledge.

3.  I submit this Affidavit in support of TMX Holdings's Special Appearance under Texas Rule of Civil Procedure 120a.

4.  TMX Holdings is a corporation formed and organized under the laws of the State of Delaware. TMX Holdings maintains its principal office in Atlanta, Georgia.

5.  TMX Holdings was formed in October 2012 in order to facilitate more efficient estate planning and tax reporting for its owners.

6.  TMX Holdings is a parent holding company for TMX Finance LLC and TitleMax Aviation Inc.

7.  TMX Holdings has no employees, does not issue any paychecks, and does not file income taxes. TMX Holdings does not have any operations. TMX Holdings is not registered to conduct business in any state.

1

8.   TMX Holdings:

    a.  has never been incorporated or otherwise formed in Texas;

    b.  has never maintained an office or facility of any kind in Texas;

    c.  has never had any employees, servants, or agents within Texas, other than counsel for this matter;

    d.  has never maintained a mailing address, or telephone number in Texas;

    e.  does not have a registered agent for service of process in Texas;

    f.  is not required to pay, and has never paid, franchise or any other taxes in Texas;

    g.  has never maintained a savings and loan association or bank account in Texas;

    h.  has never owned, leased, rented, or controlled any real or personal property in Texas;

    i.  has never been involved in any litigation (other than this lawsuit), or any involvement in any tortious or illegal activity in Texas;

    j.  has never been licensed or otherwise authorized to do business in Texas;

    k.  has never had employees or agents in Texas; and

    l.  does not manufacture goods, distribute products, or sell or otherwise provide services in Texas.

9.   TMX Holdings has never advertised or marketed in any state, including but not limited to Texas, and has never entered into a contract with a Texas resident, other than to engage counsel in this matter for the specific purpose of defending itself in this lawsuit.

10.  TMX Holdings has never accessed any driving records of anyone, including but not limited to residents of Texas.

11.  To defend this action would require TMX Holdings's representatives to travel to Texas, to exchange documents and other evidence with other parties and attorneys in Texas, and to attend the trial of this action in Texas.

12.  Because of the distance between TMX Holdings's office and Houston, Texas, it would be inconvenient, burdensome, and financially expensive for TMX Holdings to litigate this case in this Court.

APPENDIX 0100

13.  TMX Holdings is a separate and distinct entity from the other Defendants. It observes corporate formalities; maintains separate corporate accounts and a separate bank account; does not commingle assets; does not share business departments; has its own financial statements; and has separate operations. Further, it does not exercise sole authority over the other Defendants' general policies and daily operations and does not pay their salaries and expenses. Moreover, TMX Holdings does not have a direct ownership interest in Defendant, TitleMax of Texas, Inc.

FURTHER AFFIANT SAYETH NOT.

Christopher Kelly Wall
TMX Finance Holdings, Inc.

Subscribed and sworn to before me this _17th_ day of August, 2015.

Notary Public in and for the
State of Georgia

**Angela A Tripido**
**NOTARY PUBLIC**
**Chatham County, GEORGIA**
**My Comm. Expires February 16, 2019**

3

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL | § | IN THE DISTRICT COURT OF |
| SERVICES, LLC, ET AL. | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| TMX FINANCE HOLDINGS, | § | |
| INC., ET AL. | § | 152nd JUDICIAL DISTRICT |

## ORDER ON DEFENDANT
## TMX FINANCE HOLDINGS, INC.'S SPECIAL APPEARANCE

After considering Defendant TMX Finance Holdings, Inc.'s Special Appearance, the responses and replies thereto, argument of counsel, controlling law, and the affidavits, discovery on file, and oral testimony, the Court

**SUSTAINS** the Special Appearance, dismisses Plaintiff's suit against Defendant TMX Finance Holdings, Inc. with prejudice for refiling in Texas, and orders that Plaintiff take nothing against Defendant TMX Finance Holdings, Inc.

SIGNED on _____, 2015.

_____
PRESIDING JUDGE

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and d/b/a MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP, | § § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | OF HARRIS COUNTY, TEXAS |
| v. | § § | |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; and TITLEMAX OF TEXAS, INC., | § § § § § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |

## LOANSTAR'S RESPONSE IN OPPOSITION TO TMX HOLDINGS' SPECIAL APPEARANCE

COME NOW Plaintiffs Wellshire Financial Services, LLC d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans and Integrity Texas Funding, LP, (collectively, "LoanStar") and hereby file this response in opposition to TMX Finance Holdings, Inc.'s ("TMX Holdings") Special Appearance, and show the Court as follows:

### I.      INTRODUCTION

TMX Holdings is subject to this Court's personal jurisdiction because it is the alter ego of TMX Finance, LLC ("TMX Finance"), which has already consented to jurisdiction. Since TMX Holdings' creation in 2012, TMX Holdings and TMX Finance have acted as a single entity and ignored all corporate formalities. Indeed, the two defendants have exchanged ▮▮▮▮▮▮▮▮ ▮▮▮▮ without any supporting contracts or paperwork, TMX Holdings requires TMX Finance to

perform ████████████████████████████████████████, the two entities share corporate headquarters without any payment of rents, and TMX Holdings owns all membership units in TMX Finance. Further, TMX Holdings has not complied with its corporate obligations under Delaware law, including the appointment directors.

Despite the lack of any meaningful separation between the two entities, TMX Holdings asks this Court to artificially divide TMX Holdings from TMX Finance so that TMX Holdings' assets cannot be used to satisfy a judgment in this litigation. However, TMX Holdings cannot shield TMX Finance's assets simply by pointing to a different legal name. Further, TMX Holdings' admission that it was created to facilitate "more efficient estate planning and tax reporting" for Tracy Young only further evidences that TMX Holdings is under Mr. Young's control. Where, as here, TMX Holdings is the alter ego of TMX Finance, the Court can assert jurisdiction over both entities. Accordingly, the Court can (and should) exercise jurisdiction over TMX Holdings.

## II.     TMX HOLDINGS IS SUBJECT TO PERSONAL JURISDICTION

### A.     The Court Has Personal Jurisdiction over the Alter-Ego of an Entity that Has Consented to Personal Jurisdiction

This Court has personal jurisdiction over the alter-ego of an entity that has already consented to personal jurisdiction. *See, e.g., Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) ("[I]mputing a corporation's consent to personal jurisdiction to its . . . alter ego is consistent with the underlying rationale justifying piercing of the corporate veil.") (citation omitted);[1] *Mejia v. Bureau Veritas Consumer Products Service (India) Private Ltd*, Case No. 1-15-cv-333 RP, 2015 WL 4601201, at *6 n.3 (W.D. Tex. July 29, 2015) (applying

---

[1] *See also Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 745 n.1 (Tex. App.— Corpus Christi 2006, pet. denied) (approving of the Fifth Circuit's decision in *Patin*).

APPENDIX 0104

Texas long-arm statute) ("The waiver by one corporate entity is . . . properly imputed to a separate corporate entity if it is a successor to, or alter ego of, the first corporate entity");; *see also I & JC Corp. v. Helen of Troy L.P.*, 164 S.W.3d 877, 890–91 (Tex. App.—El Paso 2005, pet. denied) ("any minimum contacts of one [alter ego] may be imputed to the other").

In this litigation, TMX Finance consented to personal jurisdiction when it answered LoanStar's petition.[2] (Ex. 1, Defendant TMX Finance Original Answer [April 9, 2014].)  TMX Finance's consent to personal jurisdiction is imputed to its alter ego TMX Holdings, and TMX Holdings therefore is subject to this Court's jurisdiction.

### B.      TMX Holdings and TMX Finance Are Alter Egos

Courts consider the following factors to determine whether two entities are considered alter egos for jurisdictional purposes: (1) the amount of the subsidiary's stock owned by the parent corporation, (2) the degree of control exercised over the subsidiary, (3) the observance of corporate formalities, and (4) the existence of separate headquarters. *See PHC-Minden, LP v. Kimberly Clark Corp.*, 235 S.W.3d 163, 175 (Tex. 2007).  Each of the factors listed above compels the conclusion that TMX Holdings and TMX Finance are alter egos and that the Court can exercise jurisdiction over both entities.

### 1.      TMX Holdings Owns 100% of TMX Finance

TMX Holdings has complete ownership and control over TMX Finance.  Shortly after it was incorporated in July 2012, TMX Holdings acquired a 100% ownership in TMX Finance

---

[2] TMX Finance also has minimum contacts with the forum state sufficient to merit the exercise of specific jurisdiction.  For example, TMX Finance has significant control of the day-to-day operations of TitleMax of Texas, Inc., is closely associated with TitleMax of Texas, Inc., has a regional corporate office and chief operations officer in Texas, and has ongoing involvement with the TitleMax stores making loans in Texas. (*See* Ex. 2, Order finding TMX Finance LLC subject to personal jurisdiction in Texas, *Cantu v. TitleMax, Inc.*, Case No. 5:14-cv-00628-RP-HJB (W.D. Tex. June 17, 2015) (finding specific jurisdiction appropriate) (affirmed by trial court).)

APPENDIX 0105

when it acquired Tracy Young's membership units of TMX Finance.   (*See* Ex. 3, Delaware Certificate of Incorporation [July 26, 2012]; Ex. 4, Delaware Corporate Entity Details; Ex. 5, Excerpts From TMX Finance LLC's 2012 10-K ("TMX Finance 10-K") at 2 ["Effective September 30, 2012, Tracy Young, the former sole member of TMX Finance LLC, transferred 100% of his membership units to newly-formed TMX Finance Holdings Inc."]; Ex. 6, TMX Holdings' Responses to LoanStar's First Set of Interrogatories ("Rog. Resp.") at Nos. 1, 3.[3]) Since that time, TMX Holdings has maintained that full ownership of TMX Finance.

Further, both entities are fully controlled by the same individual, Tracy Young.  Indeed, Mr. Young owns one hundred-percent of TMX Holdings' shares and thereby completely and unilaterally controls both entities.  (*Id.* at Nos. 4–6 [Mr. Young owns all shares].)  Mr. Young also serves as the Chief Executive Officer and President of both TMX Holdings and TMX Finance.  (Ex. 8, TMX Holdings' 2012, 2013, and 2014 Annual Franchise Tax Reports ("Tax Reports") [listing Mr. Young as "President/CEO" and "CEO"]; Ex. 5, TMX Finance 10-K at 3 ["Tracy Young is our . . . Chief Executive Officer, President"].)

Thus, not only does TMX Holding own all of its subsidiary's stock, but Mr. Young has (and exerts[4]) complete control over both TMX Holdings and TMX Finance.  (*See, e.g., id.* ["Mr. Young has the ability to control substantially all matters of significance to the Company"]; Ex. 6, Rog. Resp. at Nos. 4–6.)  Indeed, Mr. Young has shuffled his ownership interest in TMX

---

[3] *See also* Ex. 7, Deposition of Christopher Kelly Wall, Corporate Representative for TMX Holdings [April 30, 2014] ("Corp. Dep.") at 12:14–18.  TMX Holdings' corporate representative deposition, as well as various other exhibits cited herein, were designated attorneys-eyes only and therefore will be produced to the Court for *in camera* review.  References to attorneys-eyes only material will be redacted for the version of this brief filed in the public record.

[4] In an attempt to prevent TitleMax's former general counsel from testifying that Mr. Young was the individual controlling this litigation on behalf of all Defendants, TitleMax asserted a baseless privilege objection.  The Court subsequently overruled that objection and compelled further deposition testimony on that matter.

Finance to TMX Holdings in an attempt to shelter certain TitleMax's assets from creditors and taxes while still retaining complete control over TMX Finance.   This factor accordingly demonstrates that TMX Holdings and TMX Finance are alter egos for jurisdictional purposes.

### 2.   TMX Holdings Controls TMX Finance

Since its formation in 2012, TMX Holdings has fully controlled TMX Finance's very existence. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ (Ex. 9, TMX_007063 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮; Ex. 10, TMX_007064–65 ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮; *see also* Ex. 7, Corp. Dep. at 35:7–23.)   That TMX Holdings made such a significant financial contribution to TMX Finance is strong evidence of control and an alter-ego relationship. *See, e.g.*, *Carson v. Maersk, Ltd.*, 61 F.Supp.2d 607, 611 (S.D. Tex. 1999) (holding company exercised sufficient control over another company to establish alter ego relationship where, among other things, dominating company "financed [other company's] ability to set up for its operations") (applying Texas long-arm statute); *Crithfield v. Boothe*, 343 S.W.3d 274, 286 (Tex. App—Dallas 2011, no pet.) (considering inadequate capitalization); *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 747 F.Supp.2d 794, 824 (S.D. Tex. 2010) (parent's financing of subsidiary indicates improper control) (applying Texas law).

Additionally despite the magnitude of that transaction, TMX Holdings has not produced any contract or paperwork demonstrating that ▮▮▮▮▮▮▮▮▮▮▮▮▮ was an arms-length transaction, despite being so ordered by the Court. (Ex. 11, January 23, 2015 Hearing Transcript

at 48:1–49:9 [ordering TMX Holdings to produce documents evidencing capital contributions].[5])

Similarly, TMX Holdings has failed to produce any paperwork evidencing its ████████████ ████████████—which it admits is non-contractual. (Ex. 7, Corp. Dep. at 28:11–15, 33:19–22.) TMX Holdings and TMX Finance's failure to deal at arm's length and inability to document their financial exchanges demonstrates TMX Holdings' control over TMX Finance and mandates piercing the corporate veil. *See, e.g., Crithfield,* 343 S.W.3d at 285 (failure to keep assets separate evidence of degree of control); *Vanderbilt,* 747 F.Supp. 2d at 824 (whether "alleged dominator deals with the dominated corporation at arms length" is indicative of control and whether alter ego relationship exists) (applying Texas law).



TMX Holdings also ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████.   For example, ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

---

[5] The Court explicitly ordered TMX Holdings to produce "All documents reflecting . . . capital contributions, loans, [and] securities agreements . . . involving both [Holdings] and any other Defendant." (Ex. 12, TMX Holdings' Amended Responses LoanStar's First Set of Requests for Production at No. 9 [improperly labeled No. 6].) In response, TMX Holdings produced only five sheets of paper and no underlying contractual documents or agreements evidencing ██████ ██████ transaction, instead claiming any supporting documents were privileged (while failing to produce a privilege log). (*Id.,* Ex. 13, TMX_007083–87.) TitleMax's failure to produce such documents in response to discovery requests precludes TitleMax from later attempting to produce such information in reply papers supporting their motion. *See Swain v. Sw. Bell Yellow Pages, Inc.,* 998 S.W.2d 731, 733 (Tex. App.—Fort Worth 1999, no pet.) (holding "the proper remedy" in a case where party refuses to respond to discovery requests "is to exclude the evidence that was requested but not produced") (citing *Remington Arms Co., Inc. v. Caldwell,* 850 S.W.2d 167, 170-71 (Tex. 1993)); *see also* Tex. R. Civ. P. 215.2 ("If a party . . . fails to comply with proper discovery requests or to obey an order to provide or permit discovery . . . the court in which the action is pending may [enter] an order . . . prohibiting [the disobedient party] from introducing designated matters in evidence[.]"); *see also* Ex. 15, November 21, 2014 Transcript at 43 ("if evidence is requested and not produced, it doesn't come in").

██████████████.  (*Id.* at 18:22–19:4 [████████████████████], 20:3–9 [█

████████████████████████], 22:2–23:9 [███████████████████████],

60:4–19 [███████████████████████████], 9:2–4 and

62:17–23 [████████████████████], 28:3–5 [████████████████

███████████████████].)

Similarly, TMX Holdings ████████████████████████████

████████████████████████████████████.  (*Id.* 7:6–10 [█████████████

████████████████████████], 9:2–4 and 62:17–23 [███████████

████████████], 21:12:–22:1 [████████████████████████], 59:21–60:3

[████████████████████████████████████████████

█████].)  Each of these facts weighs in favor of finding an alter ego relationship between TMX

Holdings and TMX Finance.  *See I & JC Corp.*, 164 S.W.3d at 890 (failure to pay officers and

the joint handling of financial operations weigh in favor of finding level of control necessary to

establish alter ego relationship).

In sum, from infusing TMX Finance with ████████████████, to failing to

document ███████████████████████ and demanding █████████████

███████████████, the evidence confirms TMX Holdings' dominance over TMX Finance.

Therefore, this factor also confirms that TMX Holdings and TMX Finance must be treated as

alter egos.

### 3.    TMX Holdings Fails to Observe Corporate Formalities

Since its inception, TMX Holdings has failed to satisfy even the most basic formalities

required of a general Delaware corporation and therefore must be considered the same entity as

TMX Finance for jurisdictional purposes.   As a general Delaware corporation, TMX Holdings is

required to have at least one director.  *See* Del. Code Ann. tit. 8, §§ 141(a)-(b) ("The business

and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, [which] shall consist of 1 or more members, each of whom shall be a natural person. . . .").  However, TMX Holdings' public filings—which were sworn to by Mr. Young under penalty of perjury—confirm TMX Holdings has never had directors.[6]  (See Ex. 8, Tax Reports [listing "0" directors].)[7]  TMX Holdings' failure to meet such a basic requirement for corporate existence weighs in favor of disregarding TMX Holdings' status as a Delaware corporation.  See Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 989 (Del. Ch. 1987) ("[w]hen [corporate] formalities are not respected, the legal fiction of corporateness becomes less real").

Further, as discussed above, TMX Holdings has disintegrated its corporate integrity by failing to transact business with TMX Finance at arms-length; instead, TMX Holdings and TMX Finance ███████████████████████████ without any supporting contract or paperwork and TMX Holdings receives ████████████████████████████████████████████████. Accordingly, TMX Holdings fails to observe corporate formalities and this factor further confirms that TMX Holdings is not separate and distinct from TMX Finance.

### 4.    TMX Holdings and TMX Finance Share Headquarters

TMX Holdings and TMX Finance share joint headquarters in Savannah, Georgia and TMX Holdings fails to pay any rent or other compensation to TMX Finance for that use of that

---

[6] Notably, TMX Holdings' corporate representative testified that ██████████████████████— meaning that either Mr. Young committed perjury when signing TMX Holdings' tax returns or the corporate representative committed perjury at his deposition. (See Ex. 7, Corp. Dep. 15:20–25 [████████████████████████].)

[7] Delaware also requires annual meetings for the election of directors, which TMX Holdings also does not conduct as it has no directors.  See Del. Code § 211(b) ("an annual meeting of stockholders shall be held for the election of directors on a date and at a time designated by or in the manner provided in the bylaws"); see also Ex. 7, Corp. Dep. at 16:1–3 (no board meetings).

APPENDIX 0110

space.  (Ex. 8, Tax Reports [listing TMX Holdings' principal place of business]; Ex. 5, TMX Finance 10-K at 1 [listing the same principal executive office], Ex. 6, Rog. Resp. at No. 8 [TMX Holdings does not own or lease the office space].)  Therefore, this fourth and final factor—along with each of the three preceding factors—requires that TMX Holdings and TMX Finance be treated as a single entity for jurisdictional purposes.  LoanStar accordingly requests the Court deny TMX Holdings' Special Appearance.

### C.   The Exercise of Personal Jurisdiction over TMX Holdings Comports with Traditional Notions of Fair Play and Substantial Justice

Each of the five factors that courts traditionally consider when determining whether personal jurisdiction comports with traditional notions of fair play and substantial justice also support this Court exercising jurisdiction over TMX Holdings: "(1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies."[8]  *See Guardian Royal Exchange Assur., Ltd. v. English China Clays, PLC*, 815 S.W.2d 223, 228 (Tex. 1991) (quotation marks and citation omitted).

---

[8] LoanStar addresses this topic out of an abundance of caution, even though courts have found that an alter ego's consent to jurisdiction is the end of the personal jurisdiction inquiry—thus, the consent satisfies traditional notions of fair play and substantial justice. *See American Airlines, Inc. v. Rogerson ATS*, 952 F.Supp. 377, 381 (N.D. Tex. 1996) (When a party consents to personal jurisdiction, "consent alone is sufficient to satisfy the fundamental fairness of the personal jurisdiction analysis."); *see also Patin*, 294 F.3d at 653 ("[I]t is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.") (five citations omitted) (emphasis in original).

9

First, TMX Holdings will not suffer undue burden should it be compelled to (continue to) litigate against LoanStar in Harris County. Indeed, TMX Holdings has no employees who LoanStar may depose, and TMX Holdings' officers (Mr. Young and ███████) are already subject to deposition due to their positions as officers of TMX Finance.[9] LoanStar will additionally travel to Savannah for any potential depositions of TMX Holdings' officers or corporate representative, just as it has in the past to depose other TitleMax employees. Moreover, TMX Holdings and TMX Finance also share the same Texas counsel, Greenberg Traurig LLP, which is already up to date on this case and may adequately and efficiently represent TMX Holdings in this Court (as demonstrated by its advocacy on TMX Holdings' behalf in the special appearance here under consideration).

Second, Texas has an exceedingly strong interest in the subject matter of this lawsuit, which involves the criminal acquisition of DMV records used to identify and solicit Texas citizens in violation of the Texas Motor Vehicle Records Disclosure Act. *See* V.T.C.A. §§ 730.003, *et seq.* (criminal punishment for improper access of DMV records); *see also* federal Driver's Privacy Protection Act, 18 U.S.C. § 2721 (federal law restricting access to DMV records). Third, LoanStar also has a strong interest in resolving the instant case in Texas, the sole state in which it operates and where it has lost substantial profits. This interest is compounded given that LoanStar has spent extensive effort in litigating the instant case in Texas over the past two years.

Fourth, the efficient resolution of this controversy is promoted by adjudication in this Court because each of the other defendants (including TMX Finance) have consented to personal

---

[9] TMX Holdings and TMX Finance also share a corporate representative. (*Compare* Ex. 7, Corp. Dep. at 1 [Christopher Kelly Wall] *with* Ex. 14, January 28, 2015 Email [presenting Mr. Wall as corporate representative].)

APPENDIX 0112

jurisdiction. Litigation against TMX Holdings in a separate jurisdiction would accordingly be duplicative and inefficient. Fifth, the substantive social policies at issue—protecting Texas citizens' personally identifying information—can be more than adequately addressed by this Texas Court. Accordingly, the exercise of personal jurisdiction over TMX Holdings does not offend notions of fair play and substantial justice and TMX Holdings' Special Appearance should be denied.

### III.    CONCLUSION

Because TMX Holdings and TMX Finance are alter egos, and this Court has personal jurisdiction over TMX Finance, TMX Holdings is subject to this Court's personal jurisdiction. LoanStar accordingly requests the Court order TMX Holdings to respond to its petition within ten days, and for other relief the Court deems just.

DATED: September 3, 2015                     Respectfully submitted,

                                            SUTHERLAND ASBILL & BRENNAN LLP

                                            By:   /s/ Daniel Johnson
                                                  Daniel Johnson (SBN 24046165)
                                                  Robert A. Lemus (SBN 24052225)
                                            1001 Fannin, Suite 3700
                                            Houston, Texas 77002
                                            Telephone: (713) 470-6100
                                            Facsimile: (713) 654-1301
                                            E-mail: daniel.johnson@sutherland.com
                                            E-mail: robert.lemus@sutherland.com

                                            And

                                            WARGO FRENCH LLP
                                                  Joseph D. Wargo (GA No. 738764)
                                                  (Admitted Pro Hac Vice)
                                                  John C. Matthews (FL No. 89659)
                                                  (Admitted Pro Hac Vice)
                                                  Abigail Stecker Romero (GA No. 772849)
                                                  (Admitted Pro Hac Vice)
                                            999 Peachtree Street, NE, 26th Floor

APPENDIX 0113

Atlanta, Georgia 30309
Telephone:  (404) 853-1500
Facsimile:  (404) 853-1501
Email: jwargo@wargofrench.com
Email: jmatthews@wargofrench.com
Email: aromero@wargofrench.com

*Attorneys for Wellshire Financial Services,
LLC, d/b/a LoanStar Title Loans, d/b/a
MoneyMax Title Loans, and d/b/a LoanMax;
Meadowwood Financial Services, LLC, d/b/a
LoanStar Title Loans, and d/b/a MoneyMax
Title Loans; and Integrity Texas Funding, LP*

12

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the within and foregoing **LOANSTAR'S RESPONSE IN OPPOSITION TO TMX HOLDINGS' SPECIAL APPEARANCE** has been forwarded to all counsel of record in accordance with Texas Rules of Civil Procedure 21 and 21a on this 3rd day of September 2015.

Geoff Gannaway
Bryon Rice
BECK REDDEN LLP
1221 McKinney St., Suite 4500
Houston, Texas 77010.

Roland Garcia, Jr.
L. Bradley Hancock
Christopher Johnsen
Greenberg Traurig LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002

*Attorneys for TMX Finance Holdings, Inc.*

/s/ Daniel Johnson
Daniel Johnson

13

# EXHIBIT 1

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS | § | |
| and INTEGRITY TEXAS FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; | § | |
| TITLEMAX OF TEXAS, INC.; | § | |
| FELIX DeLEON; | § | |
| and ISHMAEL HERNANDEZ, | § | |
| | § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |

## DEFENDANT TMX FINANCE, LLC'S ORIGINAL ANSWER

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, Defendant TMX Finance, LLC ("TMX Finance"), and files this Original Answer, in support of which it would show as follows:

<u>GENERAL DENIAL</u>

Subject to all stipulations and admissions that may hereinafter be made, TMX Finance asserts a general denial as authorized by Rule 92 of the Texas Rules of Civil Procedure, hereby denying each and every, all and singular, of the material allegations in Plaintiffs' Original Petition, and demands that Wellshire Financial Services, LLC d/b/a Loanstar Title Loans and Integrity Texas Funding, LP ("Plaintiffs") be required to prove their charges and allegations against TMX Finance as required by the Constitution and laws of the State of Texas.

1730.00001/541663.v1

<u>PRAYER FOR RELIEF</u>

WHEREFORE, PREMISES CONSIDERED, TMX Finance prays that Plaintiffs take nothing; that TMX Finance recover its costs of court; and that it be granted such other and further relief, at law or in equity, to which it may show itself justly entitled.

Respectfully submitted,

BECK  REDDEN LLP

By: _____
David J. Beck
State Bar No. 00000070
Geoff A. Gannaway
State Bar No. 24036617
Bryon A. Rice
State Bar No.  24065970
1221 McKinney Street, Suite 4500
Houston, Texas  77010
Tel:  713-951-3700
Fax:  713-951-3720
Email: dbeck@beckredden.com
        ggannaway@beckredden.com
        brice@beckredden.com

Stephen T. LaBriola
Christina M. Baugh
FELLOWS LABRIOLA LLP
Suite 2300, South Tower, Peachtree Center
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
Tel.  404 586-9200
Fax:  404 529-4028
Email:  slabriola@fellab.com
        cbaugh@fellab.com

**ATTORNEYS FOR DEFENDANTS**
**TMX FINANCE OF TEXAS, INC.,**
**TITLEMAX OF TEXAS, INC. AND**
**TMX FINANCE LLC**

1730.00001/541663.v1

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing instrument to be served on counsel of record in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 9th day of April, 2014, by email and facsimile:

**SUTHERLAND ASBILL & BRENNAN LLP**
Kent C. Sullivan, Esq.
Daniel Johnson, Esq.
Robert A. Lemus, Esq.
Facsimile: (713) 654-1301
E-mail: kent.sullivan@sutherland.com
E-mail: daniel.johnson@sutherland.com
E-mail: robert.lemus@sutherland.com

**WARGO & FRENCH, LLP**
Joseph D. Wargo
Sarah Powers
Christina Goebelsmann
Facsimile: (404) 853-1501
E-Mail: jwargo@wargofrench.com
E-Mail: spowers@wargofrench.com
E-Mail: cgoebelsmann@wargofrench.com

By: _____
Geoff A. Gannaway

# EXHIBIT 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GREGORY CANTU and<br>JACQUELINE HOLMES, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | SA-14-CA-628-RP (HJB) |
| | § | |
| TITLEMAX, INC., TITLEMAX | § | |
| HOLDINGS, LLC, TMX FINANCE, | § | |
| LLC, TMX FINANCE HOLDINGS, | § | |
| INC., TITLEMAX OF TEXAS, INC., | § | |
| and TITLEMAX FINANCE CORP., | § | |
| | § | |
| Defendants. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable Robert L. Pitman, United States District Judge:**

This Report and Recommendation concerns two Motions to Dismiss for Lack of Personal

Jurisdiction Under Federal Rule of Civil Procedure 12(b)(2) filed by Defendants TitleMax Finance

Corp. ("TitleMax Finance") and TMX Finance, LLC F/K/A TitleMax Holdings, LLC ("TMX

Finance"). (Docket Entries 6, 7). Dispositive pretrial matters have been referred to the undersigned

for ruling pursuant to Western District of Texas Local Rule CV-72 and Appendix C. (*See* Docket

Entry 31.) For the reasons set out below, I recommend that TitleMax Finance's Motion (Docket

Entry 6) be **GRANTED**, and TMX Finance's Motion (Docket Entry 7) be **DENIED**.

**I.     Jurisdiction.**

Plaintiffs bring a class action complaint under the Driver's Privacy Protection Act ("DPPA),

18 U.S.C. §§ 2721, *et seq.* (Docket Entry 1). This Court has jurisdiction over federal questions

pursuant to 28 U.S.C. § 1331. The undersigned is authorized to issue this report and recommendation by 28 U.S.C. § 636(b).

## II.    Background.

Plaintiffs allege that, beginning in the summer of 2012, Defendants began engaging in a pattern of accessing state motor vehicle records to obtain information about consumers who had previously obtained car title loans from other companies for purposes of marketing its own title loan services to these potential customers. (Docket Entry 1, at 5.) Defendants allegedly used the information to contact Plaintiffs and other putative class members for purposes of soliciting future business. (*Id.*) By obtaining this information for purposes of soliciting new customers, Plaintiffs contend that Defendants violated the DPPA, which limits the permissible uses for obtaining information from state vehicle records. *See* 18 U.S.C. 2721(b). (*Id.*)

Plaintiffs' complaint primarily targets Defendant TitleMax of Texas, Inc. ("TitleMax of Texas"), which they allege does business in the Western District of Texas.[1] Plaintiffs' claim, however, that other TitleMax entities are also liable, including TitleMax Finance and TMX Finance. According to Plaintiffs' complaint, although the TitleMax family of companies may be registered as separate companies, "in reality they all operate together as a single entity under the joint control of Tracy Young, without any separation," through multiple wholly-owned subsidiaries set up in various states (including TitleMax of Texas). (Docket Entry 1, at 2.) Plaintiffs claim that there is no meaningful division or separation between the various entities within the TitleMax family of companies, and that all TitleMax stores, regardless of whether they may be owned by any particular

---

[1] TitleMax of Texas has answered Plaintiffs' complaint, denying liability but admitting that it does business in Texas and declining to challenge this Court's jurisdiction over it. (*See* Docket Entry 8.)

2

subsidiary, are operated pursuant to a company-wide risk management system supported by district and regional managers all under the central leadership of Young, who is the founder, Chairman of the Board, Chief Executive Officer, President and the sole beneficial owner of TMX Finance, "as well as all other TitleMax companies." (*Id.* at 2–3.)

TitleMax Finance and TMX Finance, represented by the same counsel as TitleMax of Texas, have each moved to dismiss the charges against them for lack or personal jurisdiction. *See* FED. R. CIV. P. 12(b)(2) (authorizing such motions). TitleMax Finance asserts that it is a Delaware corporation formed in conjunction with a bond offering, and that it has no employees or operating assets and has never conducted any consumer business activities anywhere, let alone in Texas. (Docket Entry 6, at 2.) TMX Finance alleges that it did not commit any of the acts in Texas giving rise to Plaintiffs' complaint, that its principal place of business is Georgia, and that it lacks the minimum contacts with Texas required to justify the exercise of personal jurisdiction over a nonresident. (Docket Entry 7, at 2.)[2]

Plaintiffs responded to the motion filed by TMX Finance (Docket Entry 50), but not the motion filed by TitleMax Finance. Based on the assertion that TitleMax Finance does not do business anywhere, Plaintiffs do not oppose dismissal of their claims against that entity. (*Id.* at 1 n.1.)

## III.    Applicable Law.

If a party raises the defense of lack of personal jurisdiction, the non-moving party bears the burden of proving personal jurisdiction. *Luv N'care, Ltd. v. Insta–Mix, Inc.*, 438 F.3d 465, 469 (5th

---

[2] Proceedings on the motions to dismiss have been delayed while the parties have engaged in limited discovery regarding the personal jurisdiction issue. This discovery is ongoing, and is addressed by a separate order entered today.

3

Cir. 2006). Although the non-moving party bears the burden, "[w]hen a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . the nonmoving party need only make a *prima facie* showing, and the court must accept as true the nonmover's allegations and resolve all factual disputes in its favor." *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 625 (5th Cir.1999); *see also Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 869 (5th Cir. 2000) (explaining that we "accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts.").

A.   ***Due Process and Personal Jurisdiction.***

Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons. *See* FED. RULE CIV. P. 4(k)(1)(A) (service of process is effective to establish personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"); *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). Additionally, a federal court may only exercise personal jurisdiction over a nonresident defendant if "the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009). In this instance, the state-law and due-process inquiries merge into one, since Texas law permits the exercise of personal jurisdiction to the limits of due process. *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 220 (5th Cir. 2012).

On issues of personal jurisdiction, due process is satisfied if the "nonresident defendant has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 595 (5th Cir. 1999) (brackets in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

4

(1945)).  "The 'minimum contacts' inquiry is fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it 'reasonably anticipates being haled into court.'"  *McFadin*, 587 F.3d at 759 (internal citation omitted).

A district court may assert either general or specific jurisdiction over a party.  *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867–68 (5th Cir. 2001).  General jurisdiction is established where the defendant has "continuous and systematic" contacts with the forum state.  *Choice Healthcare, Inc. v. Kaiser Foundation Health Plan of Colo.*, 615 F.3d 364, 368 (5th Cir. 2010).  For corporations, it will be rare for such jurisdiction to be available in states other than the state of incorporation and the principal place of business.  *Daimler AG*, 134 S. Ct. at 760–61.

Even when the defendant lacks the "continuous and systematic contacts" to support general jurisdiction, specific jurisdiction may still be established if (1) the defendant has "purposefully directed his activities at residents of the forum," and (2) that the plaintiffs' alleged injury "arise[s] out of or relate[s]" to the defendant's contacts with the forum state.  *Clemens v. McNamee*, 615 F.3d 374, 378–79 (5th Cir. 2010) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, . . . physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact" for purposes of specific jurisdiction.  *Walden v. Fiore*,  134 S. Ct. 1115, 1122 (2014).

If a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable.  *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 384 (5th Cir. 2003).

5

"To show that an exercise of jurisdiction is unreasonable once minimum contacts are established, the defendant must make a 'compelling case' against it." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (citing *Burger King Corp.*, 471 U.S. at 477). In determining whether jurisdiction is unfair and unreasonable, a court may consider, when relevant, "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *McFadin*, 587 F.3d at 759–60.

**B.   *Agency and Personal Jurisdiction.***

The Fifth Circuit has recognized that the contacts of an alter ego or agent may be imputed to a parent corporation for purposes of personal jurisdiction. *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983). As the Supreme Court has explained, "[a] corporation is a distinct legal entity that can act only through its agents. . . . As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Daimler AG*, 134 S. Ct. at 759 n.13 (citations omitted).

In considering issues of personal jurisdiction, however, the presumption is in favor of corporate separateness. *Dickson Marine Inc.*, 179 F.3d at 338. Accordingly, "a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there." *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 218 (5th Cir. 2000) (quoting *Hargrave*, 710 F.2d at 1159); *see also Dickson Marine Inc.*, 179 F.3d at 338. In fact, the Fifth Circuit does not even view 100 percent ownership, shared officers and directors, and financing

6

arrangements, by themselves, to be sufficient to establish an alter ego relationship. *Alpine View Co. Ltd.*, 205 F.3d at 218. Instead, the plaintiff must present *prima facie* evidence that the parent corporation so controls the subsidiary that the activities of the subsidiary are attributable to the parent corporation for jurisdictional purposes. *Id.*; *see also Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir. 1999) (stating that subsidiary is alter ego of parent corporation when it is "organized or operated as a mere tool or business conduit"). Such proof requires "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Dickson Marine Inc.*, 179 F.3d at 338 (internal citations omitted). "There must be evidence of one corporation asserting sufficient control to make the other its agent or alter ego." *Id.*

Factors set out by the Fifth Circuit for the consideration of whether a parent corporation is amenable to personal jurisdiction based on the actions of a subsidiary include: (1) whether the parent corporation owns all or a significant portion of the subsidiary's stock; (2) whether the two corporations have separate headquarters; (3) whether they have common officers and directors; (4) whether they observe corporate formalities; (5) whether they maintain separate accounting systems and bank accounts; (6) whether the assets of the corporations are commingled; (7) whether the parent corporation exercises complete authority over general policy or daily operations; (8) whether the two entities share common business departments; (9) whether they have consolidated financial statements and tax returns; (10) whether the parent corporation finances the subsidiary or pays salaries and expenses; (11) whether the subsidiary is undercapitalized; (12) whether the subsidiary has any business other than that from the parent corporation; (13) whether the parent corporation uses the subsidiary's property as the parent's own; and (14) whether daily operations are separate. *Hargrave*, 710 F.2d 1160; *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*, 85 F.3d 201, 208–09 (5th

7

Cir. 1996). The Court's decision must be based on the totality of circumstances. *Gundle Lining Constr. Corp.*, 85 F.3d at 209.

## IV.    Analysis.

In support of its motion to dismiss, TitleMax Finance presents affidavit evidence from its vice-president Christopher Wall. (Docket Entry 7, at 9–10.) Wall's affidavit states, among other things, that TMX Finance is a separate and distinct entity, incorporated in Delaware and having its principal place of business in Georgia; that it observes corporate formalities, has its own employees, and maintains its own books and bank accounts; that it has never engaged in providing any consumer product or service in Texas; that it not licensed or otherwise authorized to do business in Texas; that it has never paid franchise taxes or any other taxes to Texas, or owned any real property there; and that is has no Texas agent for service of process in Texas. (*Id.*) Wall also asserts that "TMX Finance has never had any involvement in any tortious or illegal activity in Texas," and "has never accessed any driving records of Texas residents." (*Id.* at 10.)

In response, Plaintiffs provide a variety of contravening evidence, including, among other things:

   (1)    <u>TMX Finance's Annual Report to the Securities and Exchange Commission</u>. (Docket Entry 50-5.) This report provides contradicting evidence. It states generally that TMX Finance exists "solely as a holding company" (Docket Entry 50-5, at 5); however, it also states that the company[3] operates to provide title loans to customers with limited access to credit, that it "operate[s] under two brands," one of which is

---

[3] Although not controlling, the report uses "TMX Finance," the "Company," "we," "us" "our," and similar terms to "represent TMX Finance and its consolidated affiliates." (*Id.* at 5.)

APPENDIX 0128

TitleMax (*id.* at 6). More pertinent to the issue before the Court, the report states that TMX Finance "conduct[s] business in Texas and certain other states through wholly-owned subsidiaries." (*Id.* at 8.) It notes that it operates in compliance with city ordinances in Austin, Dallas, El Paso and San Antonio, but that its subsidiary TitleMax of Texas is challenging the legality of two of the ordinances. (*Id.* at 11.) TMX Finance also includes all of the title loans its subsidiaries have provided as accounts receivable in a "Consolidating Balance Sheet" (with receivables totaling more than $577 million). (*Id.* at 65.)

(2) Information about Otto Bielss. (Docket Entries 50-6, 50-9.) Bielss is Chief Operating Officer of TMX Finance. (Docket Entry 50-6, at 1.)[4] His "Linked In" webpage lists his business as "retail" in the "Dallas-Ft. Worth Area." (*Id.*) According to an affidavit filed in another case, a former Houston district manager of TitleMax of Texas reported to a regional manager who in turn reported directly to Bielss. (Docket Entry 50-10, at 3.) Bielss reported directly to Tracy Young, CEO of both TitleMax of Texas and TMX Finance. (*Id.*; *see also* Docket Entry 50-7, at 2.) Another affidavit, from a former Dallas area regional manager of TitleMax of Texas, stated that the regional managers reported to Bielss, and that Bielss and other corporate operations employees participated in monthly conference calls concerning operations and performance of individual Texas stores. (Docket

---

[4] The SEC Annual Report lists him as "Senior Vice President of Operations." (Docket Entry 50-5, at 74.)

9

Entry 50-11, at 4.) This regional manager opined that unattainable performance goals set during these

conference calls led TitleMax of Texas employees to engage in "improper practices" to boost sales. (*Id.* at 5.)

(3)   <u>Information about other Texas employment positions.</u>  Plaintiffs submit a page from an employment website, "Simply Hired," which lists the "TMX Finance family of companies" as offering numerous jobs in Texas. (Docket Entries 50-16 through 50-18.)

(4)   <u>Information about TMX Finance's corporate offices.</u>   Another TMX Finance document, apparently from its "careers" website, indicates that Dallas is TMX Finance's "regional corporate office and corporate contact center." (Docket Entry 50-20, at 3.) Plaintiffs also submit a document called "TMX Finance Careers" which states that TMX Finance has "over 15 departments with state-of-the-art corporate offices located in Savannah and Dallas." (Docket Entry 50-19, at 5.)

Considered in its totality, and with conflicts construed in Plaintiffs' favor, the above evidence is sufficient to present a *prima facie* case that this Court has personal jurisdiction over TMX Finance.[5] Although mere association with, or even ownership of, TitleMax of Texas would not be sufficient, Plaintiffs have presented evidence that TMX Finance had significant control of the day-to-day operations of TitleMax of Texas, including coordinating its business operations and even its legal activities in Texas courts.  This evidence, combined with (1) other evidence of the close

---

[5] TMX Finance disputes much of this evidence in its reply (Docket Entry 53); at this stage in the proceedings, however, such disputes must be resolved in Plaintiff's favor.

10

association of the two companies, (2) the placement of a regional corporate office and chief operations officer in Texas, and (3) ongoing involvement with the stores making loans in Texas, all make an exercise of specific personal jurisdiction appropriate. As the Fifth Circuit has repeatedly made clear, defendants who purposefully engage in business within the forum state "knowingly benefit[ ] from the availability of a particular state's market," and they thus may reasonably foresee that claims will arise from their business transactions. *Dontos v. Vendomation NZ Ltd.*, 582 F. App'x. 338, 348 (5th Cir. 2014) (brackets in original) (quoting *Luv N' care, Ltd.*, 438 F.3d at 470). If they engage in such business in this state, they "can reasonably expect to be haled into a Texas court." *Dontos*, 582 F.3d at 348.[6]

The same evidence that establishes sufficient "minimum contacts" between TMX Finance and Texas also defeats any argument by TMX Finance that this Court's exercise of jurisdiction would be unreasonable. *Wien Air Alaska, Inc.*, 195 F.3d at 215. It is not unreasonable for a company with corporate offices in Texas, which offers multiple corporate employment positions in Texas, and whose chief operations officer participates in the management of Texas stores and whose employees are alleged to have committed the violations giving rise to the lawsuit in Texas, should be called upon to answer that suit in this State.

For all these reasons, reviewing the totality of the evidence and resolving conflicts in Plaintiff's favor, TMX Finance's motion should be denied.[7]

---

[6] Indeed, Plaintiffs note that TMX Finance has been sued in Texas state court in a related case, but has not contested jurisdiction. (See Docket Entry 50-2.)

[7] Of course, even though Plaintiffs have established a *prima facie* case of specific personal jurisdiction, this does not "foreclose [any] defendant from holding [the Plaintiffs] to its ultimate burden at trial of establishing contested jurisdictional facts by a preponderance of the evidence." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 399 (5th Cir. 2009).

11

## V. Conclusion.

For the reasons set out above, I recommend that the Motion to Dismiss for Lack of Personal Jurisdiction Under Federal Rule of Civil Procedure 12(b)(2) filed by Defendant TitleMax Finance Corp. (Docket Entry 6) be **GRANTED**, and that the Motion to Dismiss for Lack of Personal Jurisdiction Under Federal Rule of Civil Procedure 12(b)(2) filed by Defendant TMX Finance, LLC F/K/A TitleMax Holdings, LLC (Docket Entry 7) be **DENIED**.

## VI. Instructions for Service and Notice of Right to Object/Appeal.

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either: (1) electronic transmittal to all parties represented by an attorney registered as a Filing User with the Clerk of Court pursuant to the Court's Procedural Rules for Electronic Filing in Civil and Criminal Cases; or (2) by certified mail, return receipt requested, to any party not represented by an attorney registered as a Filing User.

As provided in 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), any party who desires to object to this Report must file with the District Clerk and serve on all parties and the Magistrate Judge written Objections to the Report and Recommendation **within fourteen (14) days after being served with a copy,** unless this time period is modified by the District Court. A party filing Objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Report will bar the party from receiving a de novo determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Acuña v. Brown & Root, Inc.,*

12

200 F.3d 335, 340 (5th Cir. 2000). Additionally, a party's failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Report will bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

    **SIGNED** on June 17, 2015.

Henry J. Bemporad
United States Magistrate Judge

13

# EXHIBIT 3

APPENDIX 0134

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "TMX FINANCE HOLDINGS INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE TWENTY-SIXTH DAY OF JULY, A.D. 2012, AT 12:20 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "TMX FINANCE HOLDINGS INC.".

5185806   8100H

151236125

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 2689159

DATE: 08-31-15

**APPENDIX 0135**

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:20 PM 07/26/2012
FILED 12:20 PM 07/26/2012
SRV 120875106 - 5185806 FILE

# STATE *of* DELAWARE
## CERTIFICATE *of* INCORPORATION
### A STOCK CORPORATION

- **First:** The name of this Corporation is <u>TMX Finance Holdings Inc.</u>

- **Second:** Its registered office in the State of Delaware is to be located at <u>Corp.</u> <u>Trust Center, 1209 Orange</u> Street, in the City of <u>Wilmington</u> County of <u>New Castle</u> Zip Code <u>19801</u>. The registered agent in charge thereof is <u>The Corporation Trust Company</u>

  **Third:** The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

- **Fourth:** The amount of the total stock of this corporation is authorized to issue is <u>10,000*</u> shares (number of authorized shares) with a par value of <u>0.0000000000</u> per share. <u>*100 Class A (voting) Shares and</u> <u>9900 Class B (nonvoting) Shares</u>

- **Fifth:** The name and mailing address of the incorporator are as follows:
  Name <u>Marvin A Fentress</u>
  Mailing Address <u>24 Drayton Street, Suite 1000</u>
  <u>Savannah, GA</u> Zip Code <u>31401</u>

- **I, The Undersigned**, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this <u>24th</u> day of <u>July</u>, A.D. 20 <u>12</u>.

  BY: _____
  (Incorporator)

  NAME: <u>Marvin A Fentress</u>
  (type or print)

# EXHIBIT 4

APPENDIX 0137

Delaware.gov | Text Only                                    Governor | General Assembly | Courts | Elected Officials | State Agencies

---

Department of State: Division of Corporations

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service
Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request
How to Form a New
Business Entity
Certifications, Apostilles
& Authentication of
Documents

Privacy Policy    Frequently Asked Questions    View Search Results

## Entity Details

### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | 5185806 | Incorporation Date / Formation Date: | 07/26/2012 (mm/dd/yyyy) |
| Entity Name: | TMX FINANCE HOLDINGS INC. | | |
| Entity Kind: | CORPORATION | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

REGISTERED AGENT INFORMATION

| | |
|---|---|
| Name: | THE CORPORATION TRUST COMPANY |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST |
| City: | WILMINGTON          County: NEW CASTLE |
| State: | DE          Postal Code: 19801 |
| Phone: | (302)658-7581 |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status  ○ Status,Tax & History Information  [Submit]

[Back to Entity Search]

To contact a Delaware Online Agent click here.

---

site map   |   about this site   |   contact us   |   translate   |   delaware.gov

# EXHIBIT 5

APPENDIX 0139

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2012

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from            to

Commission File Number 333-172244

## TMX Finance LLC
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Delaware | 20-1106313 |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| 15 Bull Street, Savannah, Georgia | 31401 |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's Telephone Number, Including Area Code: (912) 525-2675

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

(Note: The registrant has filed all reports pursuant to the Securities Exchange Act of 1934 as applicable for the preceding 12 months)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☒ No ☐

The Company has 100 outstanding limited liability company membership units, all of which are held by TMX Finance Holdings Inc.

Table of Contents

TMX FINANCE LLC
AND AFFILIATES
FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2012

| | | Page |
|---|---|---|
| PART I | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 18 |

**APPENDIX 0140**

| Item 4. | Mine Safety Disclosures | 18 |
|---|---|---|
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19 |
| Item 6. | Selected Financial Data | 19 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 30 |
| Item 8. | Financial Statements and Supplementary Data | 31 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 61 |
| Item 9A. | Controls and Procedures | 61 |
| Item 9B. | Other Information | 61 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 62 |
| Item 11. | Executive Compensation | 64 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 70 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 70 |
| Item 14. | Principal Accountant Fees and Services | 72 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 73 |
| SIGNATURES | | 76 |

2

Table of Contents

## FORWARD-LOOKING STATEMENTS

This report contains "forward-looking statements" that involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain expectations, assumptions, estimates and projections. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and frequently contain words such as "anticipate," "assume," "believe," "budget," "continue," "could," "estimate," "expect," "future," "intend," "may," "plan," "potential," "predict," "project," "will" and other similar terms. All statements that address operating performance, events or developments that we expect or anticipate will occur in the future — including statements relating to demand for our products and services, sales growth, comparable store sales, store openings, state of the economy, capital allocation and expenditures, liquidity and the effect of adopting certain accounting standards — are forward-looking statements. Forward-looking statements involve risk and are not guarantees of future performance. The Company's actual results may differ significantly from current expectations as expressed or implied in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those discussed in "Item 1A. Risk Factors" in this report. The Company assumes no obligation to revise or update any forward-looking statements, except as required by law.

PART I

ITEM 1. BUSINESS.

Introduction

TMX Finance LLC is a privately-owned automobile title lending company with 1,035 company-owned stores in 12 states as of December 31, 2012. We provide our customers with access to funds through loans secured by a first or second lien on the customer's automobile. Our loan products allow our customers to meet their liquidity needs by borrowing against the value of their vehicles while allowing the customer to retain use of the vehicle during the term of the loan.

TMX Finance LLC is a limited liability company that was formed in Delaware in 2003 and exists solely as a holding company to own the equity interests of its subsidiaries. TMX Finance LLC changed its name from TitleMax Holdings, LLC to TMX Finance LLC effective June 21, 2010. Effective September 30, 2012, Tracy Young, the former sole member of TMX Finance LLC, transferred 100% of his membership interests to newly-formed TMX Finance Holdings Inc., or our "Parent," in exchange for shares of common stock of our Parent. Mr. Young is the sole beneficial owner of the common stock of the Parent. We refer to Mr. Young in this report as the "Sole Shareholder." Unless the context indicates otherwise, references in this report to "TMX Finance," the "Company," "we," "us," "our" or similar terms represent TMX Finance LLC and its consolidated affiliates.

Our principal corporate offices are located at 15 Bull Street, Suite 200, Savannah, Georgia 31401, and our telephone number is (912) 525-2675. Our website address is www.titlemax.biz. The information on our website is not a part of this report.

Overview

Our automobile title lending business provides a simple, quick and confidential way for consumers to meet their liquidity needs. We offer title loans in amounts ranging from $100 to $5,000 to customers who generally have limited access to consumer credit from banks, thrift institutions, credit card lenders and other traditional sources of consumer credit. As of December 31, 2012, we had approximately 470,000 customers and $577.2 million in title loans receivable. We believe we are the largest automobile title lender in the United States based on title loans receivable.

We principally operate under two brands: TitleMax and TitleBucks. TitleMax requires a minimum appraised vehicle value of more than $500 and offers interest rates that we believe,

**APPENDIX 0141**

Table of Contents

If we lose key management or are unable to attract and retain quality management talent, we may be unable to profitably operate and grow our business.

Our continued growth and future success will depend on our ability to retain the members of our senior management team, who possess valuable knowledge of, and experience with, the legal and regulatory environment of our industry and who have been instrumental in developing our strategic plans and procuring capital to enable the pursuit of those plans. The loss of the services of members of senior management, together with any inability to attract new skilled management, could harm our business and future development.

The interests of our Parent's sole beneficial owner may be different than those of our investors.

Tracy Young is our founder, Chairman of the Board, Chief Executive Officer, President and the sole beneficial owner of our parent holding company, TMX Finance Holdings Inc. As a result, subject to the limitations in the agreements governing our indebtedness, including the indenture governing our senior secured notes, or the "Indenture," Mr. Young has the ability to control substantially all matters of significance to the Company, including the strategic direction of our business, the election and removal of the managers of TMX Finance LLC, the appointment and removal of our officers, the approval or rejection of a sale, merger, consolidation or other business combination, the issuances of additional equity or debt securities, amendments of our organizational documents, the entering into of related party transactions and the dissolution and liquidation of the Company, regardless of whether the holders of the senior secured notes, or our "bondholders," believe that any such action is in their best interests.

As a result of Mr. Young's complete beneficial ownership and control of our Company, his interests could conflict with the interests of our bondholders. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, Mr. Young's interests as the sole equity owner of our Parent might conflict with the interests of our bondholders. Mr. Young might also have an interest in pursuing transactions that, in his judgment, could enhance his equity investment, even though such transactions might involve risks to our bondholders. In addition, Mr. Young could cause us to make acquisitions that increase the amount of our indebtedness or sell assets, either of which may impair our ability to make payments under the notes.

Economic recession, unemployment and other factors could result in a reduction in demand for our products and services, and we may be unable to adapt to any such reduction.

Factors that influence demand for our products and services include macroeconomic conditions such as employment, personal income and consumer sentiment. If consumers become more pessimistic regarding the outlook for the economy and therefore spend less and save more, demand for title loans may decline. In addition, weakened economic conditions may result in an increase in loan defaults and loan losses. We can give no assurance that we will be able to sustain our current charge-off rates or that we will not experience increasing difficulty in collecting defaulted loans. Further, in an economic slowdown, we could be required to tighten our underwriting standards, which likely would reduce our loan balances.

Should we fail to adapt to any significant declines in consumers' demand for our products or services, our revenues could decrease significantly and our operations could be harmed. Even if we do make changes to existing products or services or introduce new products or services to fulfill consumer demand, consumers may resist or may reject such products or services.

We are subject to liabilities for claims related to repossession of automobiles.

We use licensed third-party providers in connection with the repossession of defaulting customers' automobiles. We typically enter into agreements with these providers in which they indemnify us for all losses related to claims arising from a repossession and warrant that they maintain insurance sufficient to cover such claims and indemnification obligations; however, we do not enter into these agreements with every third-party provider. We are subject to the risk that any third-party provider that we use may not have sufficient insurance to cover such claims or indemnification obligations. In such event, we may be subject to claims of customers related to repossession, which could have an adverse effect on our business.

12

Table of Contents

Disruptions in the credit and capital markets could negatively impact the availability and cost of borrowing.

Borrowed funds represent a significant portion of our capital. We rely on borrowed capital, together with cash flows from operations, to fund our working capital needs, including making title loans. Disruptions in the credit and capital markets, such as those experienced in 2008 and 2009, could adversely affect our ability to obtain cash to make title loans and to refinance existing debt obligations. Efficient access to these markets is critical to our ongoing financial success; however, our future access to the credit and debt capital markets could become restricted due to a variety of factors, including a deterioration of our earnings, cash flow, balance sheet quality or overall business or industry prospects, a sustained disruption or further deterioration in the state of the credit or capital markets or a negative bias toward our industry by market participants. Our ability to obtain additional financing in the future will depend in part upon prevailing credit and capital markets conditions. The credit and capital markets are volatile and a decline in those markets may adversely affect our efforts to arrange additional financing on satisfactory terms. If adequate funds are not available on acceptable terms, we may not be able to make future title loans, take advantage of acquisitions or other opportunities or respond to competitive challenges.

Changes in credit ratings issued by statistical rating organizations could adversely affect our costs of financing.

Credit rating agencies rate our indebtedness based on factors that include our operating results, actions that we take, their view of the general outlook for our industry and their view of the general outlook for the economy. Actions taken by the rating agencies can include maintaining, upgrading or downgrading the current rating or placing us on a watch list for possible future downgrading. Downgrading the credit rating of our indebtedness or placing us on a watch list for possible future downgrading could limit our ability to access the capital markets to meet liquidity needs and refinance maturing liabilities or increase the interest rates and our cost of financing.

The Indenture and Credit Agreement impose significant operating and financial restrictions, which may prevent us from pursuing certain business opportunities and taking certain actions.

The Indenture and Credit Agreement impose, and future debt agreements may impose, operating and financial restrictions on us. These restrictions limit or prohibit, among other things, our ability to:

- incur additional indebtedness unless certain financial tests are satisfied;

- issue disqualified capital stock;

- pay dividends, redeem subordinated debt or make other restricted payments;

- make certain investments or acquisitions;

- issue stock of subsidiaries;

# EXHIBIT 6

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS; and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC.; | § | |
| | § | |
| Defendants. | § | 152ND JUDICIAL DISTRICT |

**SPECIALLY APPEARING DEFENDANT TMX FINANCE HOLDINGS, INC.'S
AMENDED ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

TO:     Plaintiff Wellshire Financial Services, LLC d/b/a LoanStar Title Loans and Integrity
        Texas Funding, LP by and through their attorneys of record, Kent C. Sullivan, Daniel
        Johnson, and Robert A. Lemus, Sutherland Asbill & Brennan, LLP, 1001 Fannin, Suite
        3700, Houston, Texas 77002; and Joseph D. Wargo, Wargo French, LLP, 999 Peachtree
        Street, N.E. 26th Floor, Atlanta, Georgia 30309.

        Subject to and without waiving its anticipated Special Appearance, Specially Appearing

Defendant TMX Finance Holdings, Inc. hereby serves its Amended Answers to Plaintiffs' First

Set of Interrogatories.

APPENDIX 0144

Respectfully submitted,

**GREENBERG TRAURIG, L.L.P.**

By: */s/ Roland Garcia, Jr.*
Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
L. Bradley Hancock
State Bar No. 00798238
hancockl@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

COUNSEL FOR SPECIALLY
APPEARING DEFENDANT TMX
FINANCE HOLDINGS, INC.

**BECK REDDEN, LLP**

David J. Beck
State Bar No. 00000070
dbeck@beckredden.com
Geoff A. Gannaway
State Bar No. 24036617
ggannaway@beckredden.com
Bryon A. Rice
State Bar No. 24065970
brice@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010
713-951-3700 - Telephone
713-951-3720 - Facsimile

COUNSEL FOR SPECIALLY
APPEARING DEFENDANT TMX
FINANCE HOLDINGS, INC.

**APPENDIX 0145**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 10th day of March, 2015.

*/s/ L. Bradley Hancock*
L. Bradley Hancock

## GENERAL OBJECTIONS

Specially Appearing Defendant TMX Finance Holdings, Inc. ("Holdings") hereby adopts and incorporates by reference the following general objections into each of its specific responses to the interrogatories contained in Plaintiffs' First Set of Interrogatories to Defendant TMX Finance Holdings, Inc.:

1.      Holdings objects to the interrogatories, and the incorporated definitions, to the extent that any part thereof purports to place any greater or different obligation or burden upon Holdings than required under the Texas Rules of Civil Procedure or other applicable law.

2.      Holdings objects to the interrogatories to the extent they reach beyond the Rule 11 agreement between counsel.

3.      Holdings objects to the interrogatories to the extent they reach beyond the appropriate scope of discovery for the limited purpose of determining the validity of an objection on jurisdictional grounds.

## RESPONSES AND SPECIFIC OBJECTIONS TO INTERROGATORIES

1.      Is TMX Finance a wholly-owned subsidiary of You?  If not, describe the relationship between You and TMX Finance.

**Response:**  Yes.

2.      Is TMX Finance TX an indirect subsidiary of You?  If not, describe the relationship between You and TMX Finance TX.

1730.00001/542568.v1                                    4

**Response:**   Holdings objects to this Interrogatory on the grounds that it is vague and ambiguous as the term "indirect subsidiary" is not defined.  Subject to and without waiving the foregoing objection, Holdings states as follows:  Holdings owns 100% of TMX Finance LLC, and TMX Finance LLC owns 100% of TMX Finance of Texas, Inc.

3.      Is TitleMax TX an indirect subsidiary of You?  If not, describe the relationship between You and TitleMax TX.

**Response:**   Holdings objects to this Interrogatory on the grounds that it is vague and ambiguous as the term "indirect subsidiary" is not defined.  Subject to and without waiving the foregoing objection, Holdings states as follows:  Holdings owns 100% of TMX Finance LLC, and TMX Finance LLC owns 100% of TitleMax of Texas, Inc.

4.      Identify by name and title all officers, members and/or directors that You have in common with TMX Finance TX.  For the purposes of this Interrogatory, an officer and/or director is "in common" if the same individual holds a position with both You and TMX Finance TX.

**Response:**  Tracy Young is the CEO and sole stockholder of Holdings.  Tracy Young is the CEO and President of TMX Finance of Texas, Inc.

5.      Identify by name and title all officers, members and/or directors You have in common with TMX Finance.  For the purposes of this Interrogatory, an officer and/or director is "in common" if the same individual holds a position with both You and TMX Finance.

**APPENDIX 0148**

**Response:**  Tracy Young is the CEO and sole stockholder of Holdings and the sole member and manager of TMX Finance LLC.   Christopher Kelly Wall is the Vice President of Holdings and of TMX Finance LLC.

6.     Identify name and title all officers, members and/or directors that You have in common with TitleMax TX.  For the purposes of this Interrogatory, an officer and/or director is "in common" if the same individual holds a position with both You and TitleMax TX.

**Response:**  Tracy Young is the CEO and sole stockholder of Holdings and the CEO and President of TitleMax of Texas, Inc.

7.     Describe how Your books and records are maintained, including but not limited to identification by name, position, and work address all of the individuals who are responsible for maintaining Your books and/or records and/or accounting information.

**Response:**  Holdings objects to this Interrogatory as overly broad, unduly burdensome, cumulative to the deposition testimony of Christopher Kelly Wall as the 30(b)(6) witness of Holdings, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.

8.     Do You own or lease the office space located at 15 Bull Street, Savannah, Georgia?  If leased, from whom do You lease the office space?

**Response:**  Holdings objects to this Interrogatory as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections,

**APPENDIX 0149**

Holdings states as follows: Holdings does not own or lease the office space located at 15 Bull Street, Savannah, Georgia.

9.      For all bank accounts for which You are an account holder or authorized signatory, please provide:  (1) banking institution, (2) last four digits of the account number, (3) names of the account holder(s), and (4) names of the authorized signatories on the accounts.

**Response:**  Holdings objects to this Interrogatory as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections, Holdings states as follows: SunTrust in Atlanta, Georgia.

10.     Identify all telephone numbers and email addresses used by each of Your officers, directors, members and employees.

**Response:**  Holdings objects to this Interrogatory as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.

# Exhibit 7
## Attorneys Eyes Only
## *In Camera Review*

# EXHIBIT 8

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | | | | | TAX YR. |
|---|---|---|---|---|---|
| TMX FINANCE HOLDINGS INC. | | | | | 2012 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5185806 | 2012/07/26 | 2013/03/02 |

| PRINCIPAL PLACE OF BUSINESS | PHONE NUMBER |
|---|---|
| 15 Bull Street Ste 200 | 912/525-2675 |

Savannah GA 31401 United States

| REGISTERED AGENT | AGENT NUMBER |
|---|---|
| THE CORPORATION TRUST COMPANY | 9000010 |

CORPORATION TRUST CENTER
1209 ORANGE ST

WILMINGTON                DE 19801

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 2012/07/26 | | COMMON | 10,000 | |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| Tracy Young | | | |
| 15 Bull Street Ste 200 | | | President/CEO |
| Savannah GA 31401 United States | | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| Corporation currently has no Directors | | |

===================================================================

Total number of directors:0

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| Tracy Young | | |
| 15 Bull Street Ste 200 | | President/CEO |
| | 2013-03-11 | |
| Savannah GA 31401 United States | | |

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| TMX FINANCE HOLDINGS INC. | 2013 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5185806 | 2012/07/26 | |

| PRINCIPAL PLACE OF BUSINESS | PHONE NUMBER |
|---|---|
| 15 BULL STREET STE.200 | 912/525-2675 |
| SAVANNAH GA 31401 United States | |

| REGISTERED AGENT | AGENT NUMBER |
|---|---|
| THE CORPORATION TRUST COMPANY | 9000010 |
| CORPORATION TRUST CENTER 1209 ORANGE ST | |
| WILMINGTON          DE 19801 | |

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2012/07/26 | | COMMON | 10,000 | |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| | TRACY YOUNG | | |
| | 15 BULL STREET STE.200 | | CEO |
| | SAVANNAH GA 31401 United States | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| Corporation currently has no Directors | | |

Total number of directors:0

NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| TRACY YOUNG | | |
| 15 BULL STREET STE.200 | 2014-01-08 | CEO |
| SAVANNAH GA 31401 United States | | |



# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE ANNUAL REPORT OF "TMX FINANCE HOLDINGS INC." AS FILED IN THIS OFFICE.

5185806   8200

151238075

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 2691712

DATE: 09-01-15

**APPENDIX 0155**

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | | | | TAX YR. |
|---|---|---|---|---|
| TMX FINANCE HOLDINGS INC. | | | | 2014 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | | |
|---|---|---|---|---|
| 5185806 | 2012/07/26 | | | |

| PRINCIPAL PLACE OF BUSINESS | PHONE NUMBER |
|---|---|
| 15 Bull St., Ste. 200 | 912/525-2675 |
| SAVANNAH GA 31401 United States | |

| REGISTERED AGENT | AGENT NUMBER |
|---|---|
| THE CORPORATION TRUST COMPANY | 9000010 |
| CORPORATION TRUST CENTER 1209 ORANGE ST | |
| WILMINGTON            DE 19801 | |

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2012/07/26 | | COMMON | 10,000 | |

| OFFICER NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| TRACY YOUNG | | |
| 15 Bull St., Ste. 200 | | CEO |
| SAVANNAH GA 31401 United States | | |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| Corporation currently has no Directors | |

Total number of directors:0

NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| TRACY YOUNG | | |
| 15 Bull St., Ste. 200 | 2015-02-25 | CEO |
| SAVANNAH GA 31401 United States | | |

APPENDIX 0156

# Exhibit 9

# Attorneys Eyes Only
# *In Camera Review*

# Exhibit 10
## Attorneys Eyes Only
## *In Camera Review*

# EXHIBIT 11

MOTION TO DISQUALIFY
*JANUARY 23, 2015*

1

2                          REPORTER'S RECORD
                        VOLUME 1 OF 1 VOLUMES
3                    TRIAL COURT CAUSE NO. 2013-33584

4

5    WELLSHIRE FINANCIAL SERVICES, LLC d/b/a   ) IN  THE  DISTRICT  COURT
     LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE )                       )
6    LOANS, and d/b/a LOANMAX; MEADOWWOOD       )
     FINANCIAL SERVICES, LLC, d/b/a  LOANSTAR  )
7    LOANS, AND d/b/a MONEYMAX TITLE LOANS; and )
     INTEGRITY TEXAS FUNDING, LP               )
8                                              )
     vs.                                       ) HARRIS   COUNTY,  TEXAS
9                                              )
     TMX FINANCE HOLDINGS, INC.; TMX FINANCE,  )                        )
10   LLC; TMX FINANCE OF TEXAS, INC;           )
     and TITLEMAX OF TEXAS, INC.               ) 152ND JUDICIAL DISTRICT
11

12

13          _____

14                       **MOTION TO DISQUALIFY**

15          _____

16

17       On the 23RD day of January, 2015, the following proceedings came

18   on to be held in the above-titled and numbered cause before the

19   Honorable ROBERT K. SCHAFFER, Judge Presiding, held in Houston, Harris

20   County, Texas.

21       Proceedings reported by computerized stenotype machine.

22

23

24

25

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

MOTION TO DISQUALIFY
*JANUARY 23, 2015*

1          MS. ROMERO:  RFP No. 9, which is No. 6 right after Number.
2    8.  There was an error in our numbering.
3          THE COURT:  The same response to that.
4          MS. ROMERO:  This one is very narrow.
5          THE COURT:  No.  It's not very narrow.  Involving both you
6    and any other Defendant?
7          MS. ROMERO:  Yes.  These Defendants that we are looking to
8    pierce the veil for jurisdictional purpose.
9          So, we want to the make sure that if they were lending money
10   to each other, we know that that's a factor that we would need to
11   look into for commingling of funds, corporate formalities, who
12   controls who, who controls the money.
13         THE COURT:  Then why don't you ask for that?  Specifically
14   ask for that.
15         Are there any documents which document loans between
16   Plaintiff -- and I guess that's done in this case.
17         MR. GANNAWAY:  And, again, your Honor, this is cumulative of
18   what they've already received because the corporate rep was asked
19   those specific questions.  Are there any financial transactions.  Is
20   any money owed between the two companies.  They got answers.  Clear
21   and concise answers to those questions at the corporate rep depo.
22         MS. ROMERO:  We are aware of at least one or two
23   transactions that occurred between Holdings and Finance.  I want to
24   see the paperwork for that.
25         You know, if there is some concern, we have a

MOTION TO DISQUALIFY
*JANUARY 23, 2015*

1   Confidentiality Agreement.  There's a Protection Order that you

2   executed, you know, last month.  For these ones that are, you know,

3   capital contribution, loans, security agreements, like these specific

4   things, we want to make sure they did it right, and they are

5   observing their corporate formalities.  That's what we have to know.

6          THE COURT:  I will go along with you on that.  Capital

7   contributions, loans and security agreements.

8          MS. ROMERO:  And leases, salaries and bonuses.

9          THE COURT:  No for the leases.

10         Why the salary and bonus payments?

11         MS. ROMERO:  A salary by one company to another company

12  employees is something that would reflect a disregard of corporate

13  formalities.  Also, a control -- you know, who holds the pocketbook.

14  Who are these companies.

15         THE COURT:  For who specifically?

16         MS. ROMERO:  For the Defendants.  I want to know if Holdings

17  has those kinds of relationships with any of these Defendants.

18         THE COURT:  Did you ask?  Did you ask the Holdings corporate

19  rep, Christopher Kelly Wall, whether TMX Holdings pays the salaries

20  of any employees of TMX Finance?

21         MS. ROMERO:  We asked if they paid at least his salary.  He

22  said that, no, they did not pay his salary.

23         THE COURT:  Is he the corporate rep?

24         MR. GANNAWAY:  He was the corporate rep.

25         THE COURT:  You didn't ask him about anyone else?

# EXHIBIT 12

APPENDIX 0163

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS; and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC.; | § | |
| | § | |
| *Defendants.* | § | 152ND JUDICIAL DISTRICT |

**SPECIALLY APPEARING DEFENDANT TMX FINANCE HOLDINGS, INC.'S
SECOND AMENDED RESPONSES TO PLAINTIFFS'
FIRST REQUEST FOR PRODUCTION**

TO:   Plaintiff Wellshire Financial Services, LLC d/b/a LoanStar Title Loans and Integrity Texas Funding, LP by and through their attorneys of record, Kent C. Sullivan, Daniel Johnson, and Robert A. Lemus, Sutherland Asbill & Brennan, LLP, 1001 Fannin, Suite 3700, Houston, Texas 77002; and Joseph D. Wargo, Wargo French, LLP, 999 Peachtree Street, N.E. 26th Floor, Atlanta, Georgia 30309.

Subject to and without waiving its anticipated Special Appearance, Specially Appearing Defendant TMX Finance Holdings, Inc. hereby serves its Second Amended Responses to Plaintiffs' First Request for Production.

1

Respectfully submitted,

**GREENBERG TRAURIG, L.L.P.**

By: */s/ Roland Garcia, Jr.*
Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
L. Bradley Hancock
State Bar No. 00798238
hancockl@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

COUNSEL FOR SPECIALLY
APPEARING DEFENDANT TMX
FINANCE HOLDINGS, INC.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 14th day of April, 2015.

*/s/ L. Bradley Hancock*
L. Bradley Hancock

**APPENDIX 0165**

## GENERAL OBJECTIONS

Specially Appearing Defendant TMX Finance Holdings, Inc. ("Holdings") hereby adopts and incorporates by reference the following general objections into each of its specific responses to the requests contained in Plaintiffs' First Request for Production of Documents to Defendant TMX Finance Holdings, Inc.:

1.      Holdings objects to the request for documents, and the incorporated definitions, to the extent that any part thereof purports to place any greater or different obligation or burden upon Holdings than required under the Texas Rules of Civil Procedure or other applicable law.

2.      Holdings objects to the request for documents to the extent the requests reach beyond the Rule 11 agreement between counsel.

3.      Holdings objects to the request for documents to the extent the requests reach beyond the appropriate scope of discovery for the limited purpose of determining the validity of an objection on jurisdictional grounds.

## RESPONSES AND SPECIFIC OBJECTIONS TO REQUESTS FOR PRODUCTION

1.      The "annual income statement and balance sheet" and the "K-1" for TMX Finance Holdings for 2011, 2012, and 2013.

**Response:**  Holdings objects to this Request as overly broad and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence. Moreover, Holdings objects to the extent this Request seeks information prior to its formation on July 26, 2012.  Subject to and without waiving any objection, Holdings will produce the annual statement of income and balance sheet for 2012 and 2013 on an attorneys' eyes only basis.

3

2.      Any and all documents that support Your response to Interrogatory No. 7, served concurrently herewith.

**Response:**  Holdings objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.   Holdings further objects that this Request seeks information protected by the work-product doctrine, and responsive documents may be withheld on the basis of privilege. Subject to and without waiving any objection, there are no responsive, non-privileged documents in Holdings' possession, custody, or control.

3.      All organizational charts depicting or describing your corporate structure, including parent companies, subsidiaries, corporate affiliates, predecessors, and successors, and any offices, departments, divisions, or organizations, including but not limited to, formal or informal working groups, that are composed of employees or agents of more than one of the Defendants to this lawsuit or any parent companies, subsidiaries, corporate affiliates, predecessors, and successors.

**Response:**  Holdings objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.   Holdings further objects to this Request as being confusing and nonsensical.

4.      All documents relating to bylaws and articles of incorporation, or functional equivalent thereof, for You and any entity in which you have an interest (whether ownership, proprietary, direct, indirect, beneficial, management, oversight, or otherwise) including, but not limited to, any changes to such bylaws and articles of incorporation.

4

**Response:**  Holdings objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.   Subject to and without waiving any objection, Holdings states that it is a Delaware corporation and incorporation documents are made available and can be retrieved through the Delaware Secretary of State's website.

4.[sic] All documents, including but not limited to emails, referring or relating to meetings held by and between any of Your officers and directors in which the state of Texas is referenced.

**Response:**  Holdings objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.  Holdings further objects that this Request seeks discovery of information protected by the attorney-client privilege and work-product doctrine, and responsive documents may be withheld on the basis of privilege.   Subject to and without waiving any objections, there are no responsive, non-privileged documents in Holdings' possession, custody, or control.

4.[sic] All documents reflecting communications by and between at least one of your officers or directors, on the one hand, and anyone, on the other hand, referring or relating to the state of Texas.

**Response:**  Holdings objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.   Holdings further objects to the extent this Request seeks discovery of documents protected by the attorney-client privilege and work-product doctrine, and responsive documents may be withheld on the basis of privilege.   Subject to and without waiving any

5

objection, there are no responsive, non-privileged documents in Holdings' possession, custody, or control.

5.[sic]  All documents reflecting any contracts or agreements in which both You and any of TMX Finance, TMX Finance TX, and/or TitleMax TX are parties.

**Response:**  Holdings objects that this Request is overly broad. Responsive documents may be withheld on the basis of privilege.  Subject to and without waiving any objection, there are no responsive, non-privileged documents in Holdings' possession, custody, or control.

6.[sic]  All powers of attorney or similar written authorization executed by or on behalf of You and granting authority to any other Defendants to act for, or on behalf of You.

**Response:**  Holdings objects that this Request is overly broad. Subject to and without waiving any objection, there are no responsive, non-privileged documents in Holdings' possession, custody, or control.

7.[sic]  All powers of attorney or similar written authorization executed by or on behalf of any Defendant and granting authority to You to act for, or on behalf of the other Defendant.

**Response:**  Holdings objects that this Request is overly broad. Subject to and without waiving any objection, there are no responsive, non-privileged documents in Holdings' possession, custody, or control.

8.[sic]  Copies of all checks, deposits or withdrawals from any account identified in response to Interrogatory No. 9 from the time of the opening of the account to present.

**APPENDIX 0169**

**Response:** Holdings objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence.

6.[sic] All documents reflecting any and all financial transactions (including but not limited to capital contributions, loans, securities agreements, leases, salary and bonus payments) involving both You and any other Defendant.

**Response:** Holdings objects to this Request as overly broad and cumulative of the deposition testimony of Christopher Kelly Wall as the 30(b)(6) witness of Holdings. Subject to and without waiving these objections and the General Objections, Holdings has produced TMX_007063 and TMX_007083-007087. There are no additional responsive, non-privileged documents in Holdings' possession, custody, or control. The only privileged documents in Holdings' possession, custody, and control are core work product involving its counsel.

**APPENDIX 0170**

# Exhibit 13
## Attorneys Eyes Only
## *In Camera Review*

# EXHIBIT 14

**APPENDIX 0172**

**From:** HancockL@gtlaw.com [mailto:HancockL@gtlaw.com]
**Sent:** Wednesday, January 28, 2015 6:40 PM
**To:** Powers, Sarah
**Cc:** Goebelsmann, Christina; Romero, Abigail Stecker; Wargo, Joseph D.; ggannaway@beckredden.com; johnsenc@gtlaw.com
**Subject:** RE: TMax--Jesswein

Sarah,

As I told you yesterday, I was in mediation until late, and just concluded my mediation today.  I am now trying to catch back up before I leave for my next mediation tomorrow.

The contact for the subpoena for Otto Bielss is as follows:

Jennifer D. Sawyer
Sawyer Law Group, LLC
24 Drayton Street, Suite 202
Savannah, Georgia 31401
912-662-8612

I am confirming whether or not the Young notice can be sent to the same address.

We are working on the affidavit, which is not something that is done overnight (or even over a weekend).  Accountants do not work that quickly.

As for Mr. Jesswein, his last known contact information is:



As for the persons involved in the approval of the $50 flyer, Kelly Wall is our corporate rep on that issue.  Jesswein created and approved of the flyer, so I do not believe that the interrogatory needs to be revised.

Many thanks,

Brad


**L. Bradley Hancock**
Shareholder
Greenberg Traurig, LLP | 1000 Louisiana Street | Suite 1700 | Houston, TX 77002
Tel 713.374.3525 | Fax 713.754.7525 | Cell 713.320.8307
HancockL@gtlaw.com | www.gtlaw.com



# EXHIBIT 15

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

1

2                              REPORTER'S RECORD
                            VOLUME 1 OF 1 VOLUMES
3                      TRIAL COURT CAUSE NO. 2013-33584

4

5   WELLSHIRE FINANCIAL SERVICES, LLC d/b/a    ) IN  THE  DISTRICT  COURT
    LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE )                          )
6   LOANS, and d/b/a LOANMAX; MEADOWWOOD       )
    FINANCIAL SERVICES, LLC, d/b/a  LOANSTAR   )
7   LOANS, AND d/b/a MONEYMAX TITLE LOANS; and )
    INTEGRITY TEXAS FUNDING, LP                )
8                                              )
    vs.                                        ) HARRIS   COUNTY,  TEXAS
9                                              )
    TMX FINANCE HOLDINGS, INC.; TMX FINANCE,   )                          )
10  LLC; TMX FINANCE OF TEXAS, INC;            )
    and TITLEMAX OF TEXAS, INC.                ) 152ND JUDICIAL DISTRICT
11

12

13            _____

14                  **ORAL HEARING ON PARTIES' MOTIONS**

15            _____

16

17       On the 21ST day of November, 2014, the following proceedings came

18   on to be held in the above-titled and numbered cause before the

19   Honorable ROBERT K. SCHAFFER, Judge Presiding, held in Houston, Harris

20   County, Texas.

21       Proceedings reported by computerized stenotype machine.

22

23

24

25

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

1   limitations you placed on it we would like the same Order to that.

2          THE COURT:  I haven't a clue what you're talking about.

3          MR. GANNAWAY:  And I'm going to be specific, your Honor.

4   One is you told us not just to produce profit-and-loss information

5   but to produce revenue -- certain revenue and expense information.

6   We'd just ask that they do the same thing so that we can analyze the

7   profit-and-loss numbers.

8          The other is that you said if we didn't produce information

9   pursuant to the Requests for profit-and-loss information, that we

10  could not use it at trial to impeach their expert.  And I would

11  like -- your Honor, honestly I think that's an inappropriate ruling.

12  But if it is going to stand, then it needs to go both ways.  And if

13  they don't produce --

14         THE COURT:  What is inappropriate about it?

15         MR. GANNAWAY:  Because it wasn't relief they sought in the

16  Motion that was before your Honor when your Honor ruled.

17         THE COURT:  But that is almost reciting what the Rule says

18  that if evidence is requested and not produced, it doesn't come in at

19  trial.  And that's the whole intent of my ruling.

20         I am frustrated with having evidence come up at trial that

21  was not produced in Discovery.  And, now, I have to conduct an

22  independent review of whether or not one party or the other is going

23  to be prejudiced by that.

24         MR. GANNAWAY:  I'm not here to challenge your ruling that

25  you made already, your Honor.

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS; and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | OF HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC., | § | |
| | § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |

## ORDER DENYING DEFENDANT TMX FINANCE HOLDINGS, INC.'S SPECIAL APPEARANCE

On this day, the Court heard Defendant TMX Finance Holdings, Inc.'s ("Defendant") Special Appearance ("Special Appearance") (filed on August 28, 2015). After considering the Motion, the responses and replies thereto, Plaintiffs' live petition on file, argument of counsel, controlling law, the evidence presented, and any papers in the file or otherwise available to the parties, the Court is of the opinion that Defendant's Special Appearance should be **DENIED** in its entirety.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Defendant's special appearance is **OVERRULED** and the Court retains Plaintiffs' suit against TMX Finance Holdings, Inc. on the Court's docket.

SIGNED this _____ day of _____, 2015.

_____

HONORABLE ROBERT SCHAFFER

1/22/2016 4:26:29 PM
Chris Daniel - District Clerk Harris County
Envelope No. 8754248
By: SALENE SMITH
Filed: 1/22/2016 4:26:29 PM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC., ET AL. | § § § | 152nd JUDICIAL DISTRICT |

_____

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC. | § § | |
| v. | § § § | |
| WELLSHIRE FINANCIAL SERVICES, LLC and MEADOWWOOD FINANCIAL SERVICES, LLC | § § § | |

_____

## DEFENDANT/COUNTERPLAINTIFF TITLEMAX OF TEXAS, INC.'S FIRST AMENDED COUNTERCLAIM

_____

Defendant/Counterplaintiff TitleMax of Texas, Inc. brings this First Amended Counterclaim against Plaintiffs/Counterdefendants Wellshire Financial Services, LLC and Meadowwood Financial Services, LLC (collectively, "Counterdefendants").

## I.
## PARTIES

1.      Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax of Texas") is a Delaware corporation with its principal place of business in Texas. TitleMax of Texas assists Texas customers in obtaining loans through third-party lenders. TitleMax of Texas was sued by Counterdefendants in this lawsuit.

2.      Plaintiff/Counterdefendant Wellshire Financial Services, LLC ("Wellshire") is a Georgia limited liability company. Wellshire is a competitor of TitleMax of Texas that operates in Texas.

3.      Plaintiff/Counterdefendant     Meadowwood     Financial     Services,     LLC

("Meadowwood") is a Georgia limited liability company. Meadowwood is a competitor of TitleMax of Texas that operates in Texas.

## II.
## FACTS

4.      TitleMax of Texas is a credit service organization ("CSO"). As a CSO, TitleMax of Texas assists customers in obtaining loans through third-party lenders. Namely, TitleMax of Texas connects a customer with a lender who, with the CSO, will secure a loan by placing a lien on the customer's vehicle. In addition to arranging for title loans, TitleMax of Texas will also help a customer refinance a pre-existing loan arranged by another CSO (such as a title loan held by Counterdefendants). TitleMax of Texas's CSO business depends on the facilitation of title loans; refinancing title loans; additional loan arrangements; and receiving referrals from existing customers. Counterdefendants are in the same line of business as TitleMax of Texas and directly or indirectly compete with TitleMax of Texas.

5.      Counterdefendants have engaged in a campaign of corporate espionage against TitleMax of Texas. Counterdefendants have stolen TitleMax of Texas's proprietary confidential financial and store-profitability information and have interfered with TitleMax of Texas's contracts, customers, and business relations by refusing to provide Letters of Guarantee and by using driving records to solicit TitleMax of Texas's customers.

**A.      Counterdefendants have entered TitleMax of Texas's non-public areas under false pretenses to steal its confidential information.**

6.      Counterdefendants have entered non-public areas within TitleMax of Texas stores posing as potential customers or other third parties and, using recording devices, unlawfully and improperly taken TitleMax of Texas's proprietary confidential financial and store-profitability information. Additionally, Counterdefendants have taken pictures of TitleMax of Texas's goal boards, which contain store-profitability information

2

circumventing the need for Counterdefendants to do their own marketing analysis. *See generally* Affidavit of Zachary Farmer, attached as **Exhibit 1**. Counterdefendants have taken TitleMax of Texas's confidential business information to attempt to undermine TitleMax of Texas, gain a competitive advantage, and increase Counterdefendants' competitiveness in the marketplace.

**B.** **Counterdefendants have interfered with TitleMax of Texas's contracts and business relationships by refusing to return titles and/or provide Letters of Guarantee within a reasonable period of time.**

7.      Additionally, Counterdefendants have refused to return titles to customers and/or provide Letters of Guarantee to TitleMax of Texas within a reasonable period of time, substantially interfering with its contracts and current and prospective business relationships. Customers have the right to do business with the lender of their choice. A customer has the option to pay the entirety of an existing loan by using funds obtained from another lender (a situation commonly referred to as a "Buyout"). Buyouts are common in the industry. To perform a Buyout in the industry custom, the new CSO obtains from the original CSO either the title to the vehicle or a Letter of Guarantee of title ensuring that clear title to the vehicle will be released upon full payment of the original title loan. The new CSO steps into the shoes of the customer during the Buyout process. *See generally* confirmation correspondence from the Texas Office of Consumer Credit Commissioner and the State of South Carolina Department of Consumer Affairs, attached as **Exhibit 2**.

8.      When customers desire to pay off their loans, Texas law requires a lienholder to provide a release of lien and title within a reasonable time. Because customers need the money immediately and may not have the requisite credit, time, or resources to use traditional banking to pay off the loan, Letters of Guarantee are commonly employed in the title industry to expedite and facilitate Buyouts. When a customer is unable to obtain

3

an immediate release of title or a Letter of Guarantee, the customer is prevented from contracting with a new CSO and is essentially held hostage. This effectively results in a prepayment penalty to the customer and violates the CSO's duty to provide a release of lien and title or its equivalent. *See id.*

9.       Knowing the foreseeable damages to the customer and the new title company, Counterdefendants have refused to provide Letters of Guarantee to TitleMax of Texas or its customers. This refusal to allow a Buyout is an institutionalized policy of Counterdefendants. By refusing to provide either the title or the Letter of Guarantee, the Buyout transactions cannot be completed, the existing loans cannot be bought out or paid off, and TitleMax of Texas loses those customers and the related goodwill. Moreover, because customers sometimes choose to refinance their title loans, losing that customer may result in not only the loss of the initial contract, but also future contracts (such as refinancing loans or arranging additional loans) with that customer. This is notwithstanding any potential referrals that the new customer may send to TitleMax of Texas.

10.       In addition to refusing to return titles and/or provide Letters of Guarantee to TitleMax of Texas and its customers within a reasonable period of time, Counterdefendants have engaged in independently tortious and unlawful conduct. Among other things, Counterdefendants breached their duty of care owed to TitleMax of Texas; lied to TitleMax of Texas's customers about its business and practices, such as by falsely telling customers that TitleMax of Texas repossesses vehicles as early as one to two days into delinquency; and engaged in deceptive and unfair business practices.

11.       The Deceptive Trade Practices and Consumer Protection Act (the "DTPA") provides that it is a violation to use false, misleading, or deceptive acts or practices including but not limited to representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited

4

by law. *See* TEX. BUS. & COMMERCE CODE § 17.46(b)(12). By failing to provide Letters of Guarantee, Counterdefendants are intentionally and knowingly denying their customers of their right to prepay their loans pursuant to their contracts, which is a violation of the DTPA. *See* TEX. BUS. & COMMERCE CODE § 17.45(9), (13). Moreover, given the urgency by which many title loan customers need to pay off their loan, Counterdefendants' refusal amounts to an unconscionable action or course of action. *See* TEX. BUS. & COMMERCE CODE § 17.45(5).

**C.    Counterdefendants have accessed and used driving records to interfere with TitleMax of Texas's customers, contracts, and prospective business relations.**

12.    Despite vigorously accusing TitleMax of Texas of using driving records to solicit customers, it has been discovered that Counterdefendants have been actively engaged in the same conduct in which they allege TitleMax of Texas was engaged. TitleMax of Texas recently learned that Counterdefendants appear to have accessed and used driving records to interfere with TitleMax of Texas's customers, contracts, and prospective business relations. *See generally* Affidavit of John Salinas, attached as **Exhibit 3**. One such customer, who highly values privacy and confidentiality and insists on remaining anonymous, was contacted and solicited by Counterdefendants. *Id.* at ¶¶ 2-3. Counterdefendants were aware of the existing TitleMax of Texas loan; told the customer they could offer a better deal; and offered to Buyout the loan. *Id.* at ¶ 3. The customer had not told anyone else about the loan, and upon information and belief Counterdefendants could have only determined its existence through the use of driving records. *Id.* at ¶ 3.

### III.
### COUNTERCLAIMS

#### COUNT I—TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

13.    TitleMax of Texas incorporates the foregoing allegations as if fully set forth

5

in this Paragraph.

14.     TitleMax of Texas had valid contracts with customers.

15.     Counterdefendants knew of these contracts and willfully and intentionally interfered with them, as discussed above.

16.     Counterdefendants' interferences proximately caused TitleMax of Texas injury.

17.     TitleMax of Texas incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

18.     Counterdefendants' actions were malicious or wanton, and therefore TitleMax of Texas specifically requests an award of exemplary damages.

### COUNT II—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

19.     TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

20.     TitleMax of Texas had a reasonable probability that potential customers would have entered into business relationships with TitleMax of Texas.

21.     Counterdefendants either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct.

22.     Counterdefendants' actions were independently tortious and/or unlawful, as discussed above.

23.     Counterdefendants' interferences proximately caused TitleMax of Texas injury.

24.     TitleMax of Texas incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

25.     Counterdefendants' actions were malicious or wanton, and therefore

APPENDIX 0183

TitleMax of Texas specifically requests an award of exemplary damages.

### COUNT III—CONVERSION

26.     TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

27.     Counterdefendants have wrongly asserted dominion over TitleMax of Texas's property, namely its proprietary confidential financial and store-profitability information, inconsistent with TitleMax of Texas's right of ownership.

28.     TitleMax of Texas owns and has the right to possess its proprietary confidential financial and store-profitability information.

29.     Counterdefendants unlawfully and knowingly came into actual possession of TitleMax of Texas's proprietary confidential financial and store-profitability information.

30.     Counterdefendants' knowingly used TitleMax of Texas's proprietary confidential financial and store-profitability information for their own benefit. The conversion harmed TitleMax of Texas.

31.     Counterdefendants' actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

### COUNT IV—THEFT OF PROPERTY

32.     TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

33.     Counterdefendants have committed theft regarding TitleMax of Texas's property, namely its proprietary confidential financial and store-profitability information.

34.     TitleMax of Texas owns and has a possessory right over its proprietary confidential financial and store-profitability information.

35.     Counterdefendants unlawfully and knowingly appropriated TitleMax of

APPENDIX 0184

Texas's proprietary confidential financial and store-profitability information.

36.    TitleMax of Texas did not consent to Counterdefendants' taking of the property.

37.    Counterdefendants' theft has harmed TitleMax of Texas.

38.    Counterdefendants' actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

COUNT V—DECLARATORY JUDGMENT

39.    TitleMax of Texas incorporates the foregoing allegations as if fully set forth in this Paragraph.

40.    A declaratory judgment would resolve a judicial controversy regarding the rights, obligations, and statuses of the parties with respect to Buyouts.

41.    TitleMax of Texas seeks a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code declaring that:

   a.   When a debtor pays off a title loan, the title-loan company must, within a reasonable period of time, provide either the title to the vehicle or its equivalent, a letter of guarantee; and

   b.   When a debtor seeks to pay off a title loan with funds brokered by a competitor title-loan company, the competitor assumes the legal rights of the debtor.

**IV.
CONDITIONS PRECEDENT**

42.    All conditions precedent to TitleMax of Texas's claims for relief have been performed or have occurred.

8

## V.
## PRAYER

43.     WHEREFORE, TitleMax of Texas prays for the following relief as discussed herein:

    a.     actual damages;

    b.     exemplary damages;

    c.     declaratory judgment;

    d.     temporary and permanent injunctive relief;

    e.     prejudgment and post-judgment interest at the highest rate allowable by law;

    f.     court costs;

    g.     attorney's fees; and

    h.     such other and further relief as the Court deems just and proper.

Dated: January 22, 2016

                                Respectfully submitted,

                                **HOLLAND & KNIGHT LLP**

                                By: */s/ L. Bradley Hancock*
                                L. Bradley Hancock
                                State Bar No. 00798238
                                brad.hancock@hklaw.com
                                Christopher David Johnsen
                                State Bar No. 24072169
                                chris.johnsen@hklaw.com
                                1100 Louisiana Street, Suite 4300
                                Houston, TX 77002-5227
                                713-821-7000 (telephone)
                                713-821-7001 (facsimile)

                                **GREENBERG TRAURIG, L.L.P.**

                                Roland Garcia, Jr.
                                State Bar No. 07645250
                                garciar@gtlaw.com
                                1000 Louisiana Street, Suite 1700
                                Houston, Texas 77002
                                713-374-3500 - Telephone
                                713-374-3505 - Facsimile

9

COUNSEL FOR DEFENDANTS
TMX FINANCE OF TEXAS, INC.;
TITLEMAX OF TEXAS, INC.; TMX
FINANCE LLC; AND TMX
FINANCE HOLDINGS, INC.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 22nd day of January, 2016.

*/s/ Christopher David Johnsen*
Christopher David Johnsen

10

**APPENDIX 0187**

# EXHIBIT 1

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| DRUMMOND FINANCIAL SERVICES, LLC; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO.: 2014cv253677 |
| | ) | |
| TMX FINANCE HOLDINGS, INC.; et al., | ) | |
| | ) | |
| Defendants. | ) | |

AFFIDAVIT OF ZACHARY FARMER

Personally appeared before the undersigned ZACHARY FARMER who, after being duly sworn, testified and said on oath as follows:

1.    I am Zachary Farmer, an individual resident of the State of Ohio.

2.    I am over 21 years of age and competent in all respects to give testimony in this matter.

3.    On December 10, 2014, I interviewed for a position with TitleMax. During the interview, I voluntarily disclosed the information that is substantially repeated in this Affidavit. TitleMax has not offered me anything of value in exchange for the information contained in this Affidavit.

4.    From February 2009 through November 14, 2014, I was an employee of Wellshire Financial Services, LLC and Drummond Financial Services, LLC, companies owned by Select Management Resources LLC ("Select"). I worked in stores doing business as "LoanStar Title Loans," "North American Title Loans," and "LoanMax."

5.    From August 2010 through June 2012, I was employed as an Operations Specialist.

6.    As an Operations Specialist, I traveled around the country, filling in at short-staffed stores, consulting, detecting fraud, assisting with staffing decisions, and identifying sponsorship opportunities. One primary task as an Operations Specialist was to improve Select's competitiveness in the marketplace, specifically with respect to Select's primary competitor,

1

TitleMax. I reported to Jesse Anderson, Brent Matthews, and Berk Jolly, who were Vice Presidents of Select.

7. As an Operations Specialist, I used several different tactics to gain competitive advantages for Select over TitleMax.

8. For example, I would pretend to be a customer and go into TitleMax stores to talk with their employees in an effort to determine what TitleMax was offering customers. I would also pretend to be a LoanMax customer seeking a better deal from TitleMax in order to see what terms they might offer. I would present TitleMax employees with a LoanMax application and try to coax them to talk about LoanMax.

9. I would also carry a concealed recording device to record my interactions with TitleMax employees. I would then mail the recording to Select Vice President Jesse Anderson at Select's corporate office in Alpharetta, Georgia.

10. As another example, I would pose as a repo-man seeking to do business with TitleMax and would ask TitleMax store managers how many repossessions they had during a specific period. TitleMax managers would often provide that information assuming I was actually in the repossession business.

11. Another tactic that I used to gain competitive advantage for Select, was to gain access to and photograph TitleMax "goal boards." Each TitleMax store had a goal board. The goal boards were typically located in back rooms of TitleMax stores, which were not open to the public.

12. A goal board typically listed a TitleMax store's financial performance goals for the month, the actual financial results from previous months, and the month-to-date financial results. The more established TitleMax stores would have more financial data on their goal boards. I would send the photographs of the goal boards electronically to Select Vice President Jesse Anderson. The data helped Select determine whether to open a Select-branded store in the immediate area to compete with TitleMax.

13. My method for gaining access to the goal boards was to pose as a potential customer and ask a TitleMax employee if I might use the store's restroom. I would then access the private back office business area and take pictures of the store's goal board as I pretended to look for the restroom. I then emailed the photographs to Select Vice President Jesse Anderson.

14.     The first time I photographed a goal board, I was sent to a TitleMax store to act like a potential customer with a LoanStar application. I was to present the application to the TitleMax employee to find out what they would say about LoanStar. While in the TitleMax store, I needed to use the restroom, and on my way back to the restroom I saw a goal board and took a picture of it. I sent the picture to Jesse Anderson, who responded that I should try to take photographs of as many other goal boards from TitleMax locations as I could. About a week later, Brent Matthews, another Select Vice President, followed up with me to see how many boards I was able to photograph and suggest where I could find more.

15.     Over the span of a year, in 2011 and 2012, I visited TitleMax stores in Texas (including Arlington, Carrolton, Mesquite, and Garland), South Carolina (including Rock Hill, Columbia, and Myrtle Beach), and Alabama (including Tuscaloosa and Birmingham). In total, I visited approximately 75 TitleMax stores for the express purpose of photographing goal boards. Of those 75 stores, I successfully photographed approximately 30 goal boards.

16.     I photographed the goal boards with a smartphone provided to me by Select and I used the email address provided to me by Select to transmit the photographs to Select Vice President Jesse Anderson.

17.     It is my understanding that gaining access to TitleMax non-public areas and photographing TitleMax goal boards became a uniform practice of Select.

18.     For example, in my last assignment with Select, I participated in a conference call with Area Managers in Ohio, shortly before TitleMax entered the Ohio market. During the call, the Area Managers were told by Select upper management that they should comply with Select's company-wide practice and direct their employees to enter TitleMax stores under false pretenses so that they could gain access to and photograph TitleMax goal boards.

19.     Another tactic that I observed was LoanMax employees using DMV records to identify which competitor bought out their customers' loans in an effort to confirm whether LoanMax was losing business to TitleMax.

20.     I make this affidavit based upon my personal knowledge for use in this lawsuit and for any legal purpose.

3

WITNESS my hand and seal, this 10th day of January, 2015.

ZACHARY FARMER

Sworn to and subscribed before me
this ___10___ day of January, 2015.

Notary Public
___HAMILTON___ County, ___OH___
My commission expires ___5-30-16___

MICHAEL P. ROLFES
NOTARY PUBLIC - OHIO
COMMISSION # 2011-RE-374726
MY COMMISSION EXPIRES MAY 30, 2016

4

APPENDIX 0192

# EXHIBIT 2

APPENDIX 0193

| From: | William Purce <William.Purce@occc.texas.gov> |
|---|---|
| Sent: | Thursday, November 12, 2015 9:47 AM |
| To: | Victoria Newman |
| Subject: | Re: Buyouts of Competitors |

Dear Ms. Newman:

At this time, our agency has not issued any advisory bulletins on this issue related to credit access businesses (there are some advisory letters dealing with regulated lenders and property tax lenders). However, our agency has investigated this issue in the past and has instructed licensees to provide and accept the payoffs. Our analysis of this issue is very similar to the analysis discussed in the South Carolina opinion letter.

Respectfully,

William Purce
Senior Administrative Review Examiner
Office of Consumer Credit Commissioner
2601 North Lamar Boulevard
Austin, Texas 78705
512.936.7626
william.purce@occc.texas.gov



TEXAS OFFICE of CONSUMER
CREDIT COMMISSIONER

| From: | Victoria Newman <Victoria.Newman@titlemax.com> |
|---|---|
| To: | 'William Purce' <William.Purce@occc.texas.gov> |
| Date: | 11/12/2015 9:07 AM |
| Subject: | Buyouts of Competitors |

Hi William,

I hope you are doing well. A question came up that I would like your help resolving.

I take the position that a buyout request from a customer should not be refused regardless of whether it's from a competitor. South Carolina has issued similar guidance on the matter (attached for your reference). A refusal of the buyout (or failure to immediately return the title or provide a letter of guaranty), in my opinion, would be akin to a prepayment penalty.

Has the OCCC issued guidance on this issue before? I haven't found any but I could have missed it.

Thanks,

Victoria

Victoria H. Newman
Sr. Compliance and Corporate Counsel

APPENDIX 0194

**TMX Finance**
15 Bull Street, Ste 200
Savannah, GA  31401
Direct line:  (912) 503-2824
Facsimile:  (866) 591-4638
Email:  victoria.newman@titlemax.com

**PRIVILEGED AND CONFIDENTIAL:**  This e-mail and any attachments hereto are intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information.  If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail.  You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

"NOTE: This e-mail, any attachments, and the information contained therein are confidential. The information contained in this email and/or any attachments is intended only for use by the intended recipient(s) and may contain trade secret or otherwise proprietary information of TMX Finance LLC and/or its affiliates and subsidiaries (collectively, "TitleMax"). If you are not the intended recipient of this e-mail, any use, dissemination, distribution or copying of this e-mail, any attachments, or the information contained therein, is strictly prohibited. If you received this e-mail and you are not an intended recipient, please immediately notify TitleMax e-mail administrator at: abuse@titlemax.biz and permanently delete the original and any copy of this e-mail, any attachments, and/or any printouts thereof."

**APPENDIX 0195**



Carri Grube Lybarker
Administrator

The State of South Carolina

Department of Consumer Affairs

2221 DEVINE STREET, STE 200
PO BOX 5757
COLUMBIA, SC 29250-5757

*Celebrating Over 35 Years of Public Service*

Commissioners
David Campbell
Chair
Columbia
Johnny E. Soschee
Vice Chair
Piedmont
Mark Hammond
Secretary of State
Columbia
Clifford Ray Keasler
Myrtle Beach
Terrell A. Parrish
Greer
Magaly P. Penn
Simpsonville
W. Fred Pennington, Jr.
Taylors

September 12, 2014

*Via Hand Delivery and Electronic Mail*

Mr. Jim Copeland
Acting Commissioner/ Assistant Commissioner
Consumer Finance Division
S.C. State Board of Financial Institutions
1205 Pendleton Street, Suite 306
Columbia, SC  29201

     RE:    Opinion Request- Prepayment Penalties

Dear Jim:

     You have requested an opinion regarding practices employed by supervised lenders when a loan is being prepaid by a third party on behalf of a consumer, the original debtor.  Consumer credit transactions are governed by the South Carolina Consumer Protection Code ("the Code"), S.C. Code Ann. sections 37-1-101 *et seq.*[1]  Right to prepay a consumer loan is addressed in  § 37-3-209 with prepayment of credit sales addressed in § 37-2-209.  From the information you have provided, the following question has been posed and will be addressed herein in the form of a general answer that could change depending on specific circumstances:

> Can a lender subject to the Code charge a consumer a different interest rate than currently being assessed and impose different terms regarding accepted method of payment or otherwise impose varying contract terms when a consumer loan is being prepaid by a third party on behalf of the consumer?

     As stated above, § 37-3-209 governs the consumer's right to prepay a consumer loan. The section specifically states: "…the debtor may prepay in full the unpaid balance of a consumer loan, refinancing, or consolidation at *any time without penalty*." (Emphasis added.)  A "debtor" is defined as "any person who is an obligor in a credit transaction, including any cosignor, comaker, guarantor, endorsee or surety, and *the assignee of any obligor*, and also includes *any person who agrees to assume the payment of a credit obligation*." (Emphasis added.)  *See* § 37-1-301(14).  Lastly, "person" includes not only an individual, but an organization. *See* § 37-1-301(20).  The right of a debtor to prepay a loan in full without penalty cannot be waived.  *See* § 37-1-107(1).

---

[1] Further reference to the South Carolina Code of Laws will be by Code section only.

ADMINISTRATOR
803-734-4233
ACCOUNTING
803-734-4264
Fax: 803-734-4299

PUBLIC INFORMATION
803-734-4296
Fax: 803-734-4229

CONSUMER ADVOCACY
803-734-4200
Fax: 803-734-4287

ENFORCEMENT/
INVESTIGATORS
803-734-4236
Fax: 803-734-4287

CONSUMER COMPLAINTS
803-734-4200
Fax: 803-734-4286

E-Mail: SCDCA@SCCONSUMER.GOV
Website: WWW.CONSUMER.SC.GOV

Toll Free in SC: 800-922-1594
Voice/TT: 800-735-2905

**APPENDIX 0196**

The cardinal rule of statutory construction is to ascertain and effectuate the Legislature's intent from the plain language of the statute. Burns v. State Farm Mut. Auto Ins. Co., 297 S.C. 520, 522, 377 S.E.2d 569, 570 (1989). The words of the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation. Hitachi Data Svs. Corp. v. Leatherman, 309 S.C. 174, 178, 420 S.E.2d 843,846 (1992). Statutory provisions of the Code shall be liberally construed as well as applied to promote the Title's underlying purposes and policies. § 37-1-102(1); Davis v. NationsCredit Financial Services Corporation et al., 326 S.C. 83, 86, 484 S.E.2d 471,472 (1997). The primary purpose of the Code is to protect consumers, as evidenced within relief provisions contained therein. Camp v. Springs Mortgage Corp., 310 S.C. 514,516, 426 S.E.2d 304,305 (1993). Section 37-1-102 further delineates the purposes and policies of the Code, including to foster competition among suppliers, protect borrowers against unfair practices and encourage fair and economically sound consumer credit practices. See § 37-1-102(2)(c)-(e).

The plain language of the Code permits a debtor to prepay a loan in full without incurring any type of penalty. Further, debtor is defined broadly to not only include the original consumer who has promised or otherwise is obligated to pay the debt, but to assignees and other persons who agree to assume responsibility of paying the debt as well, including an organization.

In the scenario you provided, a third party is attempting to prepay a loan in full on behalf of the consumer. The Lender, however, contracted for alternate interest rate terms to apply should a third party, including but not limited to, a bank, credit union, title loan, automobile dealership or insurance company pay off the loan. In construing the statutory language of the Code liberally to effectuate its purposes and policies, the Department concludes such alternate terms would constitute a prepayment penalty if the third party is an assignee of the obligor or entered into an agreement to pay the loan. The third party assuming the obligation is considered the debtor and, thus, is entitled to pay off the loan under the same terms as the consumer whom originally incurred the debt/obligation. See § 37-1-301(14).

You have also posed a scenario whereby the Lender requires that the original debtor be present at the time the third party pays off the loan. As explained above, however, when the third party assumed the obligation, the third party is considered the debtor. If the Lender refuses to accept payment from the third party on the basis that the original debtor is not present, this amounts to a violation § 37-3-209 as the Lender is depriving the debtor of the right to prepay.

Lastly, you posed a scenario whereby the Lender refuses to accept the same type of payment method from a third party attempting to prepay a loan in full as it has previously contracted for or otherwise accepted from the original debtor. While this may not be considered a prepayment penalty, the practice could constitute breach of contract if the contract delineates the types of payment accepted or if the Lender has previously, through a course of dealings, accepted payment from the original debtor via the same method the third party is attempting to utilize. See § 37-3-103(3); Dowling v. Charleston & W.C. Ry. Co., 105 S.C. 475, 81 S.E. 313 (1913); Weisz Graphics Div. v. Peck Industries, 304 S.C. 101, 403 S.E.2d 146 (Ct. App. 1991).

**APPENDIX 0197**

When a debtor exercises the right to prepay pursuant to § 37-3-209, please also be mindful of other provisions of the Code governing prepayment.  Section 37-3-210, for example, regulates prepayment rebates for consumer loans while § 37-4-108 states the parameters for the treatment of refunds of insurance premiums upon prepayment of a consumer loan.

Pursuant to sections 37-6-104(4) and 37-6-506(3), reliance upon an administrative interpretation provides protection from any penalties authorized by the Code if the administrative interpretation is subsequently declared invalid by a court or is rescinded.  Please do not hesitate to contact me directly at 803-734-4297 should you need any further information.

Best Regards,

Carri Grube Lybarker, Esq.

# EXHIBIT 3

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL | § | IN THE DISTRICT COURT OF |
| SERVICES, LLC, ET AL. | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, | § | |
| INC., ET AL. | § | 152nd JUDICIAL DISTRICT |

## AFFIDAVIT OF JOHN SALINAS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned authority, appeared John Salinas, known to me to be the person whose name is subscribed hereto and, after being duly sworn by me, stated as follows:

1.      My name is John Salinas. I am over the age of 21, of sound mind, and competent to make this Affidavit.

2.      I am a district manager of Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax"). I have knowledge of the facts stated in this Affidavit through my role with TitleMax, and each of the statements made below is based upon my knowledge.

3.      This Affidavit concerns a very good, repeat TitleMax customer who was solicited by Plaintiffs/Counterdefendants Wellshire Financial Services, LLC and Meadowwood Financial Services, LLC ("LoanStar"). This customer highly values the customer's privacy and confidentiality and insists on remaining anonymous. For ease of reference, the customer will be referred to as "Peter," which is not the customer's real name.

4.      On November 14, 2015, Peter called a TitleMax store in Pasadena, Texas to obtain the minimum amount he would need to pay to refinance his loan. While he was on the phone, he said that LoanStar called him a few days prior in an attempt to buyout his loan. LoanStar referenced TitleMax; knew that Peter has a loan with TitleMax; told Peter that LoanStar could offer him a better deal; and wanted to buyout Peter's loan with TitleMax. Peter has not even told his own family that he has a loan with TitleMax and therefore he was very concerned about how LoanStar obtained his information. He asked if TitleMax and LoanStar are affiliated or if TitleMax sells or gives away its customers' information to LoanStar. He was disturbed that LoanStar had obtained his information and he felt violated. He was also worried that others would find out he has a title loan, which is a very personal matter for him.

5.      Later that day when Peter arrived at the store to refinance his loan, he was still upset that LoanStar had obtained his information to solicit his loan. He continued to discuss what happened and he reiterated everything he reported in Paragraph 3. After some time and effort,

the store was able to assure Peter that TitleMax did not sell or give away his information to LoanStar.

_(signature)_

_____
John Salinas

    Subscribed and sworn to before me by John Salinas on this the 20th day of January, 2016, to certify which witness my hand and seal of office

_(signature)_

_____
Notary Public in the State of Texas

EDUARDO ANTONIO AGUIRRE
126602710
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
OCT. 19, 2016

- 2 -

**APPENDIX 0201**

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and d/b/a MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP, | § § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | OF HARRIS COUNTY, TEXAS |
| v. | § § | |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; and TITLEMAX OF TEXAS, INC., | § § § § § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |

## PLAINTIFFS' OBJECTION TO TITLEMAX'S FIRST AMENDED COUNTERCLAIM

COME NOW, Plaintiffs Wellshire Financial Services, LLC d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax ("Wellshire"); Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans ("Meadowwood" and collectively with Wellshire, "LoanStar"), and Integrity Texas Funding, LP ("Integrity," and collectively with LoanStar, "Plaintiffs"), and file this Objection to Defendants' ("TitleMax") First Amended Counterclaim ("Amended Counterclaim"), respectfully showing the Court as follows:

1.     TitleMax filed its Amended Counterclaim after the Court heard Plaintiffs' motion for summary judgment, without first seeking the requisite leave of Court.  Consequently, in

addition to being meritless,[1] TitleMax's Amended Counterclaim is also procedurally improper and should not be considered by this Court.  (*See* Pls.' Supp. Br. in Support of its Mot. For Summary J.)

2.      On August 14, 2015, Plaintiffs filed their Motion for Summary Judgment demonstrating that TitleMax's counterclaims were deficient as a matter of law.

3.      On November 6, 2015, the Court heard oral argument on Plaintiffs' motion for summary judgment.  At the conclusion of that hearing, the Court stated that it would rule on the viability of the Letter of Guarantee counterclaims and reserved ruling on the Secret Shopping counterclaims until after the parties had deposed TitleMax's star witness, Zach Farmer.  (*See* Nov. 6, 2015 Hearing Tr.)  On January 12, 2016, Plaintiffs deposed Mr. Farmer who testified that, after obtaining permission from TitleMax employees, he entered public areas of TitleMax stores and photographed goal boards that were kept in plain view of any member of the public.

4.      Recognizing that Farmer's testimony confirmed its Counterclaim was not viable, TitleMax served and filed an Amended Counterclaim on January 29, 2016.  (*See* Am. Counterclaim.)  Despite the fact that this amendment came more than five months after Plaintiffs moved for summary judgment on TitleMax's original Counterclaim and more than two months after the Court heard Plaintiffs' motion, TitleMax failed to seek leave of Court before filing the Counterclaim.

5.      However, TitleMax is required to seek leave of Court before filing an amended counterclaim, when, as here, it seeks to amend its pleading after a summary judgment hearing, but before an order is entered.  TRCP 166a(c) (parties may only file amended pleadings after

---

[1] Plaintiffs are contemporaneously filing a supplement brief in support of their Motion for Summary Judgment, demonstrating that TitleMax's amendments to its Counterclaim are futile and that the Court should dismiss TitleMax's counterclaim in its entirety.

**APPENDIX 0203**

hearing on summary judgment motion, but before judgment is rendered, "with permission of the court"); *Hussong v. Schawn's Sales Enters., Inc.*, 896 S.W.2d 320, 323 (Tex. App.—Houston [1st Dist.] 1995) (citing *Leinen v. Buffington's Bayou City Serv.*, 824 S.W.2d 682, 685 (Tex. App.—Houston [14th Dist] 1992, no writ) ("[A] trial court can only consider pleadings and proof on the file at the time of the [summary judgment] hearing, or filed after the hearing and before judgment *with the permission of the court*.") (emphasis added).  TitleMax has still never sought this Court's permission to file its amended Counterclaim and accordingly its amended Counterclaim should be struck as procedurally improper.

DATED:  February 23, 2016        Respectfully submitted,

          **SUTHERLAND ASBILL & BRENNAN LLP**

          By:   */s/ Daniel Johnson*
               Daniel Johnson (SBN 24046165)
               Robert A. Lemus (SBN 24052225)
          1001 Fannin, Suite 3700
          Houston, Texas 77002
          Telephone:  (713) 470-6100
          Facsimile:  (713) 654-1301
          E-mail:  daniel.johnson@sutherland.com
          E-mail:  robert.lemus@sutherland.com

          And

          **WARGO & FRENCH LLP**
               Joseph D. Wargo (GA No. 738764)
               (Admitted *Pro Hac Vice*)
               John C. Matthews (FL No. 89659)
               (Admitted *Pro Hac Vice*)
               Daniel H. Gaynor (GA No. 351612)
               (Admitted *Pro Hac Vice*)
          999 Peachtree Street, N. E., 26th Floor
          Atlanta, Georgia 30309
          Telephone:  (404) 853-1500
          Facsimile:  (404) 853-1501
          E-Mail:  jwargo@wargofrench.com

**APPENDIX 0204**

E-Mail:  jmatthews@wargofrench.com
E-Mail:  dgaynor@wargofrench.com

*Attorneys for Wellshire Financial Services,
LLC, d/b/a LoanStar Title Loans, d/b/a
MoneyMax Title Loans, and d/b/a LoanMax;
Meadowwood Financial Services, LLC, d/b/a
LoanStar Title Loans, and d/b/a MoneyMax
Title Loans; and Integrity Texas Funding, LP*

4

APPENDIX 0205

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing **PLAINTIFFS' OBJECTION TO TITLEMAX'S FIRST AMENDED COUNTERCLAIM** has been forwarded to all counsel of record in accordance with Texas Rules of Civil Procedure 21 and 21a, on this 23rd day of February 2016.

L. Bradley Hancock
Christopher Johnsen
Holland & Knight LLP
1100 Louisiana Street, Suite 4300
Houston, TX 77002

Roland Garcia, Jr.
Greenberg Traurig LLP
1000 Louisiana Street, #1700
Houston, TX 77002

*Attorneys for Defendants*
*TMX Finance LLC,*
*TMX Finance of Texas, Inc. and*
*TitleMax of Texas, Inc.*

/s/ Daniel Johnson
Daniel Johnson

11/2/2016 1:16:24 PM
Chris Daniel - District Clerk Harris County
Envelope No. 13580093
By: Iris Collins
Filed: 11/2/2016 1:16:24 PM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE LLC, ET AL. | § | 152nd JUDICIAL DISTRICT |

---

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., and TMX FINANCE OF TEXAS, INC. | § § § | |
| v. | § § | |
| WELLSHIRE FINANCIAL SERVICES, LLC and MEADOWWOOD FINANCIAL SERVICES, LLC | § § § | |

---

## DEFENDANTS'/COUNTERPLAINTIFFS' SECOND AMENDED COUNTERCLAIM

---

Defendants/Counterplaintiffs TitleMax of Texas, Inc. and TMX Finance of Texas, Inc. (collectively, "TitleMax" and/or "Counterplaintiffs") bring this Second Amended Counterclaim against Plaintiffs/Counterdefendants Wellshire Financial Services, LLC and Meadowwood Financial Services, LLC (collectively, "Counterdefendants").

## I.
## PARTIES

1.    Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax of Texas") is a Delaware corporation with its principal place of business in Texas. TitleMax of Texas assists Texas customers in obtaining loans through third-party lenders. TitleMax of Texas was sued by Counterdefendants in this lawsuit.

2.    Defendant/Counterplaintiff TMX Finance of Texas, Inc. ("TMX Finance of Texas") is a Delaware corporation with its principal place of business in Texas. TMX Finance of Texas provides direct lending services to Texas customers. TMX Finance of

Texas was sued by Counterdefendants in this lawsuit.

3.      Plaintiff/Counterdefendant Wellshire Financial Services, LLC ("Wellshire") is a Georgia limited liability company. Wellshire is a competitor of TitleMax of Texas that operates in Texas.

4.      Plaintiff/Counterdefendant Meadowwood Financial Services, LLC ("Meadowwood") is a Georgia limited liability company. Meadowwood is a competitor of TitleMax of Texas that operates in Texas.

## II.
## FACTS

5.      TitleMax of Texas is a credit service organization ("CSO"). As a CSO, TitleMax of Texas assists customers in obtaining loans through third-party lenders. Namely, TitleMax of Texas connects a customer with a lender who, with the CSO, will secure a loan by placing a lien on the customer's vehicle. In addition to arranging for title loans, TitleMax of Texas will also help a customer refinance a pre-existing loan arranged by another CSO (such as a title loan held by Counterdefendants).

6.      TMX Finance of Texas is a direct lender who makes loans directly to customers. TMX Finance of Texas is compensated through finance charges paid by the customer.

7.      TitleMax's business is affected by facilitating or making title loans; refinancing title loans; facilitating or making additional loan arrangements; and receiving referrals from existing customers. Counterdefendants are in the same line of business as TitleMax and directly or indirectly compete with TitleMax.

8.      Counterdefendants have engaged in a campaign of corporate espionage against TitleMax. Counterdefendants have stolen TitleMax's proprietary confidential financial and store-profitability information and have interfered with TitleMax's contracts,

2

APPENDIX 0208

customers, and business relations by refusing to provide Letters of Guarantee and by using

driving records to solicit TitleMax's customers.

**A.      Counterdefendants have entered TitleMax's non-public areas under false pretenses to steal its confidential information.**

9.      Counterdefendants have entered non-public areas within TitleMax stores

posing as potential customers or other third parties and, using recording devices,

unlawfully and improperly taken TitleMax's proprietary confidential financial and store-

profitability information.  Additionally, Counterdefendants have taken pictures of

TitleMax's goal boards and surrounding reports hung next to the goal boards, which

contain store-profitability information, circumventing the need for Counterdefendants to

do their own marketing and business analysis. *See generally* Affidavit of Zachary Farmer,

attached as **Exhibit 1**. Counterdefendants have taken TitleMax's confidential business

information to attempt to undermine TitleMax, gain an unfair competitive advantage, and

increase Counterdefendants' competitiveness in the marketplace.

**B.      Counterdefendants have interfered with TitleMax's contracts and business relationships by refusing to return titles and/or provide Letters of Guarantee within a reasonable period of time.**

10.      Additionally, Counterdefendants have refused to return titles to customers

and/or provide Letters of Guarantee to TitleMax within a reasonable period of time,

substantially interfering with TitleMax's contracts and current and prospective business

relationships. Customers have the right to do business with the lender or CSO of their

choice. A customer has the option to pay the entirety of an existing loan by using funds

obtained from another lender (a situation commonly referred to as a "Buyout"). To

perform a Buyout in the industry custom, the new CSO or lender obtains from the original

CSO or lender either the title to the vehicle or a Letter of Guarantee of title ensuring that

clear title to the vehicle will be released upon full payment of the original title loan. The

**APPENDIX 0209**

new CSO or new lender steps into the shoes of the customer during the Buyout process. *See generally* confirmation correspondence from the Texas Office of Consumer Credit Commissioner and the State of South Carolina Department of Consumer Affairs, attached as **Exhibit 2**.

11.     When customers desire to pay off their loans, Texas law requires a lienholder to provide a release of lien and title within a reasonable time. Because customers need the money immediately and may not have the requisite credit, time, or resources to use traditional banking to pay off the loan, Letters of Guarantee are commonly employed in the Texas title loan industry to expedite and facilitate Buyouts. When a customer is unable to obtain an immediate release of title or a Letter of Guarantee, the customer is prevented from contracting with a new CSO or new lender and is essentially held hostage. This effectively results in a prepayment penalty to the customer and violates the CSO's or lender's duty to provide a release of lien and title or its equivalent. *See id.*

12.     Knowing the foreseeable damages to the customer and the new title company, Counterdefendants have refused to provide Letters of Guarantee to TitleMax or its customers. This refusal to allow a Buyout is an institutionalized policy of Counterdefendants. By refusing to provide either the title or the Letter of Guarantee, the Buyout transactions cannot be completed, the existing loans cannot be bought out or paid off, and TitleMax loses those customers and the related goodwill. Moreover, because customers sometimes choose to refinance their title loans, losing that customer may result in not only the loss of the initial contract, but also future contracts (such as refinancing loans or arranging additional loans) with that customer. This is notwithstanding any potential referrals that the new customer may send to TitleMax.

13.     In addition to refusing to return titles and/or provide Letters of Guarantee to TitleMax and its customers within a reasonable period of time, Counterdefendants have

4

engaged in independently tortious and unlawful conduct. Among other things, Counterdefendants breached their duty of care owed to TitleMax; lied to TitleMax's customers about its business and practices, such as by falsely telling customers that TitleMax repossesses vehicles as early as one to two days into delinquency; and engaged in deceptive and unfair business practices.

14.     The Deceptive Trade Practices and Consumer Protection Act (the "DTPA") provides that it is a violation to use false, misleading, or deceptive acts or practices including but not limited to representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. *See* TEX. BUS. & COMMERCE CODE § 17.46(b)(12). By failing to provide Letters of Guarantee, Counterdefendants are intentionally and knowingly denying their customers the right to prepay their loans pursuant to their contracts, which is a violation of the DTPA. *See* TEX. BUS. & COMMERCE CODE § 17.45(9), (13). Moreover, given the urgency by which many title loan customers need to pay off their loan, Counterdefendants' refusal amounts to an unconscionable action or course of action. *See* TEX. BUS. & COMMERCE CODE § 17.45(5).

**C.     Counterdefendants have accessed and used driving records to interfere with TitleMax of Texas's customers, contracts, and prospective business relations.**

15.     Despite vigorously accusing TitleMax of Texas of using driving records to solicit customers, it has been discovered that Counterdefendants have been actively engaged in the same conduct in which they allege TitleMax of Texas was engaged. TitleMax of Texas recently learned that Counterdefendants appear to have accessed and used driving records to interfere with TitleMax of Texas's customers, contracts, and prospective business relations. *See generally* Affidavit of John Salinas, attached as **Exhibit 3**. One such customer, who highly values privacy and confidentiality and insists on remaining

anonymous, was contacted and solicited by Counterdefendants. *Id.* at ¶¶ 2-3. Counterdefendants were aware of the existing TitleMax of Texas loan; told the customer they could offer a better deal; and offered to Buyout the loan. *Id.* at ¶ 3. The customer had not told anyone else about the loan, and upon information and belief Counterdefendants could have only determined its existence through the use of driving records. *Id.* at ¶ 3.

### III.
### COUNTERCLAIMS

#### COUNT I—TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

16.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

17.     TitleMax had valid contracts with customers.

18.     Counterdefendants knew of these contracts and willfully and intentionally interfered with them, as discussed above.

19.     Counterdefendants' interferences proximately caused TitleMax injury.

20.     TitleMax incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

21.     Counterdefendants' actions were malicious or wanton, and therefore TitleMax specifically requests an award of exemplary damages.

#### COUNT II—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

22.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

23.     TitleMax had a reasonable probability that potential customers would have entered into business relationships with TitleMax.

24.     Counterdefendants either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to

occur as a result of the conduct.

25.     Counterdefendants' actions were independently tortious and/or unlawful, as discussed above.

26.     Counterdefendants' interferences proximately caused TitleMax injury.

27.     TitleMax incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

28.     Counterdefendants' actions were malicious or wanton, and therefore TitleMax specifically requests an award of exemplary damages.

### COUNT III—CONVERSION

29.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

30.     Counterdefendants have wrongly asserted dominion over TitleMax's property, namely its proprietary confidential financial and store-profitability information, inconsistent with TitleMax's right of ownership.

31.     TitleMax owns and has the right to possess its proprietary confidential financial and store-profitability information.

32.     Counterdefendants unlawfully and knowingly came into actual possession of TitleMax's proprietary confidential financial and store-profitability information.

33.     Counterdefendants' knowingly used TitleMax's proprietary confidential financial and store-profitability information for their own benefit. The conversion harmed TitleMax.

34.     Counterdefendants' actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

7

## COUNT IV—THEFT OF PROPERTY

35.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

36.     Counterdefendants have committed theft regarding TitleMax's property, namely its proprietary confidential financial and store-profitability information.

37.     TitleMax owns and has a possessory right over its proprietary confidential financial and store-profitability information.

38.     Counterdefendants unlawfully and knowingly appropriated TitleMax's proprietary confidential financial and store-profitability information.

39.     TitleMax did not consent to Counterdefendants' taking of the property.

40.     Counterdefendants' theft has harmed TitleMax.

41.     Counterdefendants' actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

## COUNT V—DECLARATORY JUDGMENT

42.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

43.     A declaratory judgment would resolve a judicial controversy regarding the rights, obligations, and statuses of the parties with respect to Buyouts.

44.     TitleMax seeks a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code declaring that:

    a.   When a debtor pays off a title loan, the title-loan company must, within a reasonable period of time, provide either the title to the vehicle or its equivalent, a letter of guarantee; and

    b.   When a debtor seeks to pay off a title loan with funds brokered by a

8

competitor title-loan company, the competitor assumes the legal rights of the debtor.

## IV.
## CONDITIONS PRECEDENT

45.     All conditions precedent to TitleMax's claims for relief have been performed or have occurred.

## V.
## PRAYER

46.     WHEREFORE, TitleMax prays for the following relief as discussed herein:

      a.     actual damages;

      b.     exemplary damages;

      c.     declaratory judgment;

      d.     temporary and permanent injunctive relief;

      e.     prejudgment and post-judgment interest at the highest rate allowable by law;

      f.     court costs;

      g.     attorney's fees; and

      h.     such other and further relief as the Court deems just and proper.

Dated:  November 2, 2016

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: */s/ L. Bradley Hancock*
L. Bradley Hancock
State Bar No. 00798238
brad.hancock@hklaw.com
Christopher David Johnsen
State Bar No. 24072169
chris.johnsen@hklaw.com
1100 Louisiana Street, Suite 4300
Houston, TX 77002-5227
713-821-7000 (telephone)
713-821-7001 (facsimile)

**GREENBERG TRAURIG, L.L.P.**

Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

COUNSEL FOR DEFENDANTS
TMX FINANCE OF TEXAS, INC.;
TITLEMAX OF TEXAS, INC.; TMX
FINANCE LLC; AND TMX
FINANCE HOLDINGS, INC.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 2nd day of November, 2016.

_/s/ Christopher David Johnsen_
Christopher David Johnsen

**APPENDIX 0216**

# EXHIBIT 1

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DRUMMOND FINANCIAL SERVICES, )
LLC; et al.,                  )
                              )
        Plaintiffs,           )
                              )        CIVIL ACTION FILE
v.                            )        NO.: 2014cv253677
                              )
TMX FINANCE HOLDINGS, INC.; et al., )
                              )
        Defendants.           )

AFFIDAVIT OF ZACHARY FARMER

        Personally appeared before the undersigned ZACHARY FARMER who, after being duly
sworn, testified and said on oath as follows:

        1.      I am Zachary Farmer, an individual resident of the State of Ohio.

        2.      I am over 21 years of age and competent in all respects to give testimony in this
matter.

        3.      On December 10, 2014, I interviewed for a position with TitleMax.  During the
interview, I voluntarily disclosed the information that is substantially repeated in this Affidavit.
TitleMax has not offered me anything of value in exchange for the information contained in this
Affidavit.

        4.      From February 2009 through November 14, 2014, I was an employee of
Wellshire Financial Services, LLC and Drummond Financial Services, LLC, companies owned
by Select Management Resources LLC ("Select").  I worked in stores doing business as
"LoanStar Title Loans," "North American Title Loans," and "LoanMax."

        5.      From August 2010 through June 2012, I was employed as an Operations
Specialist.

        6.      As an Operations Specialist, I traveled around the country, filling in at short-
staffed stores, consulting, detecting fraud, assisting with staffing decisions, and identifying
sponsorship opportunities.  One primary task as an Operations Specialist was to improve Select's
competitiveness in the marketplace, specifically with respect to Select's primary competitor,

1

TitleMax. I reported to Jesse Anderson, Brent Matthews, and Berk Jolly, who were Vice Presidents of Select.

7.      As an Operations Specialist, I used several different tactics to gain competitive advantages for Select over TitleMax.

8.      For example, I would pretend to be a customer and go into TitleMax stores to talk with their employees in an effort to determine what TitleMax was offering customers. I would also pretend to be a LoanMax customer seeking a better deal from TitleMax in order to see what terms they might offer. I would present TitleMax employees with a LoanMax application and try to coax them to talk about LoanMax.

9.      I would also carry a concealed recording device to record my interactions with TitleMax employees. I would then mail the recording to Select Vice President Jesse Anderson at Select's corporate office in Alpharetta, Georgia.

10.      As another example, I would pose as a repo-man seeking to do business with TitleMax and would ask TitleMax store managers how many repossessions they had during a specific period. TitleMax managers would often provide that information assuming I was actually in the repossession business.

11.      Another tactic that I used to gain competitive advantage for Select, was to gain access to and photograph TitleMax "goal boards." Each TitleMax store had a goal board. The goal boards were typically located in back rooms of TitleMax stores, which were not open to the public.

12.      A goal board typically listed a TitleMax store's financial performance goals for the month, the actual financial results from previous months, and the month-to-date financial results. The more established TitleMax stores would have more financial data on their goal boards. I would send the photographs of the goal boards electronically to Select Vice President Jesse Anderson. The data helped Select determine whether to open a Select-branded store in the immediate area to compete with TitleMax.

13.      My method for gaining access to the goal boards was to pose as a potential customer and ask a TitleMax employee if I might use the store's restroom. I would then access the private back office business area and take pictures of the store's goal board as I pretended to look for the restroom. I then emailed the photographs to Select Vice President Jesse Anderson.

2

14.     The first time I photographed a goal board, I was sent to a TitleMax store to act like a potential customer with a LoanStar application.  I was to present the application to the TitleMax employee to find out what they would say about LoanStar.  While in the TitleMax store, I needed to use the restroom, and on my way back to the restroom I saw a goal board and took a picture of it.  I sent the picture to Jesse Anderson, who responded that I should try to take photographs of as many other goal boards from TitleMax locations as I could.  About a week later, Brent Matthews, another Select Vice President, followed up with me to see how many boards I was able to photograph and suggest where I could find more.

15.     Over the span of a year, in 2011 and 2012, I visited TitleMax stores in Texas (including Arlington, Carrolton, Mesquite, and Garland), South Carolina (including Rock Hill, Columbia, and Myrtle Beach), and Alabama (including Tuscaloosa and Birmingham).  In total, I visited approximately 75 TitleMax stores for the express purpose of photographing goal boards.  Of those 75 stores, I successfully photographed approximately 30 goal boards.

16.     I photographed the goal boards with a smartphone provided to me by Select and I used the email address provided to me by Select to transmit the photographs to Select Vice President Jesse Anderson.

17.     It is my understanding that gaining access to TitleMax non-public areas and photographing TitleMax goal boards became a uniform practice of Select.

18.     For example, in my last assignment with Select, I participated in a conference call with Area Managers in Ohio, shortly before TitleMax entered the Ohio market.  During the call, the Area Managers were told by Select upper management that they should comply with Select's company-wide practice and direct their employees to enter TitleMax stores under false pretenses so that they could gain access to and photograph TitleMax goal boards.

19.     Another tactic that I observed was LoanMax employees using DMV records to identify which competitor bought out their customers' loans in an effort to confirm whether LoanMax was losing business to TitleMax.

20.     I make this affidavit based upon my personal knowledge for use in this lawsuit and for any legal purpose.

3

WITNESS my hand and seal, this _10th_ day of January, 2015.

ZACHARY FARMER

Sworn to and subscribed before me
this ___10___ day of January, 2015.

Notary Public
___HAMILTON___ County, ___OH___
My commission expires ___5-30-16___

MICHAEL P. ROLFES
NOTARY PUBLIC - OHIO
COMMISSION # 2011-RE-374726
MY COMMISSION EXPIRES MAY 30, 2016

4

# EXHIBIT 2

| | |
|---|---|
| **From:** | William Purce <William.Purce@occc.texas.gov> |
| **Sent:** | Thursday, November 12, 2015 9:47 AM |
| **To:** | Victoria Newman |
| **Subject:** | Re: Buyouts of Competitors |

Dear Ms. Newman:

At this time, our agency has not issued any advisory bulletins on this issue related to credit access businesses (there are some advisory letters dealing with regulated lenders and property tax lenders). However, our agency has investigated this issue in the past and has instructed licensees to provide and accept the payoffs. Our analysis of this issue is very similar to the analysis discussed in the South Carolina opinion letter.

Respectfully,


William Purce
Senior Administrative Review Examiner
Office of Consumer Credit Commissioner
2601 North Lamar Boulevard
Austin, Texas 78705
512.936.7626
william.purce@occc.texas.gov



TEXAS OFFICE of CONSUMER
CREDIT COMMISSIONER

| | |
|---|---|
| **From:** | Victoria Newman <Victoria.Newman@titlemax.com> |
| **To:** | 'William Purce' <William.Purce@occc.texas.gov> |
| **Date:** | 11/12/2015 9:07 AM |
| **Subject:** | Buyouts of Competitors |

Hi William,

I hope you are doing well. A question came up that I would like your help resolving.

I take the position that a buyout request from a customer should not be refused regardless of whether it's from a competitor. South Carolina has issued similar guidance on the matter (attached for your reference). A refusal of the buyout (or failure to immediately return the title or provide a letter of guaranty), in my opinion, would be akin to a prepayment penalty.

Has the OCCC issued guidance on this issue before? I haven't found any but I could have missed it.

Thanks,

Victoria

Victoria H. Newman
Sr. Compliance and Corporate Counsel

1

**APPENDIX 0223**

**TMX Finance**
15 Bull Street, Ste 200
Savannah, GA  31401
Direct line:  (912) 503-2824
Facsimile:  (866) 591-4638
Email:  victoria.newman@titlemax.com

**PRIVILEGED AND CONFIDENTIAL:**  This e-mail and any attachments hereto are intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information.  If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail.  You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

"NOTE: This e-mail, any attachments, and the information contained therein are confidential. The information contained in this email and/or any attachments is intended only for use by the intended recipient(s) and may contain trade secret or otherwise proprietary information of TMX Finance LLC and/or its affiliates and subsidiaries (collectively, "TitleMax"). If you are not the intended recipient of this e-mail, any use, dissemination, distribution or copying of this e-mail, any attachments, or the information contained therein, is strictly prohibited. If you received this e-mail and you are not an intended recipient, please immediately notify TitleMax e-mail administrator at: abuse@titlemax.biz and permanently delete the original and any copy of this e-mail, any attachments, and/or any printouts thereof."

APPENDIX 0224



The State of South Carolina

Department of Consumer Affairs

2221 DEVINE STREET, STE 200
PO BOX 5757
COLUMBIA, SC 29250-5757

Carri Grube Lybarker
Administrator

*Celebrating Over 35 Years of Public Service*

Commissioners
David Campbell
Chair
Columbia
Johnny E. Soschee
Vice Chair
Piedmont
Mark Hammond
Secretary of State
Columbia
Clifford Ray Keasler
Myrtle Beach
Terrell A. Parrish
Greer
Magaly P. Penn
Simpsonville
W. Fred Pennington, Jr.
Taylors

September 12, 2014

*Via Hand Delivery and Electronic Mail*

Mr. Jim Copeland
Acting Commissioner/ Assistant Commissioner
Consumer Finance Division
S.C. State Board of Financial Institutions
1205 Pendleton Street, Suite 306
Columbia, SC 29201

     **RE:   Opinion Request- Prepayment Penalties**

Dear Jim:

     You have requested an opinion regarding practices employed by supervised lenders when a loan is being prepaid by a third party on behalf of a consumer, the original debtor. Consumer credit transactions are governed by the South Carolina Consumer Protection Code ("the Code"), S.C. Code Ann. sections 37-1-101 *et seq.*[1] Right to prepay a consumer loan is addressed in § 37-3-209 with prepayment of credit sales addressed in § 37-2-209. From the information you have provided, the following question has been posed and will be addressed herein in the form of a general answer that could change depending on specific circumstances:

          Can a lender subject to the Code charge a consumer a different interest rate than currently being assessed and impose different terms regarding accepted method of payment or otherwise impose varying contract terms when a consumer loan is being prepaid by a third party on behalf of the consumer?

     As stated above, § 37-3-209 governs the consumer's right to prepay a consumer loan. The section specifically states: "...the debtor may prepay in full the unpaid balance of a consumer loan, refinancing, or consolidation at *any time without penalty.*" (Emphasis added.) A "debtor" is defined as "any person who is an obligor in a credit transaction, including any cosignor, comaker, guarantor, endorsee or surety, and *the assignee of any obligor,* and also includes *any person who agrees to assume the payment of a credit obligation.*" (Emphasis added.) *See* § 37-1-301(14). Lastly, "person" includes not only an individual, but an organization. *See* § 37-1-301(20). The right of a debtor to prepay a loan in full without penalty cannot be waived. *See* § 37-1-107(1).

---

[1] Further reference to the South Carolina Code of Laws will be by Code section only.

| | | | | |
|---|---|---|---|---|
| **ADMINISTRATOR** 803-734-4233 **ACCOUNTING** 803-734-4264 Fax: 803-734-4299 | **PUBLIC INFORMATION** 803-734-4296 Fax: 803-734-4229 | **CONSUMER ADVOCACY** 803-734-4200 Fax: 803-734-4287 | **ENFORCEMENT/ INVESTIGATORS** 803-734-4236 Fax: 803-734-4287 | **CONSUMER COMPLAINTS** 803-734-4200 Fax: 803-734-4286 |

E-Mail: SCDCA@SCCONSUMER.GOV
Website: WWW.CONSUMER.SC.GOV
Toll-Free in SC: 800-922-1594
Voice/TT: 800-735-2905

**APPENDIX 0225**

The cardinal rule of statutory construction is to ascertain and effectuate the Legislature's intent from the plain language of the statute. Burns v. State Farm Mut. Auto Ins. Co., 297 S.C. 520, 522, 377 S.E.2d 569, 570 (1989). The words of the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation. Hitachi Data Sys. Corp. v. Leatherman, 309 S.C. 174, 178, 420 S.E.2d 843,846 (1992). Statutory provisions of the Code shall be liberally construed as well as applied to promote the Title's underlying purposes and policies. § 37-1-102(1); Davis v. NationsCredit Financial Services Corporation et al., 326 S.C. 83, 86, 484 S.E.2d 471,472 (1997). The primary purpose of the Code is to protect consumers, as evidenced within relief provisions contained therein. Camp v. Springs Mortgage Corp., 310 S.C. 514,516, 426 S.E.2d 304,305 (1993). Section 37-1-102 further delineates the purposes and policies of the Code, including to foster competition among suppliers, protect borrowers against unfair practices and encourage fair and economically sound consumer credit practices. See § 37-1-102(2)(c)-(e).

The plain language of the Code permits a debtor to prepay a loan in full without incurring any type of penalty. Further, debtor is defined broadly to not only include the original consumer who has promised or otherwise is obligated to pay the debt, but to assignees and other persons who agree to assume responsibility of paying the debt as well, including an organization.

In the scenario you provided, a third party is attempting to prepay a loan in full on behalf of the consumer. The Lender, however, contracted for alternate interest rate terms to apply should a third party, including but not limited to, a bank, credit union, title loan, automobile dealership or insurance company pay off the loan. In construing the statutory language of the Code liberally to effectuate its purposes and policies, the Department concludes such alternate terms would constitute a prepayment penalty if the third party is an assignee of the obligor or entered into an agreement to pay the loan. The third party assuming the obligation is considered the debtor and, thus, is entitled to pay off the loan under the same terms as the consumer whom originally incurred the debt/obligation. See § 37-1-301(14).

You have also posed a scenario whereby the Lender requires that the original debtor be present at the time the third party pays off the loan. As explained above, however, when the third party assumed the obligation, the third party is considered the debtor. If the Lender refuses to accept payment from the third party on the basis that the original debtor is not present, this amounts to a violation § 37-3-209 as the Lender is depriving the debtor of the right to prepay.

Lastly, you posed a scenario whereby the Lender refuses to accept the same type of payment method from a third party attempting to prepay a loan in full as it has previously contracted for or otherwise accepted from the original debtor. While this may not be considered a prepayment penalty, the practice could constitute breach of contract if the contract delineates the types of payment accepted or if the Lender has previously, through a course of dealings, accepted payment from the original debtor via the same method the third party is attempting to utilize. See § 37-3-103(3); Dowling v. Charleston & W.C. Ry. Co., 105 S.C. 475, 81 S.E. 313 (1913); Weisz Graphics Div. v. Peck Industries, 304 S.C. 101, 403 S.E.2d 146 (Ct. App. 1991).

APPENDIX 0226

Copeland
September 12, 2014
Page 3 of 3

When a debtor exercises the right to prepay pursuant to § 37-3-209, please also be mindful of other provisions of the Code governing prepayment.  Section 37-3-210, for example, regulates prepayment rebates for consumer loans while § 37-4-108 states the parameters for the treatment of refunds of insurance premiums upon prepayment of a consumer loan.

Pursuant to sections 37-6-104(4) and 37-6-506(3), reliance upon an administrative interpretation provides protection from any penalties authorized by the Code if the administrative interpretation is subsequently declared invalid by a court or is rescinded.  Please do not hesitate to contact me directly at 803-734-4297 should you need any further information.

Best Regards,

Carri Grube Lybarker, Esq.

# EXHIBIT 3

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC., ET AL. | §<br>§<br>§ | 152nd JUDICIAL DISTRICT |

**<u>AFFIDAVIT OF JOHN SALINAS</u>**

| | |
|---|---|
| STATE OF TEXAS | §<br>§ |
| COUNTY OF HARRIS | § |

Before me, the undersigned authority, appeared John Salinas, known to me to be the person whose name is subscribed hereto and, after being duly sworn by me, stated as follows:

1.      My name is John Salinas. I am over the age of 21, of sound mind, and competent to make this Affidavit.

2.      I am a district manager of Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax"). I have knowledge of the facts stated in this Affidavit through my role with TitleMax, and each of the statements made below is based upon my knowledge.

3.      This Affidavit concerns a very good, repeat TitleMax customer who was solicited by Plaintiffs/Counterdefendants Wellshire Financial Services, LLC and Meadowwood Financial Services, LLC ("LoanStar"). This customer highly values the customer's privacy and confidentiality and insists on remaining anonymous. For ease of reference, the customer will be referred to as "Peter," which is not the customer's real name.

4.      On November 14, 2015, Peter called a TitleMax store in Pasadena, Texas to obtain the minimum amount he would need to pay to refinance his loan. While he was on the phone, he said that LoanStar called him a few days prior in an attempt to buyout his loan. LoanStar referenced TitleMax; knew that Peter has a loan with TitleMax; told Peter that LoanStar could offer him a better deal; and wanted to buyout Peter's loan with TitleMax. Peter has not even told his own family that he has a loan with TitleMax and therefore he was very concerned about how LoanStar obtained his information. He asked if TitleMax and LoanStar are affiliated or if TitleMax sells or gives away its customers' information to LoanStar. He was disturbed that LoanStar had obtained his information and he felt violated. He was also worried that others would find out he has a title loan, which is a very personal matter for him.

5.      Later that day when Peter arrived at the store to refinance his loan, he was still upset that LoanStar had obtained his information to solicit his loan. He continued to discuss what happened and he reiterated everything he reported in Paragraph 3. After some time and effort,

the store was able to assure Peter that TitleMax did not sell or give away his information to LoanStar.

John Salinas

Subscribed and sworn to before me by John Salinas on this the 20th day of January, 2016, to certify which witness my hand and seal of office.

Notary Public in the State of Texas

EDUARDO ANTONIO AGUIRRE
126602710
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
OCT. 19, 2016

- 2 -

**APPENDIX 0230**

2/3/2017 7:18:10 PM
Chris Daniel - District Clerk Harris County
Envelope No. 15134431
By: KATINA WILLIAMS
Filed: 2/3/2017 7:18:10 PM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE LLC, ET AL. | § | 152nd JUDICIAL DISTRICT |

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., and TMX FINANCE OF TEXAS, INC. | § § § | |
| v. | § § | |
| WELLSHIRE FINANCIAL SERVICES, LLC and MEADOWWOOD FINANCIAL SERVICES, LLC | § § § | |

---

## DEFENDANTS TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; AND TMX FINANCE LLC'S THIRD AMENDED ANSWER AND AFFIRMATIVE DEFENSES

---

Defendants TMX Finance of Texas, Inc.; TitleMax of Texas, Inc.; and TMX Finance LLC (collectively, "Defendants") submit this Third Amended Answer and Affirmative Defenses to the Second Amended Petition, and all amendments and supplements thereto (the "Petition"), filed by Plaintiffs Wellshire Financial Services, LLC; Meadowwood Financial Services, LLC; and Integrity Texas Funding, LP (collectively, "Plaintiffs").

## I.
## GENERAL DENIAL

In accordance with the rights granted to Defendants by Rule 92 of the Texas Rules of Civil Procedure, Defendants generally deny each and every material allegation contained in Plaintiffs' Petition and demand that Plaintiffs be required to prove their charges and allegations against Defendants as required by the Constitution and the laws of the State of Texas.

## II.
## AFFIRMATIVE DEFENSES

1.      The Petition fails to state a claim upon which relief may be granted.

2.      Plaintiffs' claims are barred because the acts complained of in the Petition did not cause Plaintiffs' alleged injuries or losses.

3.      Plaintiffs' claims are barred in whole or in part by the affirmative defenses of justification or privilege.

4.      Plaintiffs' damages, if any, were proximately caused in whole or in part by the acts or omissions of negligence or other bad conduct of other parties or third parties over whom Defendants had no control or right of control or that were acting outside the scope of employment.

5.      Plaintiffs' claims are barred in whole and in part by the affirmative defense of independent discovery or development without use of improper means.

6.      Plaintiffs' claims are barred due to Plaintiffs' own actions, failure to act, negligence and/or legal fault.

7.      Defendants acted in good faith and not with willful or reckless disregard of the law.

8.      Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.

9.      Defendants assert the affirmative defenses of res judicata and collateral estoppel.

10.      Plaintiffs' claims are barred at least in part by the applicable statutes of limitation.

11.      Plaintiffs' claims are barred by application of the doctrine of laches.

12.      Plaintiffs' claim for punitive damages should be dismissed to the extent an award of punitive damages would violate the U.S. Constitution or other applicable law.

13.      Plaintiffs' trespass claim is barred in whole or in part by application of the innocent trespasser doctrine.

APPENDIX 0232

14.    Plaintiffs' trespass claim is barred in whole or in part by effect of permission or invitation.

15.    Defendants assert any other affirmative defenses to which they are entitled.

## III.
## PRAYER

Defendants pray that: (1) Plaintiffs take nothing by this suit; (2) Defendants recover their attorneys' fees, costs, and expenses incurred in this suit; and (3) Defendants have such other and further relief to which they may be entitled.

Dated: February 3, 2017

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: /s/ L. Bradley Hancock
L. Bradley Hancock
State Bar No. 00798238
brad.hancock@hklaw.com
Christopher David Johnsen
State Bar No. 24072169
chris.johnsen@hklaw.com
1100 Louisiana Street, Suite 4300
Houston, TX 77002-5227
713-821-7000 (telephone)
713-821-7001 (facsimile)

**GREENBERG TRAURIG, L.L.P.**

Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

Counsel for Defendants TMX Finance of Texas, Inc.; TitleMax of Texas, Inc.; TMX Finance LLC; and TMX Finance Holdings, Inc.

3

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 3rd day of February, 2017.

*/s/ Christopher David Johnsen*
Christopher David Johnsen

4

2/3/2017 7:14:09 PM
Chris Daniel - District Clerk Harris County
Envelope No. 15134427
By: KATINA WILLIAMS
Filed: 2/3/2017 7:14:09 PM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE LLC, ET AL. | § | 152nd JUDICIAL DISTRICT |

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., and TMX FINANCE OF TEXAS, INC. | § § § | |
| v. | § § | |
| WELLSHIRE FINANCIAL SERVICES, LLC and MEADOWWOOD FINANCIAL SERVICES, LLC | § § § § | |

## THIRD AMENDED COUNTERCLAIM

Defendants/Counterplaintiffs TitleMax of Texas, Inc. and TMX Finance of Texas, Inc. (collectively, "TitleMax") bring this Third Amended Counterclaim against Plaintiffs/Counterdefendants Wellshire Financial Services, LLC and Meadowwood Financial Services, LLC (collectively, "LoanStar").

## I.
## PARTIES

1.      Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax of Texas") is a Delaware corporation with its principal place of business in Texas. TitleMax of Texas assists Texas customers in obtaining loans through third-party lenders. TitleMax of Texas was sued by LoanStar in this lawsuit.

2.      Defendant/Counterplaintiff TMX Finance of Texas, Inc. ("TMX Finance of Texas") is a Delaware corporation with its principal place of business in Texas. TMX Finance of Texas provides direct lending services to Texas customers. TMX Finance of Texas was sued by LoanStar in this lawsuit.

**APPENDIX 0235**

3.      Plaintiff/Counterdefendant Wellshire Financial Services, LLC ("Wellshire") is a Georgia limited liability company. Wellshire is a competitor of TitleMax of Texas that operates in Texas as LoanStar.

4.      Plaintiff/Counterdefendant Meadowwood Financial Services, LLC ("Meadowwood") is a Georgia limited liability company. Meadowwood is a competitor of TitleMax of Texas that operates in Texas as LoanStar.

## II.
## FACTS

5.      TitleMax of Texas is a credit services organization ("CSO"). As a CSO, TitleMax of Texas assists customers in obtaining loans through third-party lenders. Namely, TitleMax of Texas connects a customer with a lender who, with the CSO, will secure a loan by placing a lien on the customer's vehicle. In addition to arranging for title loans, TitleMax of Texas will also help a customer refinance a pre-existing loan arranged by another CSO (such as a title loan previously arranged by LoanStar). TitleMax of Texas is compensated through CSO fees paid by the customer.

6.      TMX Finance of Texas is a direct lender which makes loans directly to customers. TMX Finance of Texas is compensated through finance charges paid by the customer.

7.      TitleMax's business is affected by facilitating or making title loans; refinancing title loans; facilitating or making additional loans; and receiving referrals from existing customers. LoanStar is in the same line of business as TitleMax and directly or indirectly competes with TitleMax.

8.      Since TitleMax has entered the Texas market, it has taken a portion of LoanStar's market share through lawful competition. Among other things, TitleMax engages in substantial advertising and marketing and generally offers its customers lower rates. On

2

the other hand, LoanStar does little to no advertising and marketing and generally has higher rates than TitleMax. LoanStar filed this lawsuit against TitleMax in an attempt to harass TitleMax and obtain through litigation what LoanStar cannot gain through lawful competition. To this day—years after filing the lawsuit—LoanStar has still not identified one individual it lost due to TitleMax's alleged acts.

9.      In addition to filing this lawsuit, LoanStar has engaged in a campaign of corporate espionage against TitleMax. LoanStar has stolen TitleMax's proprietary confidential financial and store-profitability information and has interfered with TitleMax's contracts, customers, and business relations by refusing to provide Letters of Guarantee and by using driving records to solicit TitleMax's customers.

**A.      LoanStar has entered TitleMax's non-public areas under false pretenses to steal its confidential information.**

10.     LoanStar has entered non-public areas within TitleMax stores posing as potential customers or other third parties and, using recording devices, unlawfully and improperly taken TitleMax's proprietary confidential financial and store-profitability information. Additionally, LoanStar has taken pictures of TitleMax's goal boards and surrounding reports hung next to the goal boards, which contain store-profitability information, circumventing the need for LoanStar to do their own marketing and business analysis. *See generally* Affidavit of Zachary Farmer, attached as **Exhibit 1**. LoanStar has taken TitleMax's confidential business information to attempt to undermine TitleMax, gain an unfair competitive advantage, and increase LoanStar's competitiveness in the marketplace. Upon information and belief, LoanStar used TitleMax's confidential information to determine, among other things, where to put new stores and where not to put new stores, whether to renew leases, how to staff stores, where to conduct marketing, and product performance.

3

**B.**     **LoanStar has interfered with TitleMax's contracts and business relationships by refusing to return titles and/or provide Letters of Guarantee within a reasonable period of time.**

11.     Additionally, LoanStar has refused to return titles to customers and/or provide Letters of Guarantee to TitleMax within a reasonable period of time, substantially interfering with TitleMax's contracts and current and prospective business relationships. Customers have the right to do business with the lender or CSO of their choice. A customer has the option to pay the entirety of an existing loan by using funds obtained from another lender (a situation commonly referred to as a "Buyout"). To perform a Buyout in the industry custom, the new CSO or lender obtains from the original CSO or lender either the title to the vehicle or a Letter of Guarantee of title ensuring that clear title to the vehicle will be released upon full payment of the original title loan. The new CSO or new lender steps into the shoes of the customer during the Buyout process. *See generally* confirmation correspondence from the Texas Office of Consumer Credit Commissioner and the State of South Carolina Department of Consumer Affairs, attached as **Exhibit 2**.

12.     When customers desire to pay off their loans, Texas law requires a lienholder to provide a release of lien and title within a reasonable time. Because customers need the money immediately and may not have the requisite credit, time, or resources to use traditional banking to pay off the loan, Letters of Guarantee are commonly employed in the Texas title loan industry to expedite and facilitate Buyouts. When a customer is unable to obtain an immediate release of title or a Letter of Guarantee, the customer is prevented from contracting with a new CSO or new lender and is essentially held hostage. This effectively results in a prepayment penalty to the customer and violates the CSO's or lender's duty to provide a release of lien and title or its equivalent. *See id.*

13.     Knowing the foreseeable damages to the customer and the new title company, LoanStar has refused to return titles to TitleMax customers during Buyouts.

**APPENDIX 0238**

Instead, LoanStar claims that the titles are at its corporate office in Georgia. In fact, LoanStar intentionally moved its titles to Georgia to attempt to thwart Buyouts by TitleMax. Any LoanStar policy to maintain titles in Georgia was targeted at TitleMax.

14.     Additionally, LoanStar has refused to provide Letters of Guarantee to TitleMax or its customers. This is also a LoanStar policy designed by frustrate Buyouts. By refusing to provide either the title or the Letter of Guarantee, the Buyout transactions cannot be completed, the existing loans cannot be bought out or paid off, and TitleMax loses those customers and the related goodwill. Moreover, because customers sometimes choose to refinance their title loans, losing that customer may result in not only the loss of the initial contract, but also future contracts (such as refinancing loans or arranging additional loans) with that customer. This is notwithstanding any potential referrals that the new customer may send to TitleMax.

15.     In addition to refusing to return titles and provide Letters of Guarantee to TitleMax and its customers within a reasonable period of time, LoanStar has engaged in independently tortious and unlawful conduct. Among other things, LoanStar breached their duty of care owed to TitleMax; lied to TitleMax's customers about its business and practices, such as by falsely telling customers that TitleMax repossesses vehicles as early as one to two days into delinquency; and engaged in deceptive and unfair business practices.

16.     The Deceptive Trade Practices and Consumer Protection Act (the "DTPA") provides that it is a violation to use false, misleading, or deceptive acts or practices including but not limited to representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. *See* TEX. BUS. & COMMERCE CODE § 17.46(b)(12). By failing to provide Letters of Guarantee, LoanStar is intentionally and knowingly denying their customers the right to prepay their loans pursuant to their contracts, which is a violation of the DTPA. *See* TEX. BUS. & COMMERCE CODE §

APPENDIX 0239

17.45(9), (13). Moreover, given the urgency by which many title loan customers need to pay off their loan, LoanStar's refusal amounts to an unconscionable action or course of action. *See* TEX. BUS. & COMMERCE CODE § 17.45(5).

**C.   LoanStar has accessed and used driving records to interfere with TitleMax of Texas's customers, contracts, and prospective business relations.**

17.     Despite vigorously accusing TitleMax of Texas of using driving records to solicit customers, it has been discovered that LoanStar has been actively engaged in the same conduct in which they allege TitleMax of Texas was engaged. TitleMax of Texas recently learned that LoanStar appears to have accessed and used driving records to interfere with TitleMax of Texas's customers, contracts, and prospective business relations. *See generally* Affidavit of John Salinas, attached as **Exhibit 3**. One such customer, who highly values privacy and confidentiality and insists on remaining anonymous, was contacted and solicited by LoanStar. *Id.* at ¶¶ 2-3. LoanStar was aware of the existing TitleMax of Texas loan; told the customer LoanStar could offer a better deal; and offered to Buyout the loan. *Id.* at ¶ 3. The customer had not told anyone else about the loan, and upon information and belief, LoanStar could have only determined its existence through the use of driving records. *Id.* at ¶ 3.

### III.
### COUNTERCLAIMS

**COUNT I—TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS**

18.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

19.     TitleMax had valid contracts with customers.

20.     LoanStar knew of these contracts and willfully and intentionally interfered with them, as discussed above.

21.     LoanStar's interferences proximately caused TitleMax injury.

6

**APPENDIX 0240**

22.     TitleMax incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

23.     LoanStar's actions were malicious or wanton, and therefore TitleMax specifically requests an award of exemplary damages.

## COUNT II—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

24.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

25.     TitleMax had a reasonable probability that potential customers would have entered into business relationships with TitleMax.

26.     LoanStar either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct.

27.     LoanStar's actions were independently tortious and/or unlawful, as discussed above.

28.     LoanStar's interferences proximately caused TitleMax injury.

29.     TitleMax incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

30.     LoanStar's actions were malicious or wanton, and therefore TitleMax specifically requests an award of exemplary damages.

## COUNT III—CONVERSION

31.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

32.     LoanStar has wrongly asserted dominion over TitleMax's property, namely its proprietary confidential financial and store-profitability information, inconsistent with TitleMax's right of ownership.

33.     TitleMax owns and has the right to possess its proprietary confidential financial and store-profitability information.

34.     LoanStar unlawfully and knowingly came into actual possession of TitleMax's proprietary confidential financial and store-profitability information.

35.     LoanStar knowingly used TitleMax's proprietary confidential financial and store-profitability information for their own benefit. The conversion harmed TitleMax.

36.     LoanStar's actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

### COUNT IV—THEFT OF PROPERTY

37.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

38.     LoanStar has committed theft regarding TitleMax's property, namely its proprietary confidential financial and store-profitability information.

39.     TitleMax owns and has a possessory right over its proprietary confidential financial and store-profitability information.

40.     LoanStar unlawfully and knowingly appropriated TitleMax's proprietary confidential financial and store-profitability information.

41.     TitleMax did not consent to LoanStar's taking of the property.

42.     LoanStar's theft has harmed TitleMax.

43.     LoanStar's actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

### COUNT V—DECLARATORY JUDGMENT

44.     TitleMax incorporates the foregoing allegations as if fully set forth in this

APPENDIX 0242

Paragraph.

45.    A declaratory judgment would resolve a judicial controversy regarding the rights, obligations, and statuses of the parties.

46.    TitleMax seeks a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code declaring that:

a.   when a debtor pays off a title loan, the title-loan company must, within a reasonable period of time, either return the title to the vehicle or provide its equivalent, such as a letter of guarantee;

b.   title loans may be paid off by a customer or anyone acting on their behalf with cash or any other contractual payment option;

c.   title-loan companies must maintain titles to vehicles at the stores in which the customers tendered such titles as security for the loans;

d.   when a debtor seeks to pay off a title loan with funds obtained, directly or indirectly, from a competitor title-loan company, the competitor assumes the legal rights of the debtor;

e.   title-loan companies must accept powers of attorney authorizing a competitor title-loan company to perform all acts necessary to consummate a Buyout;

f.   title-loan companies have the right to accompany their customers to a competitor title-loan company for the purpose of consummating a Buyout;

g.   so long as they do not breach the peace, title-loan companies have the right to enter the parking lots and other public areas of a competitor title-loan company;

h.   title-loan companies do not have the right to enter non-public areas of a

9

competitor title-loan company under false pretenses for the purpose of surreptitiously misappropriating confidential information; and

i.   title-loan companies have the right to offer promotional credits or other compensation for referrals, so long as such referrals were not obtained through improper means.

## IV.
## APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

47.   TitleMax asks that the Court enjoin LoanStar from:

a.   refusing to return titles to customers within a reasonable period of time from a Buyout;

b.   refusing to provide Letters of Guarantee to customers or TitleMax within a reasonable period of time from a Buyout;

c.   soliciting TitleMax's customers through the use of Department of Motor Vehicle records or any other database containing any publicly available driver's information;

d.   entering non-public areas within TitleMax stores under false pretenses;

e.   refusing to accept contractual payment methods for a Buyout;

f.   moving titles to vehicles from the stores in which the customers tendered such titles as security for the loans in the hopes of thwarting a Buyout;

g.   refusing to accept powers of attorney authorizing a competitor title-loan company to perform all acts necessary to consummate a Buyout;

h.   refusing to allow a competitor title-loan company to accompany its customers during a Buyout; and

i.   refusing to allow a competitor title-loan company to enter LoanStar's parking lots and other public areas, so long as the competitor does not

10

breach the peace.

48.     A temporary injunction is proper to preserve the status quo pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). An applicant must demonstrate: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.*; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 65.011. "Irreparable injury" exists where damages cannot be measured by any "certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Interference with business relationships and attempting to acquire a party's customers and confidential information is sufficient to cause "imminent and irreparable harm of a kind that would not be fairly compensable following trial." *See Jenkins v. Transdel Corp.*, No. 03-04-00033-CV, 2004 WL 1404364, at *3 (Tex. App.—Austin 2004, no pet.) (mem. op.); *see also RenewData Corp. v. Strickler*, No. 03-05-00273-CV, 2006 WL 504998, at *15-16 (Tex. App.—Austin Mar. 3, 2006, no pet.) (mem. op.) ("Because it is difficult to assign a dollar value to loss of customer goodwill and clientele, it constitutes an irreparable injury."). Thus, the Court should enter a temporary injunction.

49.     TitleMax further requests the entry of a permanent injunction following a trial on the merits. TitleMax requests the Court set this request for a full trial on the merits.

## V.
## CONDITIONS PRECEDENT

50.     All conditions precedent to TitleMax's claims for relief have been performed or have occurred.

## VI.
## PRAYER

51.     WHEREFORE, TitleMax prays for the following relief as discussed herein:

    a.      actual damages;

    b.      exemplary damages;

11

**APPENDIX 0245**

c.      declaratory judgment;

d.      temporary and permanent injunctive relief;

e.      prejudgment and post-judgment interest at the highest rate allowable
        by law;

f.      court costs;

g.      attorney's fees; and

h.      such other and further relief as the Court deems just and proper.

Dated:  February 3, 2017

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: */s/ L. Bradley Hancock*
L. Bradley Hancock
State Bar No. 00798238
brad.hancock@hklaw.com
Christopher David Johnsen
State Bar No. 24072169
chris.johnsen@hklaw.com
1100 Louisiana Street, Suite 4300
Houston, TX 77002-5227
713-821-7000 (telephone)
713-821-7001 (facsimile)

**GREENBERG TRAURIG, L.L.P.**

Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

COUNSEL FOR DEFENDANTS
TMX FINANCE OF TEXAS, INC.;
TITLEMAX OF TEXAS, INC.; TMX
FINANCE LLC; AND TMX
FINANCE HOLDINGS, INC.

APPENDIX 0246

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 3rd day of February, 2017.

*/s/ Christopher David Johnsen*
Christopher David Johnsen

13

**APPENDIX 0247**

# EXHIBIT 1

APPENDIX 0248

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| DRUMMOND FINANCIAL SERVICES, | ) | |
| LLC; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO.: 2014cv253677 |
| | ) | |
| TMX FINANCE HOLDINGS, INC.; et al., | ) | |
| | ) | |
| Defendants. | ) | |

AFFIDAVIT OF ZACHARY FARMER

Personally appeared before the undersigned ZACHARY FARMER who, after being duly sworn, testified and said on oath as follows:

1.    I am Zachary Farmer, an individual resident of the State of Ohio.

2.    I am over 21 years of age and competent in all respects to give testimony in this matter.

3.    On December 10, 2014, I interviewed for a position with TitleMax.  During the interview, I voluntarily disclosed the information that is substantially repeated in this Affidavit. TitleMax has not offered me anything of value in exchange for the information contained in this Affidavit.

4.    From February 2009 through November 14, 2014, I was an employee of Wellshire Financial Services, LLC and Drummond Financial Services, LLC, companies owned by Select Management Resources LLC ("Select").  I worked in stores doing business as "LoanStar Title Loans," "North American Title Loans," and "LoanMax."

5.    From August 2010 through June 2012, I was employed as an Operations Specialist.

6.    As an Operations Specialist, I traveled around the country, filling in at short-staffed stores, consulting, detecting fraud, assisting with staffing decisions, and identifying sponsorship opportunities.  One primary task as an Operations Specialist was to improve Select's competitiveness in the marketplace, specifically with respect to Select's primary competitor,

1

TitleMax.  I reported to Jesse Anderson, Brent Matthews, and Berk Jolly, who were Vice Presidents of Select.

7.     As an Operations Specialist, I used several different tactics to gain competitive advantages for Select over TitleMax.

8.     For example, I would pretend to be a customer and go into TitleMax stores to talk with their employees in an effort to determine what TitleMax was offering customers.  I would also pretend to be a LoanMax customer seeking a better deal from TitleMax in order to see what terms they might offer.  I would present TitleMax employees with a LoanMax application and try to coax them to talk about LoanMax.

9.     I would also carry a concealed recording device to record my interactions with TitleMax employees.  I would then mail the recording to Select Vice President Jesse Anderson at Select's corporate office in Alpharetta, Georgia.

10.     As another example, I would pose as a repo-man seeking to do business with TitleMax and would ask TitleMax store managers how many repossessions they had during a specific period.  TitleMax managers would often provide that information assuming I was actually in the repossession business.

11.     Another tactic that I used to gain competitive advantage for Select, was to gain access to and photograph TitleMax "goal boards."  Each TitleMax store had a goal board.  The goal boards were typically located in back rooms of TitleMax stores, which were not open to the public.

12.     A goal board typically listed a TitleMax store's financial performance goals for the month, the actual financial results from previous months, and the month-to-date financial results.  The more established TitleMax stores would have more financial data on their goal boards.  I would send the photographs of the goal boards electronically to Select Vice President Jesse Anderson.  The data helped Select determine whether to open a Select-branded store in the immediate area to compete with TitleMax.

13.     My method for gaining access to the goal boards was to pose as a potential customer and ask a TitleMax employee if I might use the store's restroom.  I would then access the private back office business area and take pictures of the store's goal board as I pretended to look for the restroom.  I then emailed the photographs to Select Vice President Jesse Anderson.

2

14.     The first time I photographed a goal board, I was sent to a TitleMax store to act like a potential customer with a LoanStar application.  I was to present the application to the TitleMax employee to find out what they would say about LoanStar.  While in the TitleMax store, I needed to use the restroom, and on my way back to the restroom I saw a goal board and took a picture of it.  I sent the picture to Jesse Anderson, who responded that I should try to take photographs of as many other goal boards from TitleMax locations as I could.  About a week later, Brent Matthews, another Select Vice President, followed up with me to see how many boards I was able to photograph and suggest where I could find more.

15.     Over the span of a year, in 2011 and 2012, I visited TitleMax stores in Texas (including Arlington, Carrolton, Mesquite, and Garland), South Carolina (including Rock Hill, Columbia, and Myrtle Beach), and Alabama (including Tuscaloosa and Birmingham).  In total, I visited approximately 75 TitleMax stores for the express purpose of photographing goal boards.  Of those 75 stores, I successfully photographed approximately 30 goal boards.

16.     I photographed the goal boards with a smartphone provided to me by Select and I used the email address provided to me by Select to transmit the photographs to Select Vice President Jesse Anderson.

17.     It is my understanding that gaining access to TitleMax non-public areas and photographing TitleMax goal boards became a uniform practice of Select.

18.     For example, in my last assignment with Select, I participated in a conference call with Area Managers in Ohio, shortly before TitleMax entered the Ohio market.  During the call, the Area Managers were told by Select upper management that they should comply with Select's company-wide practice and direct their employees to enter TitleMax stores under false pretenses so that they could gain access to and photograph TitleMax goal boards.

19.     Another tactic that I observed was LoanMax employees using DMV records to identify which competitor bought out their customers' loans in an effort to confirm whether LoanMax was losing business to TitleMax.

20.     I make this affidavit based upon my personal knowledge for use in this lawsuit and for any legal purpose.

3

WITNESS my hand and seal, this _10th_ day of January, 2015.

ZACHARY FARMER

Sworn to and subscribed before me
this ___10___ day of January, 2015.

Notary Public

__HAMILTON__ County, __OH__

My commission expires ___5-30-16___

MICHAEL P. ROLFES
NOTARY PUBLIC - OHIO
COMMISSION # 2011-RE-374726
MY COMMISSION EXPIRES MAY 30, 2016

4

# EXHIBIT 2

| | |
|---|---|
| **From:** | William Purce <William.Purce@occc.texas.gov> |
| **Sent:** | Thursday, November 12, 2015 9:47 AM |
| **To:** | Victoria Newman |
| **Subject:** | Re: Buyouts of Competitors |

Dear Ms. Newman:

At this time, our agency has not issued any advisory bulletins on this issue related to credit access businesses (there are some advisory letters dealing with regulated lenders and property tax lenders).  However, our agency has investigated this issue in the past and has instructed licensees to provide and accept the payoffs.  Our analysis of this issue is very similar to the analysis discussed in the South Carolina opinion letter.

Respectfully,


William Purce
Senior Administrative Review Examiner
Office of Consumer Credit Commissioner
2601 North Lamar Boulevard
Austin, Texas 78705
512.936.7626
william.purce@occc.texas.gov



TEXAS OFFICE OF CONSUMER
CREDIT COMMISSIONER

| | |
|---|---|
| **From:** | Victoria Newman <Victoria.Newman@titlemax.com> |
| **To:** | 'William Purce' <William.Purce@occc.texas.gov> |
| **Date:** | 11/12/2015 9:07 AM |
| **Subject:** | Buyouts of Competitors |

Hi William,

I hope you are doing well.  A question came up that I would like your help resolving.

I take the position that a buyout request from a customer should not be refused regardless of whether it's from a competitor.  South Carolina has issued similar guidance on the matter (attached for your reference).  A refusal of the buyout (or failure to immediately return the title or provide a letter of guaranty), in my opinion, would be akin to a prepayment penalty.

Has the OCCC issued guidance on this issue before?  I haven't found any but I could have missed it.

Thanks,

Victoria

Victoria H. Newman
Sr. Compliance and Corporate Counsel

1

**APPENDIX 0254**

**TMX Finance**
15 Bull Street, Ste 200
Savannah, GA 31401
Direct line: (912) 503-2824
Facsimile: (866) 591-4638
Email: victoria.newman@titlemax.com

**PRIVILEGED AND CONFIDENTIAL:** This e-mail and any attachments hereto are intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

---

"NOTE: This e-mail, any attachments, and the information contained therein are confidential. The information contained in this email and/or any attachments is intended only for use by the intended recipient(s) and may contain trade secret or otherwise proprietary information of TMX Finance LLC and/or its affiliates and subsidiaries (collectively, "TitleMax"). If you are not the intended recipient of this e-mail, any use, dissemination, distribution or copying of this e-mail, any attachments, or the information contained therein, is strictly prohibited. If you received this e-mail and you are not an intended recipient, please immediately notify TitleMax e-mail administrator at: abuse@titlemax.biz and permanently delete the original and any copy of this e-mail, any attachments, and/or any printouts thereof."

**APPENDIX 0255**



Commissioners
David Campbell
Chair
Columbia
Johnny E. Soschee
Vice Chair
Piedmont
Mark Hammond
Secretary of State
Columbia
Clifford Ray Keasler
Myrtle Beach
Terrell A. Parrish
Greer
Magaly P. Penn
Simpsonville
W. Fred Pennington, Jr.
Taylors

Carri Grube Lybarker
Administrator

# The State of South Carolina
## Department of Consumer Affairs

2221 DEVINE STREET, STE 200
PO BOX 5757
COLUMBIA, SC 29250-5757

*Celebrating Over 35 Years of Public Service*

September 12, 2014

*Via Hand Delivery and Electronic Mail*

Mr. Jim Copeland
Acting Commissioner/ Assistant Commissioner
Consumer Finance Division
S.C. State Board of Financial Institutions
1205 Pendleton Street, Suite 306
Columbia, SC 29201

    RE:    **Opinion Request- Prepayment Penalties**

Dear Jim:

    You have requested an opinion regarding practices employed by supervised lenders when a loan is being prepaid by a third party on behalf of a consumer, the original debtor. Consumer credit transactions are governed by the South Carolina Consumer Protection Code ("the Code"), S.C. Code Ann. sections 37-1-101 *et seq.*[1] Right to prepay a consumer loan is addressed in § 37-3-209 with prepayment of credit sales addressed in § 37-2-209. From the information you have provided, the following question has been posed and will be addressed herein in the form of a general answer that could change depending on specific circumstances:

        Can a lender subject to the Code charge a consumer a different interest rate than currently being assessed and impose different terms regarding accepted method of payment or otherwise impose varying contract terms when a consumer loan is being prepaid by a third party on behalf of the consumer?

    As stated above, § 37-3-209 governs the consumer's right to prepay a consumer loan. The section specifically states: "...the debtor may prepay in full the unpaid balance of a consumer loan, refinancing, or consolidation at *any time without penalty*." (Emphasis added.) A "debtor" is defined as "any person who is an obligor in a credit transaction, including any cosignor, comaker, guarantor, endorsee or surety, and *the assignee of any obligor,* and also includes *any person who agrees to assume the payment of a credit obligation.*" (Emphasis added.) *See* § 37-1-301(14). Lastly, "person" includes not only an individual, but an organization. *See* § 37-1-301(20). The right of a debtor to prepay a loan in full without penalty cannot be waived. *See* § 37-1-107(1).

---

[1] Further reference to the South Carolina Code of Laws will be by Code section only.

ADMINISTRATOR
803-734-4233
ACCOUNTING
803-734-4264
Fax: 803-734-4299

PUBLIC INFORMATION
803-734-4286
Fax: 803-734-4229

CONSUMER ADVOCACY
803-734-4200
Fax: 803-734-4287

ENFORCEMENT/
INVESTIGATORS
803-734-4236
Fax: 803-734-4287

CONSUMER COMPLAINTS
803-734-4200
Fax: 803-734-4286

E-Mail: SCDCA@SCCONSUMER.GOV
Website: WWW.CONSUMER.SC.GOV

Toll Free in SC: 800-922-1594
Voice/TT: 800-735-2905

The cardinal rule of statutory construction is to ascertain and effectuate the Legislature's intent from the plain language of the statute. Burns v. State Farm Mut. Auto Ins. Co., 297 S.C. 520, 522, 377 S.E.2d 569, 570 (1989). The words of the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation. Hitachi Data Sys. Corp. v. Leatherman, 309 S.C. 174, 178, 420 S.E.2d 843,846 (1992). Statutory provisions of the Code shall be liberally construed as well as applied to promote the Title's underlying purposes and policies. § 37-1-102(1); Davis v. NationsCredit Financial Services Corporation et al., 326 S.C. 83, 86, 484 S.E.2d 471,472 (1997). The primary purpose of the Code is to protect consumers, as evidenced within relief provisions contained therein. Camp v. Springs Mortgage Corp., 310 S.C. 514,516, 426 S.E.2d 304,305 (1993). Section 37-1-102 further delineates the purposes and policies of the Code, including to foster competition among suppliers, protect borrowers against unfair practices and encourage fair and economically sound consumer credit practices. See § 37-1-102(2)(c)-(e).

The plain language of the Code permits a debtor to prepay a loan in full without incurring any type of penalty. Further, debtor is defined broadly to not only include the original consumer who has promised or otherwise is obligated to pay the debt, but to assignees and other persons who agree to assume responsibility of paying the debt as well, including an organization.

In the scenario you provided, a third party is attempting to prepay a loan in full on behalf of the consumer. The Lender, however, contracted for alternate interest rate terms to apply should a third party, including but not limited to, a bank, credit union, title loan, automobile dealership or insurance company pay off the loan. In construing the statutory language of the Code liberally to effectuate its purposes and policies, the Department concludes such alternate terms would constitute a prepayment penalty if the third party is an assignee of the obligor or entered into an agreement to pay the loan. The third party assuming the obligation is considered the debtor and, thus, is entitled to pay off the loan under the same terms as the consumer whom originally incurred the debt/obligation. See § 37-1-301(14).

You have also posed a scenario whereby the Lender requires that the original debtor be present at the time the third party pays off the loan. As explained above, however, when the third party assumed the obligation, the third party is considered the debtor. If the Lender refuses to accept payment from the third party on the basis that the original debtor is not present, this amounts to a violation § 37-3-209 as the Lender is depriving the debtor of the right to prepay.

Lastly, you posed a scenario whereby the Lender refuses to accept the same type of payment method from a third party attempting to prepay a loan in full as it has previously contracted for or otherwise accepted from the original debtor. While this may not be considered a prepayment penalty, the practice could constitute breach of contract if the contract delineates the types of payment accepted or if the Lender has previously, through a course of dealings, accepted payment from the original debtor via the same method the third party is attempting to utilize. See § 37-3-103(3); Dowling v. Charleston & W.C. Ry. Co., 105 S.C. 475, 81 S.E. 313 (1913); Weisz Graphics Div. v. Peck Industries, 304 S.C. 101, 403 S.E.2d 146 (Ct. App. 1991).

**APPENDIX 0257**

Copeland
September 12, 2014
Page 3 of 3

When a debtor exercises the right to prepay pursuant to § 37-3-209, please also be mindful of other provisions of the Code governing prepayment.  Section 37-3-210, for example, regulates prepayment rebates for consumer loans while § 37-4-108 states the parameters for the treatment of refunds of insurance premiums upon prepayment of a consumer loan.

Pursuant to sections 37-6-104(4) and 37-6-506(3), reliance upon an administrative interpretation provides protection from any penalties authorized by the Code if the administrative interpretation is subsequently declared invalid by a court or is rescinded.  Please do not hesitate to contact me directly at 803-734-4297 should you need any further information.

Best Regards,

Carri Grube Lybarker, Esq.

# EXHIBIT 3

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC., ET AL. | § § § | 152nd JUDICIAL DISTRICT |

## <u>AFFIDAVIT OF JOHN SALINAS</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned authority, appeared John Salinas, known to me to be the person whose name is subscribed hereto and, after being duly sworn by me, stated as follows:

1.     My name is John Salinas. I am over the age of 21, of sound mind, and competent to make this Affidavit.

2.     I am a district manager of Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax"). I have knowledge of the facts stated in this Affidavit through my role with TitleMax, and each of the statements made below is based upon my knowledge.

3.     This Affidavit concerns a very good, repeat TitleMax customer who was solicited by Plaintiffs/Counterdefendants Wellshire Financial Services, LLC and Meadowwood Financial Services, LLC ("LoanStar"). This customer highly values the customer's privacy and confidentiality and insists on remaining anonymous. For ease of reference, the customer will be referred to as "Peter," which is not the customer's real name.

4.     On November 14, 2015, Peter called a TitleMax store in Pasadena, Texas to obtain the minimum amount he would need to pay to refinance his loan. While he was on the phone, he said that LoanStar called him a few days prior in an attempt to buyout his loan. LoanStar referenced TitleMax; knew that Peter has a loan with TitleMax; told Peter that LoanStar could offer him a better deal; and wanted to buyout Peter's loan with TitleMax. Peter has not even told his own family that he has a loan with TitleMax and therefore he was very concerned about how LoanStar obtained his information. He asked if TitleMax and LoanStar are affiliated or if TitleMax sells or gives away its customers' information to LoanStar. He was disturbed that LoanStar had obtained his information and he felt violated. He was also worried that others would find out he has a title loan, which is a very personal matter for him.

5.     Later that day when Peter arrived at the store to refinance his loan, he was still upset that LoanStar had obtained his information to solicit his loan. He continued to discuss what happened and he reiterated everything he reported in Paragraph 3. After some time and effort,

the store was able to assure Peter that TitleMax did not sell or give away his information to LoanStar.

John Salinas

Subscribed and sworn to before me by John Salinas on this the 20th day of January, 2016, to certify which witness my hand and seal of office.

Notary Public in the State of Texas

EDUARDO ANTONIO AGUIRRE
126602710
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
OCT. 19, 2016

- 2 -

7/6/2017 11:51 AM
Chris Daniel - District Clerk Harris County
Envelope No. 18024352
By: KATINA WILLIAMS
Filed: 7/6/2017 11:51 AM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE LLC, ET AL. | § | 152nd JUDICIAL DISTRICT |

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., and TMX FINANCE OF TEXAS, INC. | § § § | |
| v. | § § | |
| WELLSHIRE FINANCIAL SERVICES, LLC and MEADOWWOOD FINANCIAL SERVICES, LLC | § § § | |

### FOURTH AMENDED COUNTERCLAIM

Defendants/Counterplaintiffs TitleMax of Texas, Inc. and TMX Finance of Texas, Inc. (collectively, "TitleMax") bring this Fourth Amended Counterclaim against Plaintiffs/Counterdefendants Wellshire Financial Services, LLC and Meadowwood Financial Services, LLC (collectively, "LoanStar").

### I.
### PARTIES

1.      Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax of Texas") is a Delaware corporation with its principal place of business in Texas. TitleMax of Texas assists Texas customers in obtaining loans through third-party lenders. TitleMax of Texas was sued by LoanStar in this lawsuit.

2.      Defendant/Counterplaintiff TMX Finance of Texas, Inc. ("TMX Finance of Texas") is a Delaware corporation with its principal place of business in Texas. TMX Finance of Texas provides direct lending services to Texas customers. TMX Finance of Texas was sued by LoanStar in this lawsuit.

3.     Plaintiff/Counterdefendant Wellshire Financial Services, LLC ("Wellshire") is a Georgia limited liability company. Wellshire is a competitor of TitleMax of Texas that operates in Texas as LoanStar.

4.     Plaintiff/Counterdefendant Meadowwood Financial Services, LLC ("Meadowwood") is a Georgia limited liability company. Meadowwood is a competitor of TitleMax of Texas that operates in Texas as LoanStar.

## II.
## FACTS

5.     TitleMax of Texas is a credit services organization ("CSO"). As a CSO, TitleMax of Texas assists customers in obtaining loans through third-party lenders. Namely, TitleMax of Texas connects a customer with a lender who, with the CSO, will secure a loan by placing a lien on the customer's vehicle. In addition to arranging for title loans, TitleMax of Texas will also help a customer refinance a pre-existing loan arranged by another CSO (such as a title loan previously arranged by LoanStar). TitleMax of Texas is compensated through CSO fees paid by the customer.

6.     TMX Finance of Texas is a direct lender which makes loans directly to customers. TMX Finance of Texas is compensated through finance charges paid by the customer.

7.     TitleMax's business is affected by facilitating or making title loans; refinancing title loans; facilitating or making additional loans; and receiving referrals from existing customers.

8.     LoanStar is in the same line of business as TitleMax and directly or indirectly competes with TitleMax. LoanStar is part of a conglomerate of lending entities controlled by parent company Select Management Resources LLC ("SMR"). LoanStar, acting as SMR's alter ego, operates under the direction and control of SMR. This control is evidenced by

APPENDIX 0263

LoanStar's submission to SMR management. For example, LoanStar designated SMR's Chief Operating Officer to testify as the corporate representative of LoanStar. SMR, through its affiliates, operate in various states nation-wide.

9.     As TitleMax has expanded into new markets, it has taken a portion of LoanStar's market share through lawful competition. Among other things, TitleMax engages in substantial advertising and marketing and generally offers its customers lower rates. On the other hand, LoanStar does little to no advertising and marketing and generally has higher rates than TitleMax. LoanStar filed this lawsuit against TitleMax in an attempt to harass TitleMax and obtain through litigation what LoanStar cannot gain through lawful competition. To this day—years after filing the lawsuit—LoanStar has still not identified one individual it lost due to TitleMax's alleged acts.

10.     In addition to filing this lawsuit, LoanStar, in collaboration with SMR, has engaged in a nation-wide scheme and campaign of corporate espionage against TitleMax. LoanStar has stolen TitleMax's proprietary confidential financial and store-profitability information and the formula, pattern, and device used by TitleMax to compile this information to maximize its competitive advantage. TitleMax's goal boards and reports consist of a customized methodology that TitleMax developed by exertions of extensive time, labor, skill, money, and through years of operations knowledge gained as a leader in the title loan industry. The information in TitleMax goal boards and reports are vital to TitleMax's success as they serve as a focal point for the employees in each individual store in furtherance of TitleMax's performance-based focus. Due to LoanStar's theft, TitleMax no longer has the exclusive possession or use of its confidential and proprietary information and methodology.

11.     Further, LoanStar has interfered with TitleMax's contracts, customers, and business relations by refusing to provide Letters of Guarantee and by using driving records

APPENDIX 0264

to solicit TitleMax's customers.

**A.**    **LoanStar has entered TitleMax's non-public areas under false pretenses to steal its confidential information.**

12.    LoanStar has, through improper means, entered non-public areas within TitleMax stores posing as potential customers or other third parties and, using recording devices, unlawfully and improperly taken TitleMax's proprietary confidential financial and store-profitability information and the formula, pattern, and device used by TitleMax to compile this information. LoanStar's covert operation resulted in LoanStar employees successfully photographing TitleMax's proprietary confidential financial and store-profitability information and the formula, pattern, and device used by TitleMax to compile this information. Photographs of TitleMax's proprietary information were then relayed to LoanStar's Vice President of Operations over the state of Texas.

13.    By taking photographs of TitleMax's goal boards and surrounding customized reports hung next to the goal boards, LoanStar circumvented the need to do their own marketing and business analysis. *See generally* Affidavit of Zachary Farmer, attached as **Exhibit 1**. LoanStar has taken TitleMax's compilation of confidential business information and exploited it in an attempt to undermine TitleMax, gain an unfair competitive advantage, and increase LoanStar's competitiveness in the marketplace. Upon information and belief, LoanStar used TitleMax's compilation of confidential information to assist and accelerate research and development and to determine, among other things, where to put new stores and where not to put new stores, whether to renew leases, how to staff stores, where to conduct marketing, and product performance. LoanStar's misappropriation and use of TitleMax's proprietary information has unfairly provided LoanStar with a mechanism for advancing its competiveness and expertise in the industry without any of the input and development costs that TitleMax incurred over the past several years as TitleMax has sourced

4

and customized its unique integrated approach to, and use of, certain key performance indicators.

**B.     LoanStar has interfered with TitleMax's contracts and business relationships by refusing to return titles and/or provide Letters of Guarantee within a reasonable period of time.**

14.     Additionally, LoanStar has refused to return titles to customers and/or provide Letters of Guarantee to TitleMax within a reasonable period of time, substantially interfering with TitleMax's contracts and current and prospective business relationships. Customers have the right to do business with the lender or CSO of their choice. A customer has the option to pay the entirety of an existing loan by using funds obtained from another lender (a situation commonly referred to as a "Buyout"). To perform a Buyout in the industry custom, the new CSO or lender obtains from the original CSO or lender either the title to the vehicle or a Letter of Guarantee of title ensuring that clear title to the vehicle will be released upon full payment of the original title loan. The new CSO or new lender steps into the shoes of the customer during the Buyout process. *See generally* confirmation correspondence from the Texas Office of Consumer Credit Commissioner and the State of South Carolina Department of Consumer Affairs, attached as **Exhibit 2**.

15.     When customers desire to pay off their loans, Texas law requires a lienholder to provide a release of lien and title within a reasonable time. Because customers need the money immediately and may not have the requisite credit, time, or resources to use traditional banking to pay off the loan, Letters of Guarantee are commonly employed in the Texas title loan industry to expedite and facilitate Buyouts. When a customer is unable to obtain an immediate release of title or a Letter of Guarantee, the customer is prevented from contracting with a new CSO or new lender and is essentially held hostage. This effectively results in a prepayment penalty to the customer and violates the CSO's or lender's duty to provide a release of lien and title or its equivalent. *See id.*

5

16.     Knowing the foreseeable damages to the customer and the new title company, LoanStar has refused to return titles to TitleMax customers during Buyouts. Instead, LoanStar claims that the titles are at its corporate office in Georgia. In fact, LoanStar intentionally moved its titles to Georgia to attempt to thwart Buyouts by TitleMax. Any LoanStar policy to maintain titles in Georgia was targeted at TitleMax.

17.     Additionally, LoanStar has refused to provide Letters of Guarantee to TitleMax or its customers. This is also a LoanStar policy designed by frustrate Buyouts. By refusing to provide either the title or the Letter of Guarantee, the Buyout transactions cannot be completed, the existing loans cannot be bought out or paid off, and TitleMax loses those customers and the related goodwill. Moreover, because customers sometimes choose to refinance their title loans, losing that customer may result in not only the loss of the initial contract, but also future contracts (such as refinancing loans or arranging additional loans) with that customer. This is notwithstanding any potential referrals that the new customer may send to TitleMax.

18.     In addition to refusing to return titles and provide Letters of Guarantee to TitleMax and its customers within a reasonable period of time, LoanStar has engaged in independently tortious and unlawful conduct. Among other things, LoanStar breached their duty of care owed to TitleMax; lied to TitleMax's customers about its business and practices, such as by falsely telling customers that TitleMax repossesses vehicles as early as one to two days into delinquency; and engaged in deceptive and unfair business practices.

19.     The Deceptive Trade Practices and Consumer Protection Act (the "DTPA") provides that it is a violation to use false, misleading, or deceptive acts or practices including but not limited to representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. *See* TEX. BUS. & COMMERCE CODE § 17.46(b)(12). By failing to provide Letters of Guarantee, LoanStar is

APPENDIX 0267

intentionally and knowingly denying their customers the right to prepay their loans pursuant to their contracts, which is a violation of the DTPA. *See* Tᴇx. Bᴜs. & Cᴏᴍᴍᴇʀᴄᴇ Cᴏᴅᴇ § 17.45(9), (13). Moreover, given the urgency by which many title loan customers need to pay off their loan, LoanStar's refusal amounts to an unconscionable action or course of action. *See* Tᴇx. Bᴜs. & Cᴏᴍᴍᴇʀᴄᴇ Cᴏᴅᴇ § 17.45(5).

**C.    LoanStar has accessed and used driving records to interfere with TitleMax of Texas's customers, contracts, and prospective business relations.**

20.    Despite vigorously accusing TitleMax of Texas of using driving records to solicit customers, it has been discovered that LoanStar has been actively engaged in the same conduct in which they allege TitleMax of Texas was engaged. TitleMax of Texas recently learned that LoanStar appears to have accessed and used driving records to interfere with TitleMax of Texas's customers, contracts, and prospective business relations. *See generally* Affidavit of John Salinas, attached as **Exhibit 3**. One such customer, who highly values privacy and confidentiality and insists on remaining anonymous, was contacted and solicited by LoanStar. *Id.* at ¶¶ 2-3. LoanStar was aware of the existing TitleMax of Texas loan; told the customer LoanStar could offer a better deal; and offered to Buyout the loan. *Id.* at ¶ 3. The customer had not told anyone else about the loan, and upon information and belief, LoanStar could have only determined its existence through the use of driving records. *Id.* at ¶ 3.

### III.
### COUNTERCLAIMS

Cᴏᴜɴᴛ I—Tᴏʀᴛɪᴏᴜs Iɴᴛᴇʀғᴇʀᴇɴᴄᴇ ᴡɪᴛʜ Exɪsᴛɪɴɢ Cᴏɴᴛʀᴀᴄᴛs

21.    TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

22.    TitleMax had valid contracts with customers.

23.    LoanStar knew of these contracts and willfully and intentionally interfered

7

**APPENDIX 0268**

with them, as discussed above.

24.     LoanStar's interferences proximately caused TitleMax injury.

25.     TitleMax incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

26.     LoanStar's actions were malicious or wanton, and therefore TitleMax specifically requests an award of exemplary damages.

### COUNT II—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

27.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

28.     TitleMax had a reasonable probability that potential customers would have entered into business relationships with TitleMax.

29.     LoanStar either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct.

30.     LoanStar's actions were independently tortious and/or unlawful, as discussed above.

31.     LoanStar's interferences proximately caused TitleMax injury.

32.     TitleMax incurred actual damage or loss, including but not limited to lost profits, loss of goodwill, and loss of future contracts and business prospects.

33.     LoanStar's actions were malicious or wanton, and therefore TitleMax specifically requests an award of exemplary damages.

### COUNT III—CONVERSION

34.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

35.     LoanStar has wrongly asserted dominion over TitleMax's property, namely

its proprietary confidential financial and store-profitability information, inconsistent with TitleMax's right of ownership.

36.     TitleMax owns and has the right to possess its proprietary confidential financial and store-profitability information.

37.     LoanStar unlawfully and knowingly came into actual possession of TitleMax's proprietary confidential financial and store-profitability information.

38.     LoanStar knowingly used TitleMax's proprietary confidential financial and store-profitability information for their own benefit. The conversion harmed TitleMax.

39.     LoanStar's actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

### COUNT IV—THEFT OF PROPERTY

40.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

41.     LoanStar has committed theft regarding TitleMax's property, namely its proprietary confidential financial and store-profitability information.

42.     TitleMax owns and has a possessory right over its proprietary confidential financial and store-profitability information.

43.     LoanStar unlawfully and knowingly appropriated TitleMax's proprietary confidential financial and store-profitability information.

44.     TitleMax did not consent to LoanStar's taking of the property.

45.     LoanStar's theft has harmed TitleMax.

46.     LoanStar's actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which would raise the presumption

APPENDIX 0270

of conscious indifference to consequences sufficient to justify an award of punitive damages.

## COUNT V—MISAPPROPRIATION OF TRADE SECRETS

47.     TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

48.     TitleMax owns trade secrets that consist of its secret or substantially secret proprietary confidential financial and store-profitability information and the formula, pattern, and device used by TitleMax to compile this information.

49.     LoanStar, through the use of improper means, misappropriated TitleMax's trade secrets.

50.     LoanStar was wrongfully enriched by its misappropriation of TitleMax's trade secrets.

51.     LoanStar's misappropriation of TitleMax's trade secrets has harmed TitleMax.

52.     LoanStar's actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

## COUNT VI—UNFAIR COMPETITION BY MISAPPROPRIATION

53.     TitleMax's formula, pattern, and device used to compile its proprietary confidential financial and store-profitability information was created through extensive time, experience, labor, skill and money.

54.     LoanStar's misappropriation and use of this compilation of information, in competition with TitleMax, gave LoanStar a special advantage because LoanStar was burdened with little or none of the expense TitleMax incurred in developing the compilation

APPENDIX 0271

of information nor the operating expertise required to develop and formulate the unique methodology misappropriated by LoanStar.

55. LoanStar was wrongfully enriched by its misappropriation of TitleMax's compilation of information.

56. LoanStar's misappropriation of TitleMax's compilation of information has harmed TitleMax.

57. LoanStar's actions demonstrate willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which would raise the presumption of conscious indifference to consequences sufficient to justify an award of punitive damages.

### COUNT VII—DECLARATORY JUDGMENT

58. TitleMax incorporates the foregoing allegations as if fully set forth in this Paragraph.

59. A declaratory judgment would resolve a judicial controversy regarding the rights, obligations, and statuses of the parties.

60. TitleMax seeks a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code declaring that:

 a. when a debtor pays off a title loan, the title-loan company must, within a reasonable period of time, either return the title to the vehicle or provide its equivalent, such as a letter of guarantee;

 b. title loans may be paid off by a customer or anyone acting on their behalf with cash or any other contractual payment option;

 c. title-loan companies must maintain titles to vehicles at the stores in which the customers tendered such titles as security for the loans;

 d. when a debtor seeks to pay off a title loan with funds obtained, directly

11

or indirectly, from a competitor title-loan company, the competitor assumes the legal rights of the debtor;

e.   title-loan companies must accept powers of attorney authorizing a competitor title-loan company to perform all acts necessary to consummate a Buyout;

f.   title-loan companies have the right to accompany their customers to a competitor title-loan company for the purpose of consummating a Buyout;

g.   so long as they do not breach the peace, title-loan companies have the right to enter the parking lots and other public areas of a competitor title-loan company;

h.   title-loan companies do not have the right to enter non-public areas of a competitor title-loan company under false pretenses for the purpose of surreptitiously misappropriating confidential information; and

i.   title-loan companies have the right to offer promotional credits or other compensation for referrals, so long as such referrals were not obtained through improper means.

## IV.
## APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

61.   TitleMax asks that the Court enjoin LoanStar from:

a.   refusing to return titles to customers within a reasonable period of time from a Buyout;

b.   refusing to provide Letters of Guarantee to customers or TitleMax within a reasonable period of time from a Buyout;

c.   soliciting TitleMax's customers through the use of Department of Motor

12

Vehicle records or any other database containing any publicly available driver's information;

d.  entering non-public areas within TitleMax stores under false pretenses;

e.  refusing to accept contractual payment methods for a Buyout;

f.  moving titles to vehicles from the stores in which the customers tendered such titles as security for the loans in the hopes of thwarting a Buyout;

g.  refusing to accept powers of attorney authorizing a competitor title-loan company to perform all acts necessary to consummate a Buyout;

h.  refusing to allow a competitor title-loan company to accompany its customers during a Buyout; and

i.  refusing to allow a competitor title-loan company to enter LoanStar's parking lots and other public areas, so long as the competitor does not breach the peace.

62.  A temporary injunction is proper to preserve the status quo pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). An applicant must demonstrate: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.*; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 65.011. "Irreparable injury" exists where damages cannot be measured by any "certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Interference with business relationships and attempting to acquire a party's customers and confidential information is sufficient to cause "imminent and irreparable harm of a kind that would not be fairly compensable following trial." *See Jenkins v. Transdel Corp.*, No. 03-04-00033-CV, 2004 WL 1404364, at *3 (Tex. App.—Austin 2004, no pet.) (mem. op.); *see also RenewData Corp. v. Strickler*, No. 03-05-00273-CV, 2006 WL 504998, at *15-16 (Tex. App.—Austin Mar. 3, 2006, no pet.) (mem. op.) ("Because it is difficult to assign a dollar value to loss of customer

13

goodwill and clientele, it constitutes an irreparable injury."). Thus, the Court should enter a temporary injunction.

63.     TitleMax further requests the entry of a permanent injunction following a trial on the merits. TitleMax requests the Court set this request for a full trial on the merits.

**V.**
**CONDITIONS PRECEDENT**

64.     All conditions precedent to TitleMax's claims for relief have been performed or have occurred.

**VI.**
**PRAYER**

65.     WHEREFORE, TitleMax prays for the following relief as discussed herein:

    a.     actual damages;

    b.     exemplary damages;

    c.     declaratory judgment;

    d.     temporary and permanent injunctive relief;

    e.     prejudgment and post-judgment interest at the highest rate allowable by law;

    f.     court costs;

    g.     attorney's fees; and

    h.     such other and further relief as the Court deems just and proper.

Dated:  July 6, 2017

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: */s/ L. Bradley Hancock*
L. Bradley Hancock
State Bar No. 00798238
brad.hancock@hklaw.com
Jeffrey D. Anderson
State Bar No. 24087100
jeffrey.anderson@hklaw.com

14

1100 Louisiana Street, Suite 4300
Houston, TX 77002-5227
713-821-7000 (telephone)
713-821-7001 (facsimile)

**GREENBERG TRAURIG, L.L.P.**

Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

COUNSEL FOR DEFENDANTS
TMX FINANCE OF TEXAS, INC.;
TITLEMAX OF TEXAS, INC.; TMX
FINANCE LLC; AND TMX
FINANCE HOLDINGS, INC.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 6th day of July, 2017.

*/s/ Jeffrey D. Anderson*
Jeffrey D. Anderson

**APPENDIX 0276**

# EXHIBIT 1

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DRUMMOND FINANCIAL SERVICES,   )
LLC; et al.,   )
  )
    Plaintiffs,   )
  )    CIVIL ACTION FILE
v.   )    NO.: 2014cv253677
  )
TMX FINANCE HOLDINGS, INC.; et al., )
  )
    Defendants.   )

## AFFIDAVIT OF ZACHARY FARMER

Personally appeared before the undersigned ZACHARY FARMER who, after being duly sworn, testified and said on oath as follows:

1.      I am Zachary Farmer, an individual resident of the State of Ohio.

2.      I am over 21 years of age and competent in all respects to give testimony in this matter.

3.      On December 10, 2014, I interviewed for a position with TitleMax. During the interview, I voluntarily disclosed the information that is substantially repeated in this Affidavit. TitleMax has not offered me anything of value in exchange for the information contained in this Affidavit.

4.      From February 2009 through November 14, 2014, I was an employee of Wellshire Financial Services, LLC and Drummond Financial Services, LLC, companies owned by Select Management Resources LLC ("Select"). I worked in stores doing business as "LoanStar Title Loans," "North American Title Loans," and "LoanMax."

5.      From August 2010 through June 2012, I was employed as an Operations Specialist.

6.      As an Operations Specialist, I traveled around the country, filling in at short-staffed stores, consulting, detecting fraud, assisting with staffing decisions, and identifying sponsorship opportunities. One primary task as an Operations Specialist was to improve Select's competitiveness in the marketplace, specifically with respect to Select's primary competitor,

1

APPENDIX 0278

TitleMax. I reported to Jesse Anderson, Brent Matthews, and Berk Jolly, who were Vice Presidents of Select.

7.     As an Operations Specialist, I used several different tactics to gain competitive advantages for Select over TitleMax.

8.     For example, I would pretend to be a customer and go into TitleMax stores to talk with their employees in an effort to determine what TitleMax was offering customers. I would also pretend to be a LoanMax customer seeking a better deal from TitleMax in order to see what terms they might offer. I would present TitleMax employees with a LoanMax application and try to coax them to talk about LoanMax.

9.     I would also carry a concealed recording device to record my interactions with TitleMax employees. I would then mail the recording to Select Vice President Jesse Anderson at Select's corporate office in Alpharetta, Georgia.

10.    As another example, I would pose as a repo-man seeking to do business with TitleMax and would ask TitleMax store managers how many repossessions they had during a specific period. TitleMax managers would often provide that information assuming I was actually in the repossession business.

11.    Another tactic that I used to gain competitive advantage for Select, was to gain access to and photograph TitleMax "goal boards." Each TitleMax store had a goal board. The goal boards were typically located in back rooms of TitleMax stores, which were not open to the public.

12.    A goal board typically listed a TitleMax store's financial performance goals for the month, the actual financial results from previous months, and the month-to-date financial results. The more established TitleMax stores would have more financial data on their goal boards. I would send the photographs of the goal boards electronically to Select Vice President Jesse Anderson. The data helped Select determine whether to open a Select-branded store in the immediate area to compete with TitleMax.

13.    My method for gaining access to the goal boards was to pose as a potential customer and ask a TitleMax employee if I might use the store's restroom. I would then access the private back office business area and take pictures of the store's goal board as I pretended to look for the restroom. I then emailed the photographs to Select Vice President Jesse Anderson.

2

14.     The first time I photographed a goal board, I was sent to a TitleMax store to act like a potential customer with a LoanStar application.  I was to present the application to the TitleMax employee to find out what they would say about LoanStar.  While in the TitleMax store, I needed to use the restroom, and on my way back to the restroom I saw a goal board and took a picture of it.  I sent the picture to Jesse Anderson, who responded that I should try to take photographs of as many other goal boards from TitleMax locations as I could.  About a week later, Brent Matthews, another Select Vice President, followed up with me to see how many boards I was able to photograph and suggest where I could find more.

15.     Over the span of a year, in 2011 and 2012, I visited TitleMax stores in Texas (including Arlington, Carrolton, Mesquite, and Garland), South Carolina (including Rock Hill, Columbia, and Myrtle Beach), and Alabama (including Tuscaloosa and Birmingham).  In total, I visited approximately 75 TitleMax stores for the express purpose of photographing goal boards.  Of those 75 stores, I successfully photographed approximately 30 goal boards.

16.     I photographed the goal boards with a smartphone provided to me by Select and I used the email address provided to me by Select to transmit the photographs to Select Vice President Jesse Anderson.

17.     It is my understanding that gaining access to TitleMax non-public areas and photographing TitleMax goal boards became a uniform practice of Select.

18.     For example, in my last assignment with Select, I participated in a conference call with Area Managers in Ohio, shortly before TitleMax entered the Ohio market.  During the call, the Area Managers were told by Select upper management that they should comply with Select's company-wide practice and direct their employees to enter TitleMax stores under false pretenses so that they could gain access to and photograph TitleMax goal boards.

19.     Another tactic that I observed was LoanMax employees using DMV records to identify which competitor bought out their customers' loans in an effort to confirm whether LoanMax was losing business to TitleMax.

20.     I make this affidavit based upon my personal knowledge for use in this lawsuit and for any legal purpose.

3

WITNESS my hand and seal, this 10th day of January, 2015.

ZACHARY FARMER

Sworn to and subscribed before me
this _____10_____ day of January, 2015.

Notary Public
_____HAMILTON_____ County, _____OH_____
My commission expires _____5-30-16_____

NOTARIAL SEAL
STATE OF OHIO

MICHAEL P. ROLFES
NOTARY PUBLIC - OHIO
COMMISSION # 2011-RE-374726
MY COMMISSION EXPIRES MAY 30, 2016

4

# EXHIBIT 2

| | |
|---|---|
| **From:** | William Purce <William.Purce@occc.texas.gov> |
| **Sent:** | Thursday, November 12, 2015 9:47 AM |
| **To:** | Victoria Newman |
| **Subject:** | Re: Buyouts of Competitors |

Dear Ms. Newman:

At this time, our agency has not issued any advisory bulletins on this issue related to credit access businesses (there are some advisory letters dealing with regulated lenders and property tax lenders). However, our agency has investigated this issue in the past and has instructed licensees to provide and accept the payoffs. Our analysis of this issue is very similar to the analysis discussed in the South Carolina opinion letter.

Respectfully,


William Purce
Senior Administrative Review Examiner
Office of Consumer Credit Commissioner
2601 North Lamar Boulevard
Austin, Texas 78705
512.936.7626
william.purce@occc.texas.gov



TEXAS OFFICE OF CONSUMER
CREDIT COMMISSIONER

| | |
|---|---|
| **From:** | Victoria Newman <Victoria.Newman@titlemax.com> |
| **To:** | 'William Purce' <William.Purce@occc.texas.gov> |
| **Date:** | 11/12/2015 9:07 AM |
| **Subject:** | Buyouts of Competitors |

Hi William,

I hope you are doing well. A question came up that I would like your help resolving.

I take the position that a buyout request from a customer should not be refused regardless of whether it's from a competitor. South Carolina has issued similar guidance on the matter (attached for your reference). A refusal of the buyout (or failure to immediately return the title or provide a letter of guaranty), in my opinion, would be akin to a prepayment penalty.

Has the OCCC issued guidance on this issue before? I haven't found any but I could have missed it.

Thanks,

Victoria

Victoria H. Newman
Sr. Compliance and Corporate Counsel

**APPENDIX 0283**

**TMX Finance**
15 Bull Street, Ste 200
Savannah, GA  31401
Direct line:  (912) 503-2824
Facsimile:  (866) 591-4638
Email:  victoria.newman@titlemax.com

**PRIVILEGED AND CONFIDENTIAL:**  This e-mail and any attachments hereto are intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information.  If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail.  You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

"NOTE: This e-mail, any attachments, and the information contained therein are confidential. The information contained in this email and/or any attachments is intended only for use by the intended recipient(s) and may contain trade secret or otherwise proprietary information of TMX Finance LLC and/or its affiliates and subsidiaries (collectively, "TitleMax"). If you are not the intended recipient of this e-mail, any use, dissemination, distribution or copying of this e-mail, any attachments, or the information contained therein, is strictly prohibited. If you received this e-mail and you are not an intended recipient, please immediately notify TitleMax e-mail administrator at: abuse@titlemax.biz and permanently delete the original and any copy of this e-mail, any attachments, and/or any printouts thereof."

**APPENDIX 0284**



# The State of South Carolina
# Department of Consumer Affairs

2221 DEVINE STREET, STE 200
PO BOX 5757
COLUMBIA, SC 29250-5757

*Celebrating Over 35 Years of Public Service*

Carri Grube Lybarker
Administrator

Commissioners
David Campbell
Chair
Columbia
Johnny E. Soschee
Vice Chair
Piedmont
Mark Hammond
Secretary of State
Columbia
Clifford Ray Keasler
Myrtle Beach
Terrell A. Parrish
Greer
Magaly P. Penn
Simpsonville
W. Fred Pennington, Jr.
Taylors

September 12, 2014

*Via Hand Delivery and Electronic Mail*

Mr. Jim Copeland
Acting Commissioner/ Assistant Commissioner
Consumer Finance Division
S.C. State Board of Financial Institutions
1205 Pendleton Street, Suite 306
Columbia, SC  29201

   RE: **Opinion Request- Prepayment Penalties**

Dear Jim:

   You have requested an opinion regarding practices employed by supervised lenders when a loan is being prepaid by a third party on behalf of a consumer, the original debtor.  Consumer credit transactions are governed by the South Carolina Consumer Protection Code ("the Code"), S.C. Code Ann. sections 37-1-101 *et seq.*[1]  Right to prepay a consumer loan is addressed in § 37-3-209 with prepayment of credit sales addressed in § 37-2-209.  From the information you have provided, the following question has been posed and will be addressed herein in the form of a general answer that could change depending on specific circumstances:

     Can a lender subject to the Code charge a consumer a different interest rate than currently being assessed and impose different terms regarding accepted method of payment or otherwise impose varying contract terms when a consumer loan is being prepaid by a third party on behalf of the consumer?

   As stated above, § 37-3-209 governs the consumer's right to prepay a consumer loan. The section specifically states: "…the debtor may prepay in full the unpaid balance of a consumer loan, refinancing, or consolidation at *any time without penalty*." (Emphasis added.)  A "debtor" is defined as "any person who is an obligor in a credit transaction, including any cosignor, comaker, guarantor, endorsee or surety, and *the assignee of any obligor*, and also includes *any person who agrees to assume the payment of a credit obligation*." (Emphasis added.) *See* § 37-1-301(14).  Lastly, "person" includes not only an individual, but an organization. *See* § 37-1-301(20).  The right of a debtor to prepay a loan in full without penalty cannot be waived.  *See* § 37-1-107(1).

---

[1] Further reference to the South Carolina Code of Laws will be by Code section only.

| | | | | |
|---|---|---|---|---|
| **ADMINISTRATOR** 803-734-4233 **ACCOUNTING** 803-734-4264 Fax: 803-734-4299 | **PUBLIC INFORMATION** 803-734-4286 Fax: 803-734-4229 | **CONSUMER ADVOCACY** 803-734-4200 Fax: 803-734-4267 | **ENFORCEMENT/ INVESTIGATORS** 803-734-4236 Fax: 803-734-4287 | **CONSUMER COMPLAINTS** 803-734-4200 Fax: 803-734-4286 |

E-Mail: SCDCA@SCCONSUMER.GOV  Toll Free in SC: 800-922-1594
Website:  WWW.CONSUMER.SC.GOV  Voice/TT: 800-735-2905

**APPENDIX 0285**

The cardinal rule of statutory construction is to ascertain and effectuate the Legislature's intent from the plain language of the statute. Burns v. State Farm Mut. Auto Ins. Co., 297 S.C. 520, 522, 377 S.E.2d 569, 570 (1989). The words of the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation. Hitachi Data Svs. Corp. v. Leatherman, 309 S.C. 174, 178, 420 S.E.2d 843,846 (1992). Statutory provisions of the Code shall be liberally construed as well as applied to promote the Title's underlying purposes and policies. § 37-1-102(1); Davis v. NationsCredit Financial Services Corporation et al., 326 S.C. 83, 86, 484 S.E.2d 471,472 (1997). The primary purpose of the Code is to protect consumers, as evidenced within relief provisions contained therein. Camp v. Springs Mortgage Corp., 310 S.C. 514,516, 426 S.E.2d 304,305 (1993). Section 37-1-102 further delineates the purposes and policies of the Code, including to foster competition among suppliers, protect borrowers against unfair practices and encourage fair and economically sound consumer credit practices. See § 37-1-102(2)(c)-(e).

The plain language of the Code permits a debtor to prepay a loan in full without incurring any type of penalty. Further, debtor is defined broadly to not only include the original consumer who has promised or otherwise is obligated to pay the debt, but to assignees and other persons who agree to assume responsibility of paying the debt as well, including an organization.

In the scenario you provided, a third party is attempting to prepay a loan in full on behalf of the consumer. The Lender, however, contracted for alternate interest rate terms to apply should a third party, including but not limited to, a bank, credit union, title loan, automobile dealership or insurance company pay off the loan. In construing the statutory language of the Code liberally to effectuate its purposes and policies, the Department concludes such alternate terms would constitute a prepayment penalty if the third party is an assignee of the obligor or entered into an agreement to pay the loan. The third party assuming the obligation is considered the debtor and, thus, is entitled to pay off the loan under the same terms as the consumer whom originally incurred the debt/obligation. See § 37-1-301(14).

You have also posed a scenario whereby the Lender requires that the original debtor be present at the time the third party pays off the loan. As explained above, however, when the third party assumed the obligation, the third party is considered the debtor. If the Lender refuses to accept payment from the third party on the basis that the original debtor is not present, this amounts to a violation § 37-3-209 as the Lender is depriving the debtor of the right to prepay.

Lastly, you posed a scenario whereby the Lender refuses to accept the same type of payment method from a third party attempting to prepay a loan in full as it has previously contracted for or otherwise accepted from the original debtor. While this may not be considered a prepayment penalty, the practice could constitute breach of contract if the contract delineates the types of payment accepted or if the Lender has previously, through a course of dealings, accepted payment from the original debtor via the same method the third party is attempting to utilize. See § 37-3-103(3); Dowling v. Charleston & W.C. Ry. Co., 105 S.C. 475, 81 S.E. 313 (1913); Weisz Graphics Div. v. Peck Industries, 304 S.C. 101, 403 S.E.2d 146 (Ct. App. 1991).

APPENDIX 0286

When a debtor exercises the right to prepay pursuant to § 37-3-209, please also be mindful of other provisions of the Code governing prepayment.  Section 37-3-210, for example, regulates prepayment rebates for consumer loans while § 37-4-108 states the parameters for the treatment of refunds of insurance premiums upon prepayment of a consumer loan.

Pursuant to sections 37-6-104(4) and 37-6-506(3), reliance upon an administrative interpretation provides protection from any penalties authorized by the Code if the administrative interpretation is subsequently declared invalid by a court or is rescinded.  Please do not hesitate to contact me directly at 803-734-4297 should you need any further information.

Best Regards,

Carri Grube Lybarker, Esq.

# EXHIBIT 3

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL | § | IN THE DISTRICT COURT OF |
| SERVICES, LLC, ET AL. | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, | § | |
| INC., ET AL. | § | 152nd JUDICIAL DISTRICT |

## AFFIDAVIT OF JOHN SALINAS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned authority, appeared John Salinas, known to me to be the person whose name is subscribed hereto and, after being duly sworn by me, stated as follows:

1.      My name is John Salinas. I am over the age of 21, of sound mind, and competent to make this Affidavit.

2.      I am a district manager of Defendant/Counterplaintiff TitleMax of Texas, Inc. ("TitleMax"). I have knowledge of the facts stated in this Affidavit through my role with TitleMax, and each of the statements made below is based upon my knowledge.

3.      This Affidavit concerns a very good, repeat TitleMax customer who was solicited by Plaintiffs/Counterdefendants Wellshire Financial Services, LLC and Meadowwood Financial Services, LLC ("LoanStar"). This customer highly values the customer's privacy and confidentiality and insists on remaining anonymous. For ease of reference, the customer will be referred to as "Peter," which is not the customer's real name.

4.      On November 14, 2015, Peter called a TitleMax store in Pasadena, Texas to obtain the minimum amount he would need to pay to refinance his loan. While he was on the phone, he said that LoanStar called him a few days prior in an attempt to buyout his loan. LoanStar referenced TitleMax; knew that Peter has a loan with TitleMax; told Peter that LoanStar could offer him a better deal; and wanted to buyout Peter's loan with TitleMax. Peter has not even told his own family that he has a loan with TitleMax and therefore he was very concerned about how LoanStar obtained his information. He asked if TitleMax and LoanStar are affiliated or if TitleMax sells or gives away its customers' information to LoanStar. He was disturbed that LoanStar had obtained his information and he felt violated. He was also worried that others would find out he has a title loan, which is a very personal matter for him.

5.      Later that day when Peter arrived at the store to refinance his loan, he was still upset that LoanStar had obtained his information to solicit his loan. He continued to discuss what happened and he reiterated everything he reported in Paragraph 3. After some time and effort,

the store was able to assure Peter that TitleMax did not sell or give away his information to LoanStar.

_John Salinas_

John Salinas

Subscribed and sworn to before me by John Salinas on this the 20th day of January, 2016, to certify which witness my hand and seal of office

_Edward Aguirre_

Notary Public in the State of Texas

EDUARDO ANTONIO AGUIRRE
126602710
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
OCT. 19, 2016

- 2 -

**APPENDIX 0290**

7/6/2017 11:41 AM
Chris Daniel - District Clerk Harris County
Envelope No. 18023903
By: KATINA WILLIAMS
Filed: 7/6/2017 11:41 AM

CAUSE NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, ET AL. | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TMX FINANCE LLC, ET AL. | § | 152nd JUDICIAL DISTRICT |

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., and TMX FINANCE OF TEXAS, INC. | § § § | |
| v. | § § | |
| WELLSHIRE FINANCIAL SERVICES, LLC and MEADOWWOOD FINANCIAL SERVICES, LLC | § § § | |

**DEFENDANTS TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; AND TMX FINANCE LLC'S FOURTH AMENDED ANSWER AND AFFIRMATIVE DEFENSES**

Defendants TMX Finance of Texas, Inc.; TitleMax of Texas, Inc.; and TMX Finance LLC (collectively, "Defendants") submit this Fourth Amended Answer and Affirmative Defenses to the Second Amended Petition, and all amendments and supplements thereto (the "Petition"), filed by Plaintiffs Wellshire Financial Services, LLC; Meadowwood Financial Services, LLC; and Integrity Texas Funding, LP (collectively, "Plaintiffs").

## I.
## GENERAL DENIAL

In accordance with the rights granted to Defendants by Rule 92 of the Texas Rules of Civil Procedure, Defendants generally deny each and every material allegation contained in Plaintiffs' Petition and demand that Plaintiffs be required to prove their charges and allegations against Defendants as required by the Constitution and the laws of the State of Texas.

**APPENDIX 0291**

## II.
## AFFIRMATIVE DEFENSES

1.      The Petition fails to state a claim upon which relief may be granted.

2.      Plaintiffs' claims are barred because the acts complained of in the Petition did not cause Plaintiffs' alleged injuries or losses.

3.      Plaintiffs' claims are barred in whole or in part by the affirmative defenses of justification or privilege.

4.      Plaintiffs' damages, if any, were proximately caused in whole or in part by the acts or omissions of negligence or other bad conduct of other parties or third parties over whom Defendants had no control or right of control or that were acting outside the scope of employment.

5.      Plaintiffs' claims are barred in whole and in part by the affirmative defense of independent discovery or development without use of improper means.

6.      Plaintiffs' claims are barred due to Plaintiffs' own actions, failure to act, negligence and/or legal fault.

7.      Defendants acted in good faith and not with willful or reckless disregard of the law.

8.      Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.

9.      Defendants assert the affirmative defenses of res judicata and collateral estoppel.

10.     Plaintiffs' claims are barred at least in part by the applicable statutes of limitation.

11.     Plaintiffs' claims are barred by application of the doctrine of laches.

12.     Plaintiffs' claim for punitive damages should be dismissed to the extent an award of punitive damages would violate the U.S. Constitution or other applicable law.

13.     Plaintiffs' trespass claim is barred in whole or in part by application of the innocent trespasser doctrine.

APPENDIX 0292

14.     Plaintiffs' trespass claim is barred in whole or in part by effect of permission or invitation.

15.     Plaintiffs' claims are barred in whole or in part due to lack of standing to bring their claims.

16.     Plaintiffs' claims are barred in whole or in part as there are no lost trade secrets by an alleged DMV database search.

17.     Plaintiffs' claims are barred in whole or in part as there has been no improper solicitation of Plaintiff's customers.

18.     Plaintiffs' claims are barred in whole or in part as Plaintiffs have not identified any specific lost customers or contracts, and such claims are based on speculation.

19.     Plaintiffs' claims are barred as they have engaged in a nation-wide scheme to misappropriate Defendants' confidential, proprietary and/or substantially secret information.

20.     Plaintiffs have brought groundless claims in bad faith and for the purpose of harassment, have intentionally and unreasonably delayed the prosecution, defense and trial of this case, have caused unnecessary and expensive discovery, have failed to timely comply with court orders and discovery requests, have impeded discovery motions by delaying and obstructing attempts to confer on discovery motions, and continue to pursue objectively unreasonable claims unnecessarily multiplying these proceedings.

21.     Defendants assert any other affirmative defenses to which they are entitled.

### III.
### PRAYER

Defendants pray that: (1) Plaintiffs take nothing by this suit; (2) Defendants recover their attorneys' fees, costs, and expenses incurred in this suit; and (3) Defendants have such other and further relief to which they may be entitled.

Dated: July 6, 2017

APPENDIX 0293

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: */s/ L. Bradley Hancock*
L. Bradley Hancock
State Bar No. 00798238
brad.hancock@hklaw.com
Jeffrey D. Anderson
State Bar No. 24087100
jeffrey.anderson@hklaw.com
1100 Louisiana Street, Suite 4300
Houston, TX 77002-5227
713-821-7000 (telephone)
713-821-7001 (facsimile)

**GREENBERG TRAURIG, L.L.P.**

Roland Garcia, Jr.
State Bar No. 07645250
garciar@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
713-374-3500 - Telephone
713-374-3505 - Facsimile

COUNSEL FOR DEFENDANTS TMX
FINANCE OF TEXAS, INC.; TITLEMAX OF
TEXAS, INC.; TMX FINANCE LLC; AND
TMX FINANCE HOLDINGS, INC.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on the 6th day of July, 2017.

*/s/ Jeffrey D. Anderson*
Jeffrey D. Anderson

4

**APPENDIX 0294**

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, | § | IN THE DISTRICT COURT |
| LLC, d/b/a LOANSTAR TITLE LOANS, | § | |
| d/b/a/ MONEYMAX TITLE LOANS, and | § | |
| d/b/a LOANMAX; MEADOWWOOD | § | |
| FINANCIAL SERVICES, LLC, d/b/a | § | |
| LOANSTAR TITLE LOANS, and d/b/a/ | § | |
| MONEYMAX TITLE LOANS; and | § | |
| INTEGRITY TEXAS FUNDING, LP, | § | |
| | § | OF HARRIS COUNTY, TEXAS |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC. | § | |
| | § | 152nd JUDICIAL DISTRICT |
| Defendants. | § | |
| | § | |
| | § | |

## PLAINTIFFS' THIRD AMENDED PETITION AND
## REQUEST FOR DISCLOSURE

COME NOW, Plaintiffs WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a

LOANSTAR TITLE LOANS, d/b/a/ MONEYMAX TITLE LOANS, and d/b/a LOANMAX;

MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and

d/b/a/ MONEYMAX TITLE LOANS;  and INTEGRITY TEXAS FUNDING, LP and file this

Amended Petition and Request for Disclosure, and respectfully show the following:

### I.    DISCOVERY

1.    Pursuant to Tex. R. Civ. P. 190.3, discovery is to be conducted under a Level 3

discovery control plan.

## II.    PARTIES

2.    Plaintiff Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans ("LoanStar") is a limited liability company organized under the laws of the State of Georgia. LoanStar is registered to transact business in the State of Texas.

3.    Plaintiff Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a/ Moneymax Title Loans ("Meadowwood") is a limited liability company organized under the laws of the State of Georgia.  Meadowwood is registered to transact business in the State of Texas.

4.    Plaintiff Integrity Texas Funding, LP ("Integrity") is a limited partnership organized under the laws of the State of South Carolina.  Integrity is registered to transact business in the State of Texas.

5.    LoanStar, Meadowwood, and Integrity are hereafter referred to collectively as "Plaintiffs."

6.    Defendant TMX Finance Holdings, Inc. ("TMX Finance Holdings") is a corporation organized under the laws of the State of Delaware, whose home office address is 15 Bull Street, Suite 200, Savannah, GA 31401.  Defendant TMX Finance Holdings has engaged in business in the State of Texas, does not maintain a regular place of business in the State of Texas, does not have a registered agent for service of process in the State of Texas, and therefore may be served with process through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.

7.    Defendant TMX Finance, LLC ("TMX Finance") is a limited liability company organized under the laws of the State of Delaware, whose home office address is 15 Bull Street, Suite 200, Savannah, GA 31401.  Defendant TMX Finance has engaged in business in the State

2

of Texas, does not maintain a regular place of business in the State of Texas, does not have a registered agent for service of process in the State of Texas, and therefore may be served with process through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.

8.     Defendant TMX Finance of Texas, Inc. ("TMX Finance Texas") is a corporation organized under the laws of the State of Delaware.  TMX Finance Texas is registered to transact business in the State of Texas and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

9.     Defendant TitleMax of Texas, Inc. ("TMX Texas") is a corporation organized under the laws of the State of Delaware.  TMX Texas is registered to transact business in the State of Texas and may be served with process by serving its registered agent, CT Corporation System, at 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

10.     Defendants TMX Finance Holdings, TMX Finance, TMX Finance of Texas, and TMX Texas are jointly and severally liable for Plaintiffs' claims and are collectively referred to as "Defendants" or "TitleMax."

### III.     JURISDICTION

11.     The court has jurisdiction over the lawsuit because the amount in controversy exceeds this court's minimum jurisdictional requirements.

12.     The court has jurisdiction over Defendants, nonresident corporations, because Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas.

APPENDIX 0297

## IV.    VENUE

13.    Venue is proper in Harris County under Chapter 15 of the Tex. Civ. Prac. & Rem. Code, including but not limited to §15.002.

## V.    ACTS OF AGENTS

14.    When it is alleged that Defendants did any act, it is meant that Defendants performed or participated in such act or thing, or Defendants' officers, agents, or employees performed or participated the act or thing and were authorized to do so by Defendants.

## VI.    FACTS

### A.    PLAINTIFFS' BUSINESS

15.    LoanStar is licensed and operates as a Credit Services Organization ("CSO") under Texas law.

16.    Meadowwood is licensed and operates as a Credit Services Organization ("CSO") under Texas law.

17.    Integrity operates as a consumer lender to provide secured and unsecured loans to customers.

18.    LoanStar brokers loans exclusively with Integrity.  The loans that LoanStar and Integrity specialize in offering are loans secured by customers' motor vehicles.

19.    Meadowwood brokers loans exclusively with Integrity.  The loans that Meadowwood and Integrity specialize in offering are loans secured by customers' motor vehicles.

20.    The major value of a customer's business to Plaintiffs is the retention of that customer, both for refinances and future loans.  Therefore, Plaintiffs invest significant time and

4

resources in developing the existing customer relationship.  Due to these efforts, customers will return to Plaintiffs for future loans and use Plaintiffs to refinance their loans.  It is this customer retention that produces value for Plaintiffs.

21.     To preserve that value, Plaintiffs expend significant effort and money to obtain and retain the business of its customers.  Plaintiffs' customer list is proprietary and confidential, and the information is appropriately protected from any unauthorized access or distribution.

22.     LoanStar shares its proprietary customer list and customer loan information with Integrity under contractual assurances of confidentiality and appropriate treatment.  LoanStar's customers are Integrity's customers.

23.     Meadowwood shares its proprietary customer list and customer loan information with Integrity under contractual assurances of confidentiality and appropriate treatment.  Meadowwood's customers are Integrity's customers.

## B.     DEFENDANTS' BUSINESS

24.     Defendants are part of a family of related companies operating under the name "TitleMax."  TitleMax is engaged in the business of automobile title lending, and is a competitor of Plaintiffs.

25.     Defendant TMX Texas operates as a CSO under Texas law and is a competitor of Plaintiffs.

26.     Defendant TMX Finance Texas also operates as a CSO under Texas law and is a competitor of Plaintiffs.

27.     Defendant TMX Finance is a parent company which owns all ownership and membership interests of various operating subsidiaries, including Defendants TMX Finance

5

Texas and TMX Texas.  Defendant TMX Finance manages, directs, and controls all operations of its operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas.

28.     Tracy Young is the CEO of TMX Finance and controls all aspects of the company.   Mr. Young owns TMX Finance through his ownership interest in TMX Finance Holdings.

29.     Defendant TMX Finance Holdings is a parent company which owns all ownership and membership interests in Defendant TMX Finance, and thus indirectly owns Defendants TMX Finance Texas and TMX Texas.

30.     Mr. Young is also the CEO of TMX Finance Holdings.  Mr. Young also controls all aspects of TMX Finance Holdings.  Mr. Young owns TMX Finance Holdings.

31.     Otto Bielss is a President or Senior Executive for the TitleMax family of companies.  In those capacities, Mr. Bielss controls or directs the business activities of those companies, including their sales and marketing operations.

### C.     TEXAS DMV DRIVER INFORMATION DATABASE

32.     The Texas Department of Motor Vehicles ("DMV") maintains a database of records containing drivers' personal information collected in connection with obtaining a driver's license and/or vehicle registration ("DMV Records").  The DMV sells DMV Records to certain entities who are authorized to resell the DMV Records under very limited circumstances (the "Authorized Resellers").  Access to DMV Records is severely restricted to only a few permissible uses because of the sensitive personal identifying nature of the information contained therein.  Violation of the federal and state laws limiting access to DMV Records is a punishable criminal offense.

6

### D.    CONDUCT OF DEFENDANTS' EMPLOYEES OR AGENTS

33.    Upon information and belief, Defendants have conspired to surreptitiously target and collect the license plate numbers of the customers in LoanStar's and Meadowwood's parking lots, and have used that information to perform impermissible searches for the customers' personal information in DMV Records.  Defendants have also conspired to impermissibly search the DMV Records directly by lienholder to identify Plaintiffs' customers, obtain their personal information, and use that information for impermissible purposes.

34.    Access to the non-public DMV Records is strictly prohibited by state and federal statute, including the Texas Motor Vehicle Records Disclosure Act, Tex. Transp. Code § 730.001 et seq., and the federal Driver's Privacy Protection Act, 18 U.S.C. § 2721 et seq., except for specifically enumerated purposes.

35.    Therefore, in order to access these DMV Records, Defendants are required to— and do in fact—falsely represent to the Authorized Resellers that they will use the information therein for a statutorily permitted purpose.  Defs.' No Evidence and Traditional Summary Judgment Mtn. filed February 5, 2016, at 16-18.  Defendants actually use such information to solicit Plaintiffs' customers for loan products absent their consent or an opportunity to prohibit such solicitation, which is impermissible.  In fact, Defendants do not even advise the customers that their information was obtained from DMV Records.

36.    Through these acts, Defendants have sought to collect and compile the information contained in Plaintiffs' confidential customer lists for Defendants' use in the direct contact and solicitation of Plaintiffs' customers.  Specifically, Defendants' fraudulent scheme is to obtain access to the identities and contact information belonging to Plaintiffs' customers via the DMV Records—which requires an affirmative act of misrepresentation to the Authorized

7

Resellers as described above—and then to solicit the identified customers via methods including direct mail and telephone calls, offering to buy out their loan(s) with Plaintiffs on terms they purport to be favorable for the customers.  This conduct comprises a single, continuous scheme, each individual act being dependent on the commission of the other acts in order for the scheme to carry out its fraudulent purpose.

37.     For example, on or about January 18, 2013, Defendants utilized the United States Postal Service to send a letter to Plaintiffs' existing customer Ana Maria Ochoa, offering to buy out her current loan by issuing her a new loan on purportedly better terms.  Defendants could not have learned of Ms. Ochoa's identity or that she was an existing title loan customer, other than via their illegal searches of the DMV records.  Pltfs.' Appl. for Temp. Restraining Order ("TRO Appl.") filed June 8, 2013, Ex. E.  This tactic was repeated on countless occasions throughout the State of Texas.

38.     Upon information and belief, the fraudulent customer-stealing conspiracy outlined above was approved and sanctioned at the highest levels of Defendants' management structure located in the State of Georgia.  Specifically, upon information and belief, it was directed and concealed by Defendants' top executives and ownership including Tracy Young and Otto Bielss.  Mr. Young and Mr. Bielss are therefore co-conspirators in this scheme.

39.     Indeed, Plaintiffs placed Defendants' General Counsel, Vin Thomas (also located in the State of Georgia), on notice that this conduct was occurring as of at least November 15, 2012 via letter directed to him.  Pltfs.' TRO Appl., Ex. F.  Immediately thereafter, Mr. Thomas discussed Plaintiffs' letter with Defendants' senior management, including Mr. Young and Mr. Bielss.  In a responsive letter dated December 6, 2012, Mr. Thomas denied the conduct was occurring, but acknowledged that it would be improper if it were.  Pltfs.' TRO Appl., Ex. G.

APPENDIX 0302

40.     Notwithstanding Defendants' assurances, their fraudulent scheme not only continued, it expanded.  Pltfs.' TRO Appl., Exs. E, H.  For example, in the spring of 2013, Defendants, via General Manager Ishmael Hernandez, conducted such a large search of one Authorized Reseller's databases that it "overwhelmed" its servers and resulted in other customers encountering difficulty in obtaining information from them.  *Id*.  Mr. Hernandez emailed his colleague Keith Haberstroh (also a General Manager) a list of Plaintiffs' customers obtained from the Authorized Reseller, and Mr. Haberstroh forwarded the list to various other of Defendants' General Managers, as well as two of Defendants' retail stores, instructing them to use the list for a "mailer."  Pltfs.' TRO Appl., Exs. S, T.

41.     In a similar instance, Mr. Hernandez emailed Defendants' employee a list of Plaintiffs' customers' identifying information obtained from an Authorized Reseller, stating—in an email titled "GOOD LUCK"—"Here are some leads just for your area."  See Plaintiffs' TRO Appl., Ex. U.  Later, at deposition in this case, Mr. Hernandez asserted his Fifth Amendment right against self-incrimination when asked about these activities, as did three other employees engaged in similar conduct (Felix DeLeon, James Batterson, and Lucia Grajeda).

42.     In May 2013, an employee and whistleblower using the pseudonym "Humble Veritas" contacted Defendants' corporate human resources and legal departments alleging that Defendants' employees were engaging in the conduct described herein.  In contrast to Defendants' assurances to Plaintiffs that the conduct was not occurring and would be considered improper if it was, Defendants' corporate departments advised Humble Veritas that the conduct in question constituted "an acceptable business practice."

43.     Despite this e-mail exchange in May 2013, and despite the knowledge of Defendants' top management and ownership (including Mr. Young and Mr. Bielss) that

9

Defendants were engaging in the conduct described herein, Defendants abjectly failed to produce these "smoking gun" e-mails to Plaintiffs in discovery.  In February 2015, after nothing had been done to rectify Defendants' illegal and fraudulent conduct, Humble Veritas forwarded his e-mails to Plaintiffs' counsel, stating that they may be of "interest" in the pending litigation.

44.     Defendants' illegal and unlawful actions have interfered with and hindered Plaintiffs' ability to conduct their businesses and affairs with such customers, causing them to lose thousands of customers to Defendants as a direct result of the fraudulent scheme alleged herein.

45.     As a result, Plaintiffs have lost millions of dollars in profits as a direct result of the fraudulent scheme alleged herein.

## VII.    CAUSES OF ACTION

### A.    COUNT I – MISAPPROPRIATION OF PLAINTIFFS' TRADE SECRETS

46.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

47.     Plaintiffs' customer list and related loan information are trade secrets under Texas law.

48.     Defendants have acquired or discovered Plaintiffs' trade secret by improper means.  Defendants have performed unlawful and impermissible searches for the drivers' personal information in the DMV Records in order to target Plaintiffs' customers for direct contact and solicitation.  This conduct is continuous and ongoing.

49.     Defendants have used, and continue to use, Plaintiffs' trade secrets without authorization from Plaintiffs.  Upon information and belief, Defendants have accessed information from the DMV Records to circumvent the measures Plaintiffs have in place to

10

prevent unauthorized access to Plaintiffs' trade secrets.  Defendants then used the unlawfully accessed personal information to solicit Plaintiffs' customers for business.

50.     Defendants' unauthorized use of Plaintiffs' trade secrets has harmed Plaintiffs. Defendants were and are in fact using the personal information, including the name, address, date of birth, and driver's license number, to directly contact and solicit Plaintiffs' existing and prospective customers.  Defendants' unlawful efforts have caused Plaintiffs to lose customers to Defendants.

51.     As a direct and proximate result of Defendants' infringing acts, Plaintiffs have suffered damages in the form of the loss of existing and prospective customers, loss of business goodwill, loss of interest payments under the current loan contracts, loss of interest payments under the prospective loan contracts, and loss of associated prospective fees in an amount not less than that which will make Plaintiffs whole and which will be proven at trial.

52.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Plaintiffs' legitimate rights.  Accordingly, Plaintiffs are entitled to recover exemplary damages in an amount to be determined by a jury.

### B.     COUNT II - TORTIOUS INTERFERENCE WITH INTEGRITY'S LOAN CONTRACTS

53.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

54.     Defendants had actual knowledge of the valid Loan Contracts existing between Integrity and its customers.

55.     Despite their actual knowledge of the Loan Contracts, Defendants willfully and intentionally interfered with the customers' performance of the Loan Contracts by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting

11

and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers.  Defendants were not parties to the Loan Contracts, had no rights or interests in the Loan Contracts and no legitimate justification or excuse for their interference.

56.     Integrity has been damaged as a direct and proximate result of Defendants' conduct including the loss of existing customers and Loan Contracts, loss of business goodwill, and loss of interest due under the Loan Contracts, in an amount not less than that which will make Integrity whole and which will be proven at trial.

57.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of Integrity's legitimate rights.  Accordingly, Integrity is entitled to recover exemplary damages in an amount to be determined by a jury.

### C.     COUNT III - TORTIOUS INTERFERENCE WITH INTEGRITY'S PROSPECTIVE LOAN CONTRACTS AND BUSINESS RELATIONSHIPS

58.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

59.     Defendants had actual knowledge of the relationship between Integrity and its customers, including the reasonable probability that Integrity would have entered into business relationships with its repeat customers.

60.     Despite Defendants' actual knowledge of the current and prospective relationships between Integrity and its customers, Defendants willfully and intentionally interfered with Integrity's prospective contracts and business relationships by one, or both, of the following independently tortious and unlawful acts for the purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate

12

numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching

the DMV Records by lienholder for Integrity's customers.  Defendants had no legitimate right,

justification, or excuse to interfere in the relationship between Integrity and its customers, and

Defendants' conduct was intentionally calculated to damage Integrity.

61.     Integrity has been damaged as a direct and proximate result of Defendants'

conduct including the loss of prospective Loan Contracts, loss of business goodwill, and loss of

interest due under the prospective Loan Contracts, in an amount not less than that which will

make Integrity whole and which will be proven at trial.

62.     Defendants' conduct was committed intentionally, knowingly, and with callous

disregard of Integrity's legitimate rights.  Accordingly, Integrity is entitled to recover exemplary

damages in an amount to be determined by a jury.

### D.     COUNT IV - TORTIOUS INTERFERENCE WITH LOANSTAR'S AND MEADOWWOOD'S PROSPECTIVE CSO CONTRACTS AND BUSINESS RELATIONSHIPS

63.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

64.     Defendants had actual knowledge of the relationship between LoanStar and

Meadowwood and their existing customers, respectively, including the reasonable probability

that LoanStar and Meadowwood would have entered into business relationships with their

respective repeat customers.

65.     Despite Defendants' actual knowledge of the relationship between LoanStar and

its customers, and Meadowwood and its customers, Defendants willfully and intentionally

interfered with LoanStar's and Meadowwood's respective, prospective contracts and business

relationships by one, or both, of the following independently tortious and unlawful acts for the

purpose of directly contacting and soliciting Plaintiffs' customers: (1) surreptitiously recording the customers' license plate numbers to perform impermissible searches of the DMV Records or (2) impermissibly searching the DMV Records by lienholder for Integrity's customers. Defendants had no legitimate right, justification, or excuse to interfere in the relationship between LoanStar and its customers, and between Meadowwood and its customers, and Defendants' conduct was intentionally calculated to damage LoanStar and Meadowwood.

66.     LoanStar and Meadowwood have been damaged as a direct and proximate result of Defendants' conduct including the loss of existing customers, loss of business goodwill, and loss of CSO Fees under the prospective CSO Contracts, in an amount not less than that which will make LoanStar and Meadowwood whole and which will be proven at trial.

67.     Defendants' conduct was committed intentionally, knowingly, and with callous disregard of LoanStar's and Meadowwood's legitimate rights.  Accordingly, LoanStar and Meadowwood are entitled to recover exemplary damages in an amount to be determined by a jury.

### E.     COUNT V – CIVIL RICO

68.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

69.     At all relevant times, each Defendant was a "person" within the meaning of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(3).

70.     All Defendants, along with their ownership and executives including Mr. Young and Mr. Bielss, constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1964(4), that engages in, and the activities of which affect, interstate commerce.

14

71.     Specifically, upon information and belief, Defendants' conduct in fabricating a scheme to steal customers from Plaintiffs was invented at the highest levels of Defendants' corporate structure, and then filtered down throughout the same.  Each of the operating subsidiaries of Defendants TMX Finance Holdings and TMX Finance, along with their employees and agents, were complicit in this fraudulent scheme and acted in furtherance of that scheme when they, among other things, falsely represented to the Authorized Resellers that they intended to use the information obtained by DMV Records for a statutorily-permitted purpose, and subsequently used that information to target Plaintiffs' customers with mailed solicitations in violation of 18 U.S.C. § 1341.  The conduct of Defendants and their co-conspirators spans state lines to target Plaintiffs' customers, as it is directed from and approved by executives located in the State of Georgia and utilized the U.S. mail services.  This conspiracy began in at least 2011 and continued through the present.

72.     As a result of Defendants' fraudulent scheme, Plaintiffs have lost relationships with thousands of customers and been denied a fair opportunity to consummate relationships with many more potential customers, causing Plaintiffs to forfeit millions of dollars in lost profits.

## VIII.   EQUITABLE RELIEF

73.     As may be demonstrated in a separate application for temporary restraining order, temporary injunction, and permanent injunction, Plaintiffs request any and all equitable relief to which they may be entitled.

## IX.     JURY DEMAND

74.     Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

15

## XII.   CONDITIONS PRECEDENT

75.    All conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

## XIII.   REQUEST FOR DISCLOSURE

76.    Under Tex. R. Civ. Proc. 194, Plaintiffs request that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XIV.   PRAYER

WHEREFORE, Plaintiffs respectfully pray that Defendants be cited to appear and answer, and on final trial, that Plaintiffs be awarded a judgment against Defendants, jointly and severally, for the following:

a.    Actual damages;

b.    Disgorgement of all profits wrongfully earned by Defendants;

c.    Exemplary damages, including treble damages as authorized by RICO;

d.    Prejudgment and postjudgment interest;

e.    Attorney fees;

f.    Court costs; and

g.    All other relief to which Plaintiffs are entitled.

DATED:  August 16, 2017                Respectfully submitted,

**JOHNSON GARCIA LLP**

By:    */s/ Daniel Johnson*
        Daniel Johnson (SBN 24046165)
        Juan C. Garcia (SBN 24045914)
        Two Arena Place
        7324 Southwest Fwy, Suite 545

16

Houston, Texas 77074
Telephone:  (832) 844-6460
Facsimile:  (832) 844-6868
E-mail:  daniel@johnsongarcialaw.com
E-mail:  juan@johnsongarcialaw.com

And

**WARGO & FRENCH LLP**
Joseph D. Wargo (GA No. 738764)
(Admitted *Pro Hac Vice*)
John C. Matthews (FL No. 89659)
(Admitted *Pro Hac Vice*)
Dustin S. Sharpes (GA No. 522995)
(Admitted *Pro Hac Vice*)
Jeffrey N. Williams (CA No. 274008)
(Pending *Pro Hac Vice*)
999 Peachtree Street, N. E., 26th Floor
Atlanta, Georgia 30309
Telephone:  (404) 853-1500
Facsimile:  (404) 853-1501
E-Mail:  jwargo@wargofrench.com
E-Mail:  jmatthews@wargofrench.com
E-Mail:  dsharpes@wargofrench.com
E-Mail:  jwilliams@wargofrench.com

*Attorneys for Wellshire Financial Services,*
*LLC, d/b/a LoanStar Title Loans, d/b/a*
*MoneyMax Title Loans, and d/b/a LoanMax;*
*Meadowwood Financial Services, LLC, d/b/a*
*LoanStar Title Loans, and d/b/a MoneyMax*
*Title Loans; and Integrity Texas Funding, LP*

**APPENDIX 0311**

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the within and foregoing has been forwarded to all counsel

of record in accordance with Texas Rules of Civil Procedure 21 and 21a on this 16th day of August 2017.

L. Bradley Hancock
Christopher Johnsen
Holland & Knight LLP
1100 Louisiana Street, Suite 4300
Houston, TX 77002

Roland Garcia, Jr.
Greenberg Traurig LLP
1000 Louisiana Street, #1700
Houston, TX 77002

*Attorneys for TMX Finance*
*LLC, TMX Finance of Texas,*
*Inc. and TitleMax of Texas,*
*Inc.*

           */s/ Daniel Johnson*
             Daniel Johnson

**APPENDIX 0312**